UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KEVIN DALE, FRANK HOVAR, JAMIE LAWSON,
MICHAEL LEOPARDO, BRAD LONG, FORTUNATO
SALAMONE, JOEL SJOSTROM, GLEN TURPOFF,
CHRIS WOOD, AND JOSE ZAMARRIPA, as members of
the Board of Trustees of the
NORTHERN ILLINOIS ANNUITY FUND AND PLAN,
on behalf of the Participants of the Northern Illinois
Annuity Fund and Plan,

                Plaintiffs,

     vs.

NFP CORP.,
6833 Stalter Drive, Suite 208,
Rockford, Illinois 61108,

BENEFIT PLANNING SERVICES, INC.,
6833 Stalter Drive, Suite 208,
Rockford, Illinois 61108,

KESTRA FINANCIAL, INC.,
5707 Southwest Parkway, Suite 2-400,
Austin, Texas 78735,

KESTRA ADVISORY SERVICES, LLC,
5707 Southwest Parkway, Suite 2-400,
Austin, Texas 78735,

KESTRA INVESTMENT SERVICES, LLC,
5707 Southwest Parkway, Suite 2-400,
Austin, Texas 78735,

JERRY G. KORCHAK,
2412 Harris Road,
Rockford, Illinois 61107, and

STEPHEN F. CURRY,
1873 Crenshaw Circle,
Vernon Hills, Illinois 60061,

                Defendants.

Case No. 1:20-cv-2942

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

---

**COMPLAINT**

---

## SUMMARY OF THE ACTION

1.      This action is filed under the Employee Retirement Income Security Act

("ERISA"), as amended, 29 U.S.C. § 1001, et seq., against various fiduciaries and parties in

interest of a defined contribution profit sharing annuity plan known as the Northern Illinois

Annuity Fund and Plan (the "Plan").

2.      The Plaintiffs, Kevin Dale, Frank Hovar, Jamie Lawson, Michael Leopardo, Brad

Long, Fortunato Salamone, Joel Sjostrom, Glen Turpoff, Chris Wood, and Jose Zamarripa, are

members of the of the Board of Trustees of the Plan (collectively, the "Trustees").  They bring

this action as Plan fiduciaries directly on behalf of the Plan and the participants of the Plan

("Participants") in order to enforce the provisions of ERISA and recover the losses suffered by

the Plan and obtain injunctive and other equitable relief.

3.      From no later than September 2004 until their termination in October 2017,

Defendants acted as ERISA fiduciaries, charged with acting as investment managers, providing

investment advisory services, and making investment decisions on behalf of the Plan.

4.      Defendants' ERISA fiduciary duties included the duty of loyalty, which required

them to act for the exclusive purpose of providing benefits to the Participants, and to charge the

Plan expenses that are reasonable and relate only to Plan activities.  The duty of loyalty required

Defendants' complete and undivided loyalty to Plan Participants without any dealing for

Defendants' own benefit.

5.     Defendants' ERISA fiduciary duties included the duty of prudence, which required them to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

6.     Defendants' ERISA fiduciary duties required them to disclose certain information to the Trustees relating to, among other things, the investment of Plan assets and the indirect and direct compensation relating to such investments.

7.     Defendant's ERISA fiduciary duties required them to follow the terms of the Plan documents.

8.     Defendants also were required to refrain from causing the Plan to engage in ERISA Section 406 prohibited transactions, from using Plan assets for their own benefit and for the benefit of parties in interest, and from engaging in self-dealing and in conflict of interest transactions without disclosure.

9.     These fiduciary duties are the highest duties known to the law.  Yet, Defendants turned a blind eye to their fiduciary duties.  Their actions reveal they were driven by one goal -- to make as much money as they could for themselves -- regardless of the impact on the Plan and its Participants.  Defendants had a pattern and practice of giving investment advice and making investment decisions for the Plan that would maximize the Defendants' compensation without regard to the best interests of the Plan and its Participants, all the while violating their fiduciary duties.  In order to financially benefit themselves, Defendants administered, advised, and managed the Plan and assets of the Plan as if the Plan was a retail investor instead of what it is, an employee benefit plan and an institutional investor.

3

10.     Defendants breached their fiduciary duties of loyalty and prudence, their duty to disclose, their duty to follow Plan documents, and their duty to not engage in prohibited transactions as defined under ERISA and the common law.

11.     Defendants' violations of ERISA have caused damage to the Plan and its Participants, and the Plan is entitled to the full extent of the remedies available under ERISA including, but not limited to, reimbursement to the Plan for the losses resulting from the fiduciary breaches, an accounting and disgorgement of any fees and profits made by Defendants through the use of Plan assets, and an award of attorneys' fees and costs.

## PARTIES

12.     The Trustees are appointed by sponsoring labor unions and an employer association to a jointly administered Board of Trustees established under the federal Labor Management Relations Act, § 301.

13.     The Plan is required to be administered under the terms of ERISA, the Internal Revenue Code, and other federal laws.  The Plan conducted business and had its offices in Rockford, Illinois at all relevant times.

14.     The registered agent for service of process is the Plan's law firm, Dowd, Bloch, Bennett, Cervone, Auerbach & Yokich, 8 South Michigan Avenue, 19th Floor, Chicago, Illinois 60603.

15.     The Plan is a defined contribution, multiemployer pension plan for the benefit of union members that provides retirement benefits within the meaning of § 3(37) of ERISA, 29 U.S.C. § 1002(37).

16.     The Participants are past and present union members who, at the relevant time, were or are eligible to receive retirement benefits pursuant to the governing Plan documents and ERISA.

HB: 4831-7503-0460.1

17.     Defendant NFP Corp. ("NFP") is a Delaware corporation with its principal place of business located at 340 Madison Avenue, Floor 20, New York, New York 10173 and a branch office located at 6833 Stalter Drive, Suite 200, Rockford, Illinois.  Its registered agent for service of process is CT Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

18.     NFP operates as an insurance broker, consultant, and wealth management company.  Its "Advisor Services Segment" provides independent broker/dealer and registered investment advisory service to financial advisors.

19.     Defendant Benefit Planning Services, Inc. ("BPS") is an Illinois corporation with its principal place of business located at 6833 Stalter Drive, Suite 200, Rockford, Illinois 61108. Its registered agent for service of process is CT Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.  BPS is a subsidiary of NFP.

20.     BPS is in the business of brokering insurance, consulting, and managing wealth. BPS is not a registered investment advisor or registered broker-dealer.

21.     Defendant Kestra Financial, Inc. ("Kestra Financial") is a Texas corporation with its principal place of business located at 5707 Southwest Parkway, Suite 2-400, Austin, Texas 78735-6221.  Its registered agent for service of process is CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

22.     Kestra Financial is a registered investment advisor and registered broker-dealer.

23.     Defendant Kestra Advisory Services, LLC ("Kestra AS") is a limited liability company registered under the laws of Texas with its principal place of business located at 5707 Southwest Parkway, Suite 2-400, Austin, Texas 78735-6221 and a branch office located at 6833

HB: 4831-7503-0460.1

Stalter Drive, Suite 200, Rockford, Illinois 61108. Its registered agent for service of process is CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

24. Kestra AS is a registered investment advisor.

25. Defendant Kestra Investment Services, LLC ("Kestra IS")(f/k/a NFP Advisors Services, LLC, NFP Securities, Inc., and NFP Securities Inc./BD) is a limited liability company registered under the laws of Texas with its principal place of business located at 707 Southwest Parkway, Suite 2-400, Austin, Texas 78735-6221. Its registered agent for service of process is CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

26. Kestra IS a registered brokerage firm.

27. Upon information and belief, Kestra IS was a registered investment advisor, but its registration was terminated on or around September 22, 2016.

28. Upon information and belief, NFP owned Kestra Financial, Kestra AS, and Kestra IS until it sold its majority interest to a private equity firm on or around June 24, 2016. Upon information and belief, NFP retained a minority ownership interest in Kestra and NFP's Chairman and CEO is a member of Kestra's Board of Directors.

29. The Defendant parties in paragraphs 17-28 are affiliated entities that share common management, common ownership, common addresses, common agents, or common financial control, and/or are predecessors or successors in interest to one another.

30. Upon information and belief, Defendant Jerry G. Korchak ("Korchak") is an adult resident of the State of Illinois and resides in Rockford, Illinois 61107.

31. Korchak is a registered investment advisor representative ("IAR") and a registered representative ("RR"), who has been a representative of, associated with, or employed by the Defendants alleged above from no later than September 2004 to the present.

HB: 4831-7503-0460.1

32.     Upon information and belief, Defendant Stephen F. Curry ("Curry") is an adult resident of the state of Illinois and resides in Vernon Hills, Illinois 60061.

33.     Curry is a registered IAR and RR, who has been a representative of, associated with, or employed by the Defendants alleged above from no later than September 2004 to the present.

34.     Upon information and belief, Curry owns an interest in Defendant BPS.

35.     Given the Defendants' overlapping control, ownership, management, employees, representatives, and physical locations, all Defendants are treated herein as a single, joint enterprise, which is liable to the Plan for violations of ERISA and are referred to collectively as "Defendants" unless otherwise noted.

36.     The Defendants who acted as registered broker-dealers and RRs with respect to assets of the Plan may be referred to collectively as "NFP/Kestra Brokers;" the Defendants that were registered investment advisors ("RIA") and IARs at the relevant times may be referred to collectively as "NFP/Kestra;" and Defendants Korchak and Curry may be referred to collectively as the "Representatives."

## JURISDICTION AND VENUE

37.     The Plaintiffs bring this action pursuant to ERISA and under Sections 502(a)(2), 502(a)(3), and all other relevant sections of ERISA (29 U.S.C. § 1001 et seq.), which provide that an ERISA fiduciary may pursue a civil action on behalf of the Plan to remedy breaches of fiduciary duty as set forth in ERISA § 409, 29 U.S.C. § 1109, and to obtain other appropriate equitable relief.

38.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1132(e).

HB: 4831-7503-0460.1

39.     All Defendants are subject to service of process issued from this Court and this Court has personal jurisdiction pursuant to 29 U.S.C. § 1132(e)(2).

40.     Venue with respect to this action lies in the Northern District of Illinois, pursuant 29 U.S.C. § 1132(e)(2) because (a) some or all of the breaches of fiduciary duty giving rise to this action occurred in this district, and (b) Defendants may be found in this district and have agents doing business in this district.

## FACTUAL ALLEGATIONS

### The Northern Illinois Annuity Fund and Plan

41.     In 1981, under the Agreement and Declaration of Trust dated June 25, 1981 (as restated and amended on June 13, 1996 and further amended on February 15, 2017), the Board of Trustees of the Plan established a defined contribution annuity plan governed by ERISA.

42.     Various labor unions and employers entered into collective bargaining agreements that initially provided for the establishment of the Plan and currently mandates that employers contribute to the Plan.  The purpose of the Plan is to provide workers with a trust fund through which to accumulate money to protect themselves and their families in the event of death or disability during their working years, and to provide additional financial security in retirement.

43.     The Plan provides for equal representation on the Board of Trustees by appointees of the participating unions and an association of the contributing employers.

44.     The Plan sponsor is the Board of Trustees.

45.     The Trustees are ERISA fiduciaries of the Plan.

46.     Unlike the type of ERISA plan commonly known as a 401(k) plan where plan Participants may direct their investments, the Plan Participants do not participate in any way in the allocation or directing of funds into any particular investment.

8

47.     The amount of benefit for each Plan participant is the balance in his or her individual account at the time he or she qualifies for a distribution.  Such amount is equal to the sum of all contributions made over the years of employment, adjusted to reflect the Participants' share of any investment earnings or losses of the Plan as a whole, less administration expenses incurred by the Plan.

### Defendants' Status as ERISA Fiduciaries of the Plan

48.     The Trustees of the Plan entered into a service agreement with BPS dated September 1, 1981 ("1981 BPS Agreement"), pursuant to which BPS would "perform any and all services reasonable and necessary to aid the Client in instituting and administering the Annuity Fund and Plan" in exchange for payment of $6,000 plus 1% of contributions to the Plan, the 1% to be calculated and paid on a quarterly basis.

49.     From 1981 until its termination, BPS acted as the Plan administrator and record-keeper with authority and control over all aspects of the administration of the Plan.

50.     Upon information and belief, for some period of time, BPS acted as an investment manager for the Plan.

51.     From 1981 until its termination, all communications to the Plan from any third-party including Participants and service providers were sent to BPS.

52.     BPS had complete control of all information relating to the Plan.

53.     BPS determined what information was provided to the Trustees and what information was withheld.

54.     BPS was acquired by an NFP entity and became a partially owned or wholly owned subsidiary of NFP.

55.     Upon information and belief, by no later than September 2004, Curry began working for BPS and/or acquired an interest in BPS.

56.     Upon information and belief, by no later than September 2004, Korchak and Curry were both representatives of Defendants as IARs, RRs, and in the case of Curry, an owner of BPS.

57.     Pursuant to the Plan's investment policy statement ("IPS"), its investment policy was to maintain a diversified balanced portfolio to be managed at a reasonable expense by investment managers approved by the Trustees.

58.     By no later than September 2004, Korchak was an investment manager and advisor to the Plan.

59.     By no later than September 2004, Curry was an investment manager and advisor to the Plan.

60.     There was no written agreement between the Plan and any Defendant at any time during the engagement, except for the 1981 BPS Agreement, which became outdated and obsolete.

61.     From no later than September 2004 through October 16, 2017 pursuant to the arrangement with the Plan, Defendants exercised authority and control respecting the management and disposition of Plan assets and provided the Plan with individualized investment advice, on a regular basis, and received fees for providing such services.

62.     Defendants often made investment decisions and implemented such decisions using Plan assets and informed the Trustees of those decisions after the fact.

63.     In the rare instances where Defendants informed the Trustees about a transaction before execution, Defendants did not provide the Trustees with adequate or sufficient

HB: 4831-7503-0460.1

information concerning their investment options including the risks and benefits of each investment.

64.     In all instances involving the investment of Plan assets, the Trustees relied upon Defendants' selections, recommendations, and determinations.

65.     From September 2004 through October 2017, Defendants directed the selection, or acted as the broker on certain investments they selected as the Plan's investment managers and advisors, using Plan assets.

66.     By no later than September 2004 until 2017, Defendants received an annual asset management fee of 37.5 bps or 0.375 % of the fixed income assets under management for the Plan's account, although there was no contract to that effect.

67.     Defendants also received commissions, mark-ups on bonds, finder's fees, and kickbacks from parties in interest and other fiduciaries, for the same investments that they selected for the Plan's account using assets of the Plan.

68.     At all relevant times, Defendants determined how, when, and where to invest certain Plan assets; selected, recommended, purchased, and held certain investments for the Plan; drafted the Plan's IPS; selected and designated additional investment managers for certain investment options and negotiated agreements with them; selected and designated NFP/Kestra Brokers as the directing broker for certain investments which they also recommended or purchased; and allocated Plan assets among other investment managers.

69.     Until March 9, 2017, the Trustees relied on the advice, recommendations, representations, selections, and decisions of Defendants concerning the investment, management, and disposition of Plan assets and administration of the Plan.

70.    Defendants, and each of them, were acting as ERISA fiduciaries with respect to the Plan as to each of the complained of actions or inactions alleged herein.

### Defendants' Imprudent, Conflicted, and Prohibited Conduct
### Relating to PIMCO Class A Shares

71.    Defendants purchased shares of the PIMCO Total Return Fund using Plan Assets. Defendants advised, recommended, or held this investment in mutual fund share class, PIMCO Class A Shares ("PIMCO Class A Shares"), for the Plan's portfolio.

72.    The PIMCO Class A Shares are a high fee share class typically purchased by retail investors and are not appropriate for institutional investors such as the Plan with substantially larger amounts to invest.

73.    The PIMCO Class A share class charges both 12b-1 fees and sales loads.

74.    Institutional shares were available but did not provide favorable 12b-1 fees for Defendants.

75.    Defendants received 12b-1 fees and other fees from investment in the PIMCO Class A Shares.

76.    For the PIMCO Class A Shares, commissions were realized by Defendants at 1.75% for holdings of $500,000-$1 million.  Holdings of PIMCO Class A Shares over $1 million paid 0 %.

77.    PIMCO Total Return A shares were held in the amount of just under $1 million from at least 2011 to March 2014.

78.    Defendants failed to purchase, recommend, or hold for the Plan institutional share classes that did not charge 12b-1 fees, even though the Plan was eligible to hold institutional share classes.

HB: 4831-7503-0460.1

79. Had the Plan held shares in the institutional share class of a mutual fund, the Plan would have earned higher returns because of the absence of a 12b-1 charge, and Defendants would have taken no commissions or significantly lower commissions than they in fact did.

80. Investment in the PIMCO Class A Shares violated the Plan's IPS as the PIMCO Fund prospectus includes a disclosure that the PIMCO Class A Shares includes holdings in "below investment grade" fixed income investments.

81. PIMCO Class A Shares constituted an imprudent investment using assets of the Plan.

82. Upon information and belief, Defendants failed to disclose receipt of all fees and other compensation from the PIMCO Class A Shares.

83. Defendants failed to disclose to the Trustees the conflict of interest that existed as a result of their receipt of 12b-1 fees, and their selection of the PIMCO Class A Shares that generated such fees, and failed to disclose that investing a few more dollars in the PIMCO Class A Shares would have resulted in less compensation for Defendants.

84. Defendants did not provide the Trustees with appropriate written financial reports relating to these investments and failed to disclose reasonable alternative investments.

85. These Defendants selected and retained these high fee investments to financially benefit themselves to the financial detriment of the Plan and its Participants. They had a conflict of interest in doing so, and the amount of such fees are assets owed to the Plan.

86. Upon information and belief, the Plan suffered a loss in value because the amounts these investments could have earned more if placed on terms available to institutional investors.,.

13

87. Defendants were rebuked by the SEC in March 2019, confirming the practice of investing in retail-class funds was not a "one-off" event or possible mistake but an embedded firm practice designed to take additional compensation from 12b-1 fees without disclosing the arrangements.

## Defendants' Imprudent, Conflicted, and Prohibited Conduct Relating to the "Alternative Investments" Using Plan Assets

88. On or around December 24, 2013, Defendants invested $300,000 of Plan assets in CION Investment Corporation ("CION Investment"). NFP Securities was identified as the Plan custodian and broker-dealer.

89. On or around December 24, 2013, Defendants invested $300,000 of Plan assets in Cole Credit Corp. ("Cole Credit Investment"). NFP Securities was identified as the Plan custodian and broker-dealer.

90. On or around December 24, 2013, Defendants invested $300,000 of Plan assets in FS Investment Corp. ("FS Investment").

91. The CION, Cole Credit, and FS investments constituted "alternative investments."

92. Alternative investments were specifically prohibited under the Plan's IPS.

93. Defendants knew that shares in these investments can be difficult to sell if they are not held for a stated time, that they were not listed on any securities exchange, and that there was no secondary market for these investments.

94. Defendants knew that the Plan may not be able to resell their shares in these investments regardless of how they performed.

95. Defendants did not disclose to the Trustees that these investments were not listed on any securities exchange, there was no secondary market for these investments, or that the Plan may not be able to resell their shares regardless of how the investments performed.

HB: 4831-7503-0460.1

96.     These Alternative Investments were not fixed income investments as they had significantly different risk and return characteristics then fixed income investments

97.     Defendant misrepresented that these investments were "Fixed Income" investments, as described in the Plan's IPS.

98.     Defendants failed to disclose material information concerning these investments to the Trustees, including their risk profile.

99.     Upon information and belief, Defendants received compensation for placing Plan assets in these alternative investments including finder's fees or other incentive fees.

100.    Upon information and belief, Defendants failed to disclose all of the compensation received in connection with these investments.

101.    Two out of the three alternative investments sustained negative returns.

102.    If the Plan assets had been invested in other suitable asset classes, liquidity would have been available to Plan.  Where an investment produces declining investment value and limited liquidity, the amount and magnitude of the lost investment opportunity compounds.

103.    Recent attempts to seek redemption of the Plan's investments have not been honored by Cole Property or FIS.

### Defendants' Imprudent and Conflicted Management of the
### Fixed Income Portion of the Plan's Portfolio

104.    At the relevant times, a significant portion of the Plan's portfolio was invested in bonds.

105.    Defendants through its representative Korchak exercised discretion in the execution of bond trades.

106.    Korchak recommended the arrangement in which he exercised discretion in the execution of bond trades and, as a result, received commissions and other fees on such trades.

107.     Korchak acted with a conflict of interest in recommending the arrangement that enabled him to increase his compensation at his discretion and in carrying out the arrangement.

108.     Defendants utilized taxable municipal bonds where bid-ask spreads are typically wider versus other securities such as Treasuries and many high-quality corporate debt bonds.

109.     In addition to Defendants' 37.5 bps asset management fee, Defendants took a 1.0-2.5% markup on all bond trades executed by Korchak.  There was no contract to that effect.

110.     Upon information and belief, Korchak frequently bought and sold bonds solely in an effort to generate fees for Defendants without benefit to the Plan or its Participants.

111.     In December 2016, the Trustees instructed Korchak to cease all discretionary bond purchases for the Plan's account and instead to make recommendations to the Trustees and obtain the Trustees' approval of any proposed sales or purchases.

112.     In direct violation of this instruction, Korchak executed at least two bond transactions without approval by the Trustees.

113.     In instances when the Trustees instructed Korchak to execute bond trades after December 2016, , Korchak did not execute those trades.

114.     From approximately December 2016 through November 2017, Korchak failed to manage the bond portfolio, and the actions and inactions taken during that period were contrary to the expressed direction or actions of the Trustees.

115.     The Trustees did not learn about the 1.0-2.5% markup on bond trades executed by Korchak until June 2017, when, after the Trustees required prior approval for all bond trades, Korchak asked the Trustees for authority to purchase $4 million in bonds.  Korchak told the Trustees that he would agree to eliminate his practice of adding an alleged longstanding but undisclosed "mark-up" on the bond purchases in exchange for an increase in the basis points

16

paid to Defendants for bond management. The Trustees were unaware before Korchak's "proposal" of any such mark-up and rejected the offer.

## Defendants' Imprudent and Conflicted Conduct Concerning the MetLife Managed GIC Product

116. Upon information and belief, in August 24, 2004, Defendants advised the Plan to invest an estimated $4 million in a MetLife Managed GIC contract 25157 that paid NFP Securities or Alliance Benefit Group 0.68% or 68 bps of the investment.

117. Fees associated with this investment included quarterly custody and asset-based fees, which were unreasonable and excessive, and the Plan was charged fees payable to Alliance Benefit Group, the named investment administrator, for duplicate custodial services.

118. Upon information and belief, Defendants realized additional, undisclosed compensation in connection with this investment using the assets of the Plan.

119. In 2017, Korchak misrepresented to the Trustees that he was the "only" person that could request redemption of the MetLife GIC, when in fact the Plan Sponsor was authorized to immediately request a redemption. Korchak's misrepresentations delayed transfer of the control of this asset from Defendants to the Trustees. On information and belief, Defendants received fees during the period of delay in transferring control of the asset to the Trustees.

120. When advising the Plan to invest in the MetLife GIC, Defendants failed to disclose to the Trustees the conflicts of interest related to their receipt of fees and commissions for brokerage services and their selection of the MetLife GIC that pays such fees.

121. Defendants also failed to disclose material information regarding this investment to the Trustees, the risk associated with it, and information as to alternative investments.

122. Defendants did not provide the Trustees with all financial reports relating to the MetLife GIC investment.

123.    Defendants failed to evaluate the performance and fees of Alliance Benefit Group as investment manager for this investment.

124.    Upon information and belief, the Plan suffered losses because the $4 million should have been allocated to diversified investments of the other Plan assets which produced higher returns.

### Defendants' Imprudent and Conflicted Conduct Relating to Investment in Unit Investment Trust Using Plan Assets

125.    On or around September 2015, Defendants invested approximately $10 million of Plan assets in a Unit Investment Trust (UIT) with Advisors Asset Management ("AAM") as the designated investment manager.

126.    The UIT included six investment classes including REITs and S&P 500 funds.

127.    Defendants reported the UIT as part of the fixed income portion of the Plan's portfolio, but this was a misrepresentation since its overall risk profile differs significantly from fixed income investment classes.

128.    Investment in the UIT violated the Plan's IPS..

129.    Certain material information concerning the risk profile of this investment was not disclosed to the Trustees.

130.    The Plan paid AAM an annual asset management fee of 2.5% of the total value of assets in the account.  The UIT included a 1.95% sales fee.

131.    AAM paid Defendants annual fees equal to 1.5% of the total asset value.  This fee-splitting arrangement shows that, in the absence of the conflicted and self-dealing conduct of Defendants, AAM would have accepted an annual management fee of 1.5%.

132.    Defendants did not disclose to the Trustees the fee-splitting arrangement with AAM.

133.     Upon information and belief, there is no written agreement reflecting any arrangement between the Plan and AAM.

134.     Upon information and belief, Defendants received other compensation from the UIT investment, which was not disclosed.

135.     Defendants did not provide the Trustees with regular reports from AAM as to the performance for the UIT investment.

136.     Defendants failed to evaluate for the Trustees the performance of AAM as investment manager.

137.     Defendants did not provide the Trustees with information about the risks, returns, and costs of such investments or information about alternative investment managers for such strategies which would have charged lower fees.

138.     While three of five tranches of these investments have been liquidated since the termination of the Defendants, the remaining two have long-dated redemption dates, and the market value of these tranches declined significantly below the initial amount invested.

139.     Defendants benefited from the UIT investment to the detriment of the Plan and its Participants.

## Defendants' Imprudent and Conflicted Recommendation of First Trust Advisors and Failures to Disclose Kickbacks

140.     In or around 2009, Defendants recommended the Plan engage a new investment manager to manage the equity portion of the Plan's portfolio and recommended First Trust Advisors, LLP ("FTA").

141.     Defendants represented to the Trustees that they had carefully selected FTA as an appropriate investment manager and that FTA would satisfy the financial objective of the Plan to preserve capital with some growth to maintain stability of the yield over time.

142.    The Trustees relied upon Defendants' advice and recommendations in the Plan's agreement to engage FTA.

143.    Defendants did not provide the Trustees with multiple alternatives for investment managers, including FTA, and did not provide the Trustees with a detailed summary, research, or comparison reports that included quantitative and qualitative analyses consistent with industry standards.

144.    Defendants did not properly evaluate whether other investment managers with institutional client experience could be engaged.

145.    FTA had extremely limited institutional retirement plan client experience and limited internal capabilities to evaluate equity managers, which was not disclosed to the Trustees.

146.    FTA's stock selection decisions were not made based on its independent research and review of the management policies, capabilities and performance of the companies issuing stock and, on information and belief, FTA made no company visits before investing the Fund's money. On information and belief FTA relied primarily on Morningstar Inc.'s research available to the public. FTA's limited experience and resources compared to most institutional investment advisors were not disclosed to the Trustees.

147.    The Plan's portfolio represented 48% of FTA's total assets under management in the equity strategy ultimately used with FTA, which was not disclosed to the Trustees.

148.    At one time relevant to the engagement of FTA, FTA had 105 client relationships with an average account size of only $300,000. This lack of experience managing institutional assets, which was not disclosed to the Trustees, was known or should have been known to

20

Defendants. It was imprudent of Defendants to cause the Plan to hire FTA as its investment advisor for its ERISA DC Plan equity portfolio worth more than $6.5 million at inception.

149.    On March 3, 2009, the Plan and FTA entered into a "Discretionary Investment Advisory Contract and Letter of Instruction" (the "FTA Contract"), pursuant to which FTA would provide investment management services in exchange for an annual investment management fee.

150.    Defendants negotiated the FTA Contract.

151.    As set forth in the FTA Contract, FTA is a fiduciary of the Plan within the meaning of Section 3(21) of ERISA.

152.    The initial FTA account value was $6,574,852 of Plan assets.

153.    Under the FTA Contract, the annual asset management fee paid by the Plan to FTA was based on the total value of Plan assets calculated at 0.55% of assets up to $5 million; 0.35% of assets between $5 and $10 million, and 0.30% of assets over $10 million.

154.    Neither the FTA Contract nor any other agreement refers to any fee splitting between FTA and Defendants.

155.    FTA paid Ibbotson Associates (n/k/a Morningstar, Inc.) a licensing fee of .07% out of its fee with respect to the assets invested in the FTA/Ibbotson Multi Discipline Portfolio. Ibbotson Associates provided asset allocation research and services.

156.    NFP Securities and Korchak designated themselves as the directed brokers for all securities trades relative to the FTA account.

157.    Defendants knew when they recommended FTA that NFP Securities and Korchak would be the directed broker and, as such, would receive commissions and other fees.

HB: 4831-7503-0460.1

158.    Defendants did not disclose the conflicts of interest related to their selection of FTA and the arrangement with FTA under which they would be the directing brokers and would receive other indirect fees and commissions.

159.    Defendants selected, advised, and recommended that the Trustees engage FTA precisely so that Defendants would realize these financial benefits.

160.    On information and belief, Defendants' received additional compensation of 25 bps of the Plan's assets in the FTA account through an undisclosed fee-splitting arrangement with FTA.

161.    Defendants did not fully disclose their portion of this fee, and to the extent the Trustee received some information about the fee, such information was incomplete, confusing, and insufficient to apprise the Trustees of its nature and extent.

162.    The fee also was duplicative for services that Defendants were already providing, and it is unknown what investment management services, if any, were provided by Defendants or FTA in exchange for the fee.

163.    Defendants did not provide the Trustees with all financial reports relating to the investments held by FTA.

164.    Defendants did not provide information to the Trustees on the actual performance of FTA as an equity manager compared to other equity managers. After the initial selection of FTA, Defendants never compared FTA's performance with those of other investment advisors or managers so that the Trustees could decide whether to retain or replace FTA.

165.    Upon information and belief, Defendants financially benefitted from the FTA contract to the detriment of the Plan and its Participants.

HB: 4831-7503-0460.1

**Defendants' Lack of Prudent Process and Disclosure in
Selection of Other Investment Managers for the Plan Portfolio**

166.    From time to time, Defendants engaged additional investment managers on a discretionary basis.

167.    Defendants selected other investment managers for the equity portion of the Plan's portfolio, including BlackRock Investment Management, LLC ("BIM"),  MorganStanley SmithBarney LLC ("MSSB"), and Merrill Lynch ("ML").

168.    A prudent process was not employed by Defendants in selecting other investment managers.

169.    The Trustees relied upon Defendants' advice and recommendations in the selection and engagement of such investment managers.

170.    BIM, MSSB, and ML were ERISA fiduciaries of the Plan.

171.    BIM, MSSB and ML were paid an annual investment management fee.  At this time, it is unknown what services BIM, MSSB, and ML provided in exchange for the fees.

172.    Upon information and belief, the Defendants did not disclose to the Trustees the nature and extent of their arrangements with BIM, MSSB, or ML including the compensation or fees received in connection with the Plan assets.

173.    Between approximately 2009 to at least 2015, Merrill Lynch managed an average of $5 M of fixed income securities.

174.    Upon information and belief, a fee was paid to Defendants as compensation relating to placing Plan assets with Merrill Lynch, but such fee was not disclosed.

**Defendants' Failure to Provide ERISA Rule 408(b)(2) Disclosures**

175.    Defendants were required as ERISA covered service providers to produce ERISA Section 408(b)(2) written disclosures ("408(b)(2) Disclosures") beginning in 2012 and thereafter

HB: 4831-7503-0460.1

as fees changed materially on an annual basis, consistent with the rules and regulations governing such disclosures.

176.    Such written disclosure was required to disclose a description of the services provided to the Plan, whether the service provider is acting as a fiduciary, a description of all direct compensation, a description of all indirect compensation, a description of compensation received by affiliates or subcontractors, a description of payors and recipients of compensation, a description of the arrangement between recipients of compensation, description of commissions, sales loads, and other fees, and a description of the mechanics of payment.

177.    Such written disclosure was required to be provided (a) in advance of arrangement/providing services, (b) within 60 days of any change to compensation, (c) at least annually if there are any changes to compensation, and (d) upon written request by other fiduciaries.

178.    Defendants failed to produce written 408(b)(2) Disclosures to the Plan, with the exception of a 2012 disclosure by NFP Securities.

179.    NFP Securities' 2012 disclosure was non-compliant, vague, and did not contain the requisite information required under ERISA section 408(b)(2).

180.    Upon information and belief, any disclosures made did not provide a complete and accurate accounting of all fees and commissions paid Defendants.

181.    The Plan's accounting firm requested on behalf of the Trustees at least an annual disclosure by Defendants of the direct and indirect compensation received by Defendants during the last Plan year. Defendants' responses were false as indirect compensation in the form of fees, commissions, kickbacks and markups on bond purchases were not disclosed.

HB: 4831-7503-0460.1

**Defendants' Lack of Procedural Prudence With Respect to Use of Plan Assets**

182.     As ERISA fiduciaries, Defendants had an affirmative obligation to provide full and accurate information to the Trustees and the Plan's Participants regarding the Plan assets.

183.     Defendants did not provide the Trustees with a written statement on a monthly, quarterly, or even annual basis that collectively accounted for all assets of the Plan for the purposes of determining a total return and performance and fees of all managers.

184.     Defendants did not provide the Trustees with information measuring risk for the overall portfolio or the risk profile for the alternatives to the bonds and equity investments of FTA.

185.     Defendants did not provide the Trustees with information concerning faltering investments such as REITs and the certain alternative investments detailed below.

186.     In the absence of a total return analysis, it was impossible for the Trustees to understand the impact of underperforming investments relative to a benchmark.

187.     After the Trustees demanded through counsel that Defendants produce a performance report in 2016, the "Total Fund Yield" information provided as of November 30, 2016 was incomplete and inaccurate.

188.     In February 2017, Defendants provided a report purporting to list the Plan's Total Fund Yield net of fees and through May 31, 2016 for the previous one, three, five and 10 years. Contrary to previous oral representations to the Trustees by Defendants in Plan meetings that the investments were performing well and exceeding appropriate benchmarks, the report disclosed below benchmark returns of -0.92% for one year, 3.02% for three years, 3.51% for five years and 3.27% for 10 years. Defendants failed to provide the separate returns for alternative investments and an appropriate benchmark that included the alternative investments. The report showed the

Plan failed to perform at or above an appropriate benchmark for at prior 10 years, which was contrary to what was conveyed to the Trustees. In addition, the report indicated the performance of FTA was 115, 159 and 551 basis points below the All Equity Benchmark in the past five-, three-, and one-year periods, respectively.

189.     In May 2017, Defendants provided another document purporting to list the Plan's fiscal year returns through 11/30/2016, from one, three, five, and ten years.  The seven-year performance information was blacked out, accompanied with a disclaimer about the underperformance of Lehman bonds.  The report also showed significant underperformance of the Plan's managers not previously disclosed to the Trustees, including losses incurred as a result of investments in Lehman bonds.

190.     Defendants failed to obtain written contracts with all investment managers, failed to disclose the terms of investments to the Trustees including their compensation, failed to monitor investments adequately, and did not employ a watch list process for poorly performing managers.

191.     Defendants failed to educate the Trustees concerning their investment options, and the risks and returns of existing investments or possibilities of altering the heavy allocation from 79% fixed income investments.

**Defendant BPS's Lack of Procedural Prudence as Administrator and Record-Keeper**

192.     Other than the 1981 BPS Agreement, there were no written service contracts between Defendants and the Plan.

193.     BPS, in its role as record-keeper and third-party administrator for the Plan, failed to properly maintain material information concerning the Plan and its Participants.

26

194. BPS failed to follow industry standards in the organization and maintenance of Plan records.

195. The database for the Plan records was improperly maintained.

196. The content of the Plan records was incomplete, incorrect, and otherwise deficient.

197. BPS knew that numerous Participants could not be communicated with because of incomplete or erroneous records but charged the Plan with periodic communications to such Participants.

198. BPS failed to monitor Participants' records through "death audits" to ensure that deceased Participants were removed, and survivors received benefits to which they were entitled.

199. BPS failed to follow up with Employers to obtain current information about employees on whose behalf they were contributing.

200. As a result of these failures, the number of Plan Participants was and remains inaccurate, and the costs and fees paid to BPS were not predicated on accurate information.

201. As a result of these failures, certain Plan Participants did not receive statements or disclosures required by law, while deceased individuals were sent statements.

202. BPS charged for certain recordkeeping and related fees calculated based on the number of total Participants in the Plan. The more Participants in the Plan, the more compensation BPS would charge the Plan. The administrative fees, including statement printing and mailing fees charged by BPS to the Plan, were not adjusted so that BPS was compensated based on inflated numbers of active Plan Participants.

203. Another result of the negligent recordkeeping was that certain required minimum distribution to Participants over age 70½ were missed, resulting in Participants not receiving the

HB: 4831-7503-0460.1

benefits to which they were entitled and subjecting the Plan and Participants to liability for potential IRS penalties of 50% of the benefits.

204.　　In 2017, the Plan engaged an auditor to review the status of Plan records. The auditor determined that at least 3,200 Plan participant records were corrupted, had inaccurate names, addresses, or were otherwise incomplete, or went missing while in the custody of BPS.

205.　　The Plan incurred fees to identify and correct the missing, incomplete, or inaccurate participant information and address other administrative deficiencies caused by BPS.

### Defendants' Failure to Supervise and Monitor BPS and the Representatives

206.　　Defendants failed to monitor BPS as a record-keeper and administrator.

207.　　Because BPS and NFP/Kestra are affiliated companies with common ownership, management, employees, and addresses, among other things, NFP/Kestra had a conflict of interest concerning BPS.

208.　　NFP/Kestra profited from providing inadequate support for administration and profited from keeping BPS, rather than seeking bids for competent administrative services providers.

209.　　NFP/Kestra failed to evaluate the performance and cost of BPS because, among other reasons, such evaluation and monitoring would involve evaluating and monitoring itself.

210.　　NFP/Kestra and NFP/Kestra Brokers were at all times responsible for the actions and omissions of the Representatives, Korchak and Curry, as they had a duty to supervise and monitor them to ensure compliance with their fiduciary duties and to take affirmative action against them in the event of non-compliance.

211. NFP/Kestra and NFP/Kestra Brokers failed to supervise, monitor and guide its Representatives on the appropriate choice of investments, communication with the Plan including Rule 408(b)(2) disclosures, and other appropriate conduct.

212. NFP/Kestra failed to ensure that its representatives were competent to provide services to an employee benefit plan.

213. NFP/Kestra failed to provide competent representatives.

214. As a result of the failure to supervise and monitor, the representatives were unchecked and lacked any accountability and were able to breach their fiduciary duties and caused the Plan to engage in prohibited transactions in violation of ERISA, all while hiding information and failing to provide required disclosures to the Trustees.

<u>**Trustees' Actions to Address Defendants' Conduct**</u>

215. The Trustees were informed in 2016 that no comprehensive written contracts between the Plan and Defendants existed, that Defendants had failed to provide complete, adequate, and accurate reports on the performance of Plan investments, and that Defendants had acted imprudently and with conflicts of interest concerning certain Plan investments.

216. The Trustees took affirmative steps to address and remedy the problems created by the acts and omissions of Defendants as set forth herein. Among other things, the Trustees through counsel:

    a.    Met with Defendants' representatives to try to determine what actions were being taken by them, requested creation of written contracts to disclose and clarify the Defendants' obligations, and requested written performance reports and disclosure of the identity and reports of the investment custodian being used by Defendants.

29

b.     Approved requests for proposals to replace Defendants and select a new TPA, investment advisor, investment managers, and custodian.

c.     Restricted the actions of the Representatives such that any further proposed bond transactions required disclosure of the reason for the transaction and advanced approval by the Trustees.

d.     Demanded that Defendants provide the Plan with a detailed investment report on current and past performance.

e.     Determined to modify the investment contract with FTA to remove Defendants as the designated broker and required FTA to use best execution principles in selecting brokers.

f.     Commenced a process to determine which historical transactions and investments were potentially problematic under ERISA.

217.   The Trustees agreed to hire a new investment advisor, new third-party administrator, and new custodian.. Defendants Korchak and Curry, and their employee Tracy Gannon who provided day-to-day administration of the Plan, were notified that the effective date for transfer of all responsibilities to the new service providers would be September 1, 2017.

218.   The Plan, through the Trustees, made written demands that Defendants cooperate and timely turn over the Plan's records, invested assets and other property to the new TPA and custodian.

219.   Defendants had a fiduciary responsibility to provide for an orderly transition to the new service providers, including avoiding unnecessary costs, confusion, and delays that would raise administrative costs and be harmful to Participants.

220.     Rather than cooperating with the transition request, Defendants significantly delayed and otherwise interfered in the transition of material documents, computer participant and contribution data, information concerning invested assets and other information, causing the Plan to incur significant costs and three months of delays beyond September 1, 2017 to accomplish most of the transition to the new service providers. From December 2017 through July 2019, Plan assets invested by Defendants still had not been placed in control of the Trustees and their new Fund investment advisor.

221.     Defendants claimed they could not locate certain investment documentation.

222.     Defendants objected to providing participant data in usable electronic form, contending that the information and computer software was owned by Defendants.

223.     In July 2017, four months after the notification to Defendants of their termination and of the September 1, 2017 transition date, Defendants had taken no steps to accomplish the transition. Instead, Defendants then demanded a non-disclosure agreement and a HIPAA Business Associate Agreement as a condition of their implementing the transition.  There was no basis for the Defendants to condition the turnover of Plan information on entry into a nondisclosure agreement. Such an agreement would not be in the interests of Participants and would benefit solely the Defendants.  In addition, HIPAA applies only to welfare plans, and Defendants' demands were inappropriate and designed to delay the transition, and cost the Plan legal fees and caused a delay of several weeks.

224.     Because of Defendants' improper recordkeeping, organization, and management of electronic and other Plan records and materials, and Defendants' unreasonable delay tactics, the Plan was forced to delay the September transition date to December 1, 2017, pay additional administrative fees to Defendants, and incurred additional expenses to recover participant

31

records and information concerning invested assets. The transition to the new service providers could not take place until December 1, 2017.

225.    Because of the disarray of the participant and contribution data turned over by Defendants, the new administrator, WPAS, had to create a duplicate benefits administration database system, which required the Plan to incur additional expenses.

**Defendants' Unearned and Excessive Asset Management Fee for 2016 and 2017**

226.    Defendants benefitted from their own delays in transferring custody, management, and control of Plan assets to the Plan's new services providers.

227.    In the first ten months of 2017, Defendants continued to charge the Plan an investment management fee of 37.5 bps on the bond portfolio and received other fees from FTA, AMA, and other managers.

228.    Defendants provided no advisory or investment management services to the Plan during that period except to request permission to purchase $4,000,000 of new bonds in June 2017 when the Trustees had already notified them of their termination and that they had been informed that a new investment advisor had been hired.

229.    From December 2016 through November 2017, Defendants failed to follow the Trustees' directions concerning the purchase and sales of bonds, failed to make the few bond purchases approved by the Trustees, and failed to provide an accurate report on the performance of all of the assets when providing requested performance reports in February and March 2017.

230.    Certain assets of the Plan remained in the control of Defendants for more than 18 months after the September 1, 2017 date on which the transition was supposed to take place.

231.    Upon information and belief, Defendants continued to receive commissions and fees in connection with such investments controlled by their brokerage accounts.

232.     Defendants maintained control and, upon information and belief, the discretionary management authority over the Cole, CION, and FS Investments after the effective termination date of all Defendants on December 1, 2017.

233.     In October 2017, Defendants demanded an additional $6,000 for its last month of administration of the Plan as a condition of the Plan receiving all of its participant and contribution data and access to administrator's computer.  The Trustees had not yet received all of the equipment. and Plan data and had not formally approved payment of the additional $6,000 when BPS provided evidence that BPS directed such amount paid to itself without honoring its commitments concerning Plan data and equipment.

234.     The Trustees and, by extension, the Plan Participants did not, and do not, have complete and actual knowledge of the commissions, fees, and expenses that Defendants charged to the Plan because such information was not disclosed.

235.     As a result of the Defendants' failure and refusal to provide such information, the Trustees lacked the information necessary to understand and protect the Plan and/or to have complete knowledge of the Defendants' ERISA violations.

236.     Defendants' silence and/or non-disclosure in the face of such a duty to disclose is equivalent to an affirmative misrepresentation.

237.     Pursuant to ERISA § 502(a), the Trustees have served by certified mail a copy of the Complaint upon the Secretary of Labor located at 200 Constitution Avenue, NW Washington, D.C. 20210, and the Secretary of Treasury, located at 1500 Pennsylvania Avenue, NW Washington, D.C. 20220.

HB: 4831-7503-0460.1

## FIRST CLAIM FOR RELIEF FOR BREACH OF FIDUCIARY DUTY
## ERISA SECTION 502(a)(2)

238.     The Trustees incorporate by reference as if fully set forth herein the above stated paragraphs of the Complaint.

239.     ERISA § 502(a)(2) (29 U.S.C. § 1132(a)(2)) provides that a plan fiduciary may bring an action for appropriate relief under ERISA § 409 (29 U.S.C. § 1109).

240.     Defendants were ERISA fiduciaries of the Plan.

241.     As to each of the acts and omissions detailed herein, Defendants were acting in a fiduciary capacity.  Defendants provided regular, individualized investment advice pursuant to an arrangement with the Plan in exchange for a fee, and further exercised discretionary authority and control with respect to the disposition of assets including the advice, recommendation, and execution of investments of Plan assets.

242.     The ERISA fiduciary duties require fiduciaries to act for the exclusive purpose of providing benefits to Participants and their beneficiaries, and defraying reasonable expenses of administering the plan (duty of loyalty), and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims (duty of prudence).

243.     Pursuant to their fiduciary duty of prudence, Defendants were required to administer the Plan and advise and manage its investments as would a prudent person acting in a like capacity and familiar with such matters.

244.     Pursuant to their fiduciary duty of loyalty, Defendants were required to discharge their duties with respect to the Plan solely in the interest of the Participants and for the exclusive

HB: 4831-7503-0460.1

purpose of providing benefits to Participants and their beneficiaries, and defraying reasonable expenses of administering the plan.

245. Pursuant to their fiduciary duties, Defendants acting as dual-registered IARs and RRs with respect to assets of the Plan, were required to fully disclose the existence, nature, and extent of such conflict of interest, the details of whether they were brokering a security as an RR or providing investment management and advice as an IAR, and the nature and the extent of any and all direct and indirect compensation.

## COUNT I
## DEFENDANTS' BREACH OF FIDUCIARY DUTY RELATING TO INVESTMENT OF PLAN ASSETS IN PIMCO CLASS A SHARES

246. The Trustees incorporate by reference as if fully set forth herein the above stated paragraphs of the Complaint.

247. Defendants had fiduciary duties to act prudently and solely in the best interest of Plan Participants in dealing with Plan assets and breached their fiduciary duties to do so by advising, recommending, and causing investment of Plan assets in high-fee PIMCO Class A Shares that were imprudent for the Plan as an institutional investors, when lower-cost share classes of the same funds for which the Plan was eligible were available.

248. Defendants breached their fiduciary duties by selecting the PIMCO Class A Shares that generated 12b-1 fees and other fees and commissions, by holding such shares in an amount to maximize their receipt of fees, and by failing to purchase, recommend, or hold for the Plan institutional share classes that did not charge 12b-1 fees, even though the Plan was eligible to hold the institutional share classes.

249. Defendants breached their fiduciary duty to follow plan documents because investment in the PIMCO Class A Shares violated the Plan's IPS.

HB: 4831-7503-0460.1

250.    Defendants breached their fiduciary duties by failing to disclose the nature and extent of all fees and other compensation from the PIMCO Class A Shares, and failing to disclose the existence, nature and extent of the conflict of interest presented by their receipt of 12b-1 fees, their selection of the PIMCO Class A Shares that generated such fees, and failing to disclose that a slightly greater investment would generate no or less fees for the Defendants.

251.    Defendants breached their fiduciary duties in connection with the PIMCO investment because they did not establish a process for determining whether the investment continued to be prudent and whether the fees were reasonable for the level of investment return, and they did not communicate their findings or the process to the Trustees.

252.    Defendants breached their fiduciary duties by failing to act in the best of interests of the Plan and its Participants, but rather in their own, and Defendants financially benefitted.

253.    The Plan and its Participants have suffered losses, including a possible loss in value, and been otherwise injured, as a result of Defendants' breaches of fiduciary duty. Defendants are required to render an accounting of all such fees, the amount of which are assets owed to the Plan.

## COUNT II
## DEFENDANTS' BREACH OF FIDUCIARY DUTY RELATING TO INVESTMENT IN "ALTERNATIVE INVESTMENTS" USING PLAN ASSETS

254.    The Trustees incorporate by reference as if fully set forth herein the above stated paragraphs of the Complaint.

255.    Defendants had fiduciary duties to act prudently and solely in the best interest of Plan Participants in dealing with Plan assets and breached their fiduciary duties to do so by advising, recommending, and causing investment of approximately $900,000 of Plan assets in the CION Investment, Cole Credit Investment, and FS Investment.  These three investments

HB: 4831-7503-0460.1

were alternative investments prohibited under the Plan's IPS. They were imprudent for the Plan and not for the exclusive purpose of providing benefits to the Participants.

256. Defendants' breaches in recommending these investments were further aggravated when Defendants failed to disclose any and all fees they received in connection with these investments and failed to monitor or recommend changes when these investments sustained negative returns.

257. Defendants breached their fiduciary duties by representing that these investments were "fixed income" investments when they were not and by failing to disclose the risk profile of these investments including that the Plan may not be able to resell their shares regardless of how the investment performed because they were not listed on any securities exchange and there was no secondary market for them. Including these investments in the fixed income portfolio was deceptive because the expected returns from these investments, above bond returns, would make the performance of the fixed income portfolio appear better than it was.

258. Defendants breached their fiduciary duties by failing to disclose the existence, nature and extent of the conflict of interest presented by their receipt of compensation relating to these investments, and their selection of the very investments that generated such compensation.

259. Defendants did financially benefit from the CION Investment, Cole Credit Investment, and FS Investment to the detriment of the Plan and its Participants. They had a conflict of interest in doing so that was not disclosed, received undisclosed indirect compensation in connection with these investments, which were prohibited transactions, and the amount of such fees are assets owed to the Plan.

260. The Plan and its Participants have suffered losses, including in the amount of lost principle and the amounts these investments could have earned if placed in diversified

37

investments permitted under the IPS, and has been otherwise injured as a result of Defendants' breaches of fiduciary duty. Defendants are required to render an accounting of all such indirect compensation, the amounts of which are assets owed to the Plan.

**COUNT III**
**DEFENDANTS' BREACH OF FIDUCIARY DUTY RELATING TO**
**MANAGEMENT OF FIXED INCOME INVESMENTS**

261. The Trustees incorporate by reference as if fully set forth herein the above stated paragraphs of the Complaint.

262. Defendants had fiduciary duties to act prudently and solely in the best interest of Plan Participants in dealing with Plan assets including managing the bond portfolio and breached their fiduciary duties to do so by failing to disclose to the Plan and otherwise all of the commissions and other fees received through brokering the bonds, including a "mark-up" of 1.0-2.5% on bond trades; excessively trading bonds to generate more fees; failing to follow bond trading restrictions imposed in December 2016 by the Plan; and violating directives to purchase bonds in 2017.

263. Defendants breached their fiduciary duties in connection with the bond trades because the generation of commissions on bond trades was not in the best interest of Plan Participants. Defendants' interest in generating commissions so that Defendants could earn more fees for their own benefit compromised Defendants' ability to make investment decisions solely in the interests of Participants.

264. Defendants' practice of charging the Plan for commissions on bond trades was contrary to industry practice. Qualified bond managers paid 37.5 basis points to administer a bond portfolio typically would cover commission or other trading costs out of the set fee paid by the fund.

265.    Defendants breached their fiduciary duties in connection with the bond trades because they did not establish a process for determining whether regular and continuous bond trades were prudent for the plan and in the best interest of Plan Participants, and did not communicate to the Trustees any process nor established the suitability and prudence of the investments or reasonableness of the associated fees .

266.    Defendants breached their fiduciary duties by failing to disclose the existence, nature and extent of the conflict of interest presented by their receipt of mark ups and other compensation relating to the bond trading, and their decisions on where, when and how to buy and sell the bonds that generated such fees.

267.    Defendants did financially benefit and had a conflict of interest in doing so, and the amount of fees received are assets owed to the Plan.

268.    The Plan and its Participants have suffered losses and been otherwise injured as a result of Defendants' breaches of fiduciary duty. Defendants are required to render an accounting of all such fees and markups, the amount of which are assets owed to the Plan.

## COUNT IV
## DEFENDANTS' BREACH OF FIDUCARY DUTY RELATING TO METLIFE MANAGED GIC INVESTMENTS

269.    The Trustees incorporate by reference as if set forth in full herein the above stated paragraphs of the Complaint.

270.    Defendants had fiduciary duties to act prudently and solely in the best interest of Plan in dealing with Plan assets and breached their fiduciary duties to do so by advising, recommending, and placing $4 million of Plan assets in a MetLife GIC designed to yield a negligent return on the investment and pay excessive compensation to Defendants, and by failing to determine whether fees associated with this investment were unreasonable and whether fees

HB: 4831-7503-0460.1

charged by the alleged investment administrator were unnecessary because they were duplicative of other custodial fees paid by the Plan.

271.     Defendants breached their fiduciary duty by failing to disclose all material information regarding this investment, including regular and timely financial and other performance reports, by failing to monitor or evaluate the performance of Alliance Benefit Group as an investment manager, and by failing to replace the investment based on poor performance. Defendants failed to include the negligible returns on this investment in reporting on their own performance periodically to the Trustees. On information and belief, Defendants did not include the returns on this investment when reporting on Plan investment returns in 2017.

272.     Defendants breached their fiduciary duties by failing to disclose the existence, nature and extent of the conflict of interest presented by their receipt of compensation from the MetLife GIC and their selection of the MetLife GIC that generated such compensation.

273.     Defendants did financially benefit from this investment to the detriment of the Plan and had a conflict of interest in doing so, and the amount of fees received are assets owed to the Plan.

274.     The Plan and its Participants have suffered losses and been otherwise injured as a result of Defendants' breach of fiduciary duty. Defendants are required to render an accounting of all such fees, the amount of which are assets owed to the Plan. Defendants are also liable for the lost earnings resulting from acquiring this investment rather than investing the $4,000,000 in a diversified fixed income and equity portfolio.

## COUNT V
## DEFENDANTS' BREACH OF FIDUCARY DUTY RELATING TO UIT INVESTMENT

275.     The Trustees incorporate by reference as if set forth in full herein the above stated paragraphs of the Complaint.

HB: 4831-7503-0460.1

276. Defendants had fiduciary duties to act prudently and solely in the best interest of the Plan in dealing with Plan assets and breached their fiduciary duties to do so by advising, recommending, and placing an investment in the Unit Investment Trusts (UIT). The UIT was prohibited under the Plan's IPS and an imprudent investment. Defendants caused the Plan to pay unreasonable management fees to AAM in order to obtain a one-half share of those management fees, thus receiving "kick-backs" from AAM which, upon information and belief, were not disclosed.

277. Defendants breached their fiduciary duties in connection with the UIT because they did not establish or follow a process for determining whether the investment continued to be prudent and whether the fees were reasonable for the level of investment return, and they did not communicate their findings or the process to the Trustees.

278. The Plan and its Participants have suffered losses and been otherwise injured as a result of Defendants' breaches of fiduciary duty. Defendants did financially benefit from this investment to the detriment of the Plan and had a conflict of interest in doing so. Defendants are required to render an accounting of all such fees, the amount of which are assets owed to the Plan.

**COUNT VI**
**DEFENDANTS' BREACH OF FIDUCARY DUTY RELATING TO**
**FIRST TRUST ADVISORS AS ADDITIONAL MONEY MANAGER AND**
**FAILURE TO DISCLOSE FEES PAID BY FTA**

279. The Trustees incorporate by reference as if set forth in full herein the above stated paragraphs of the Complaint.

280. Defendants had a duty to but failed to act in accordance with their duties of prudence and loyalty in selecting other money managers to deal with assets of the Plan and breached their fiduciary duties by advising, recommending, and effecting the hiring of FTA as an

equity investment manager, without providing information consistent with industry standards concerning multiple investment managers; without disclosing the lack of experience of FTA with multiemployer pension benefit plans and without disclosing the limited resources of FTA; by designating NFP/Kestra Brokers and Korchak as the directing brokers for all securities transactions; by failing to disclose that the directed brokerage imposed on FTA was a conflict of interest; and by paying an excessive "equity management fee" to FTA and splitting that fee with the Defendants, while failing to completely and accurately disclose such fee-splitting. Defendants failed to disclose such indirect compensation when it was requested annually on behalf of the Trustees by the accountant.

281.    Defendants breached their fiduciary duties in connection with FTA because they did not establish a prudent process for determining whether the investments offered through FTA continued to be prudent and whether the fees were reasonable for the level of investment return and level of service, and they did not communicate their findings or the process to the Trustees.

282.    Defendants did financially benefit from the selection of FTA to the detriment of the Plan and had a conflict of interest in doing so, and the amount of fees received are assets owed to the Plan.

283.    The Plan and its Participants have suffered losses and been otherwise injured as a result of Defendants' breaches of fiduciary duty. Defendants are required to render an accounting of all such fees and commissions, the amounts of which are assets owed to the Plan.

## COUNT VII
## DEFENDANTS' BREACH OF FIDUCARY DUTY RELATING TO
## SELECTION OF OTHER MONEY MANAGERS FOR PLAN ASSETS

284.    The Trustees incorporate by reference as if set forth in full herein the above stated paragraphs of the Complaint.

285.     Defendants had a fiduciary duty to follow a prudent process in accordance with industry standards to recommend and select other investment managers for the equity portion of the Plan's portfolio, including BIM, MSSB, and ML and possibly others, but breached their duties by causing the Plan to pay duplicate management fees, and failing to disclose these relationships to the Plan or the nature and extent of all compensation or fees realized by Defendants as a result of investing with these managers.

286.     Defendants did financially benefit from these selections to the detriment of the Plan and had a conflict of interest in doing so, and the amount of fees received are assets owed to the Plan.

287.     The Plan and its Participants have suffered losses and been otherwise injured as a result of Defendants' breaches of fiduciary duty. Defendants are required to render an accounting of all such fees, the amounts of which are assets owed to the Plan.

## COUNT VIII
## DEFENDANTS' BREACH OF FIDUCARY DUTY FOR
## FAILURE TO PROVIDE ERISA SECTION 408(b)(2) DISCLOSURES

288.     The Trustees incorporate by reference as if set forth in full herein the above stated paragraphs of the Complaint.

289.     As ERISA covered service providers, Defendants had a statutory and fiduciary duty to provide written 408(b)(2) Disclosures to the Plan. They breached their duty by failing to provide such disclosures, with the exception of a 2012 disclosure by NFP Securities which was non-compliant, and by failing to otherwise provide a complete and accurate accounting of all fees and commissions paid Defendants.

290.     Defendants did financially benefit from their non-disclosure to the detriment of the Plan and had a conflict of interest in doing so, and the amount of fees received are assets owed to the Plan.

43

291. The Plan and its Participants have suffered losses and been otherwise injured as a result of Defendants' breach of fiduciary duty. Defendants are required to render an accounting of all such fees, the amounts of which are assets owed to the Plan.

## COUNT IX
## DEFENDANTS' BREACH OF FIDUCARY DUTY FOR FAILURE TO IMPLEMENT AND FOLLOW PRUDENT PROCESSES WITH RESPECT TO THE PLAN

292. The Trustees incorporate by reference as if set forth in full herein the above stated paragraphs of the Complaint.

293. Defendants had a duty to but failed to implement or follow prudent processes, consistent with industry standards and with ERISA, in serving as a Plan fiduciary and providing services to the Plan.

294. Defendants breached their fiduciary duties by, among other things, failing to enter into written service agreements with the Plan; by failing to provide the Trustees with a total return analysis of all Plan assets on a monthly, quarterly,  annual basis, and over market cycles such as three years, five years, and 10 years; by failing to provide detailed information and risk/return education about each investment significantly different from traditional equities and bonds in advance of acquiring alternative investments; by failing to monitor investments and to provide written information about performance of ongoing investments; and by failing to provide written benchmarking and fee data to enable the Trustees to assess the reasonableness of fees.

295. Defendants did financially benefit from these breaches to the detriment of the Plan and had a conflict of interest in doing so, and the amount of all fees received are assets owed to the Plan.

296. The Plan and its Participants have suffered losses and been otherwise injured as a result of Defendants' breaches of fiduciary duty. Defendants are required to render an accounting of all such fees, the amounts of which are assets owed to the Plan.

HB: 4831-7503-0460.1

**COUNT X**
**DEFNDANT BPS'S BREACH OF FIDUCARY DUTY FOR FAILURE TO IMPLEMENT**
**AND FOLLOW PRUDENT PROCESSES WITH RESPECT TO**
**PLAN ADMINISTRATION AND RECORDKEEPING**

297.    The Trustees incorporate by reference as if set forth in full herein the above stated
paragraphs of the Complaint.

298.    BPS had a fiduciary duty to implement and follow prudent processes, consistent
with industry standards and with ERISA, in serving as administrator and record-keeper of the
Plan and providing services to the Plan, and breached its fiduciary duty by failing to properly
organize, monitor, update, and maintain any and all records relating to the Plan and its
Participants and by charging the Plan unreasonable, excessive, and unnecessary recordkeeping
and related fees in light of these failures.

299.    The Plan and its Participants have suffered losses, including fees to address the
failings, and been otherwise injured as a result of Defendants' breaches of fiduciary duty.
Defendants' failure to update and enter into reasonable written service contracts since 1981
enabled Defendants to provide substandard support and services for administration and to retain
greater profits from their relationship with the Plan. Their failure to provide adequate financial
and technical support for day-to-day administration of the Plan resulted in the creation of
incomplete and inaccurate participant records to the detriment of Participants over many years.
More than half of the Participants did not have usable records of their addresses and did not
receive notices, plan documents, 408 (b)(2) expense disclosures, and periodic benefit account
reports to which they were entitled. Defendants' inadequate financial and technical support for
the collection of employer contributions resulted in long delays in crediting Participants'
accounts with the amount contributed by their employers and resulted in months of lost earnings
on the amounts paid by contributing employers.  Defendants are required to render an accounting

of all such administrative fees for which appropriate written agreements did not exist and inadequate services were provided, the amounts of which are assets owed to the Plan.

## COUNT XI
## BREACH OF FIDUCIARY DUTY TO
## SUPERVISE AND MONITOR BPS AND THE REPRESENTATIVES

300.    The Trustees incorporate by reference as if set forth in full herein the above stated paragraphs of the Complaint.

301.    NFP/Kestra and NFP/Kestra Brokers had a fiduciary duty to supervise and monitor BPS and the Representatives, including a duty to make sure that the persons serving in professional and fiduciary positions possessed the knowledge and experience needed to administer a plan in a manner that professionals familiar with the operation of employee benefit plans would act.  They had a fiduciary duty to avoid creating an administrative and investment arrangement in which the Representatives had conflicts of interest that would affect the actions and advice provided to the Plan.

302.    NFP/Kestra and NFP/Kestra Brokers breached their fiduciary duty by failing to supervise, monitor, and guide its Representatives as to all matters for which they were serving as fiduciaries of the Plan including, but not limited to, investigating, advising on, recommending, and selecting prudent investments for the Plan, avoiding conflicts of interests, educating and informing the Plan regarding investments, disclosing all direct and indirect compensation, ensuring written agreements were in place, and otherwise complying with ERISA.

303.    NFP/Kestra and NFP/Kestra Brokers breached their fiduciary duty by failing to ensure their Representatives were competent to provide services to an employee benefit plan.

304.    NFP/Kestra breached its fiduciary duty by failing to monitor, supervise, or replace BPS.

HB: 4831-7503-0460.1

305.     This failure to supervise and monitor allowed the Representatives and BPS to breach their fiduciary duties.

306.     The Plan and its Participants have suffered losses and been otherwise injured as a result of Defendants' breaches of fiduciary duty. NFP/Kestra and NFP/Kestra Brokers are liable for the losses caused by the Representatives.

**COUNT XII**
**BREACH OF FIDUCIARY DUTY FOR**
**CHARGING PLAN UNREASONABLE AND EXCESSIVE FEES**

307.     The Trustees incorporate by reference as if set forth in full herein the above stated paragraphs of the Complaint.

308.     Defendants have a fiduciary duty to charge only reasonable compensation for services provided to the Plan.

309.     Defendants breached their fiduciary duty by obtaining commissions, kickbacks, and other disclosed and undisclosed compensation while charging an asset management fee of 37.5 basis points for fixed income investments, which compensation was unreasonable and excessive.

310.     Defendants breached their fiduciary duty by continuing to charge the Plan an investment management fee of 37.5 bps and other fees from November 2016 through November 2017, during which time Defendants provided no advisory or investment management services to the Plan, rendering any such fee unreasonable and excessive.

311.     The Plan and its Participants have suffered losses and have been otherwise injured as a result of Defendants' breaches of fiduciary duty. Defendants are required to render an accounting of all such fees collected during the last 12 months of their responsibility for the bond portfolio, the amounts of which are assets owed to the Plan.

HB: 4831-7503-0460.1

**COUNT XIII**
**BREACH OF FIDUCIARY DUTY RELATING TO**
**TRANSITION TO NEW SERVICE PROVIDERS**

312.    The Trustees incorporate by reference as if set forth in full herein the above stated paragraphs of the Complaint.

313.    After their termination by the Plan, Defendants had a fiduciary duty to cooperate in a timely and reasonable fashion in the transition of Plan assets and Plan records to the Plan's new administrator, custodian, investment providers, and other service providers, and breached such duty by failing to so act.

314.    By failing to act in a timely manner and delaying the transfer of assets, equipment and information, Defendants continued to receive fees administration and for the conflicted investments they made with Plan assets.  Rather than transfer the assets, which the Trustees determined was in the best interest of the Plan, Defendants retained the assets and delayed the transfer so they could continue to earn fees for their own account, to the detriment of Plan Participants.

315.    The Plan and its Participants have suffered losses and have been otherwise injured as a result of Defendants' breaches of fiduciary duty. Defendants are required to render an accounting of all such administrative, brokerage and other fees collected after September 1, 2017 because of the delayed transition, the amounts of which are assets owed to the Plan.

**SECOND CLAIM FOR RELIEF**

**DEFENDANTS' VIOLATION OF**
**ERISA SECTION 406 - PROHIBITED TRANSACTIONS**

316.    The Trustees incorporate by reference as if set forth in full herein the above stated paragraphs of the Complaint.

HB: 4831-7503-0460.1

317.    ERISA § 406(a) prohibits a plan fiduciary from causing a plan to engage in several categories of transactions including the furnishing of goods, services or facilities with a "party in interest" such as a plan service provider, employer, and fiduciaries.  29 U.S.C. §§ 1106(a).

318.    ERISA § 406(b)(1) provides that a fiduciary with respect to a plan shall not deal with the assets of the plan in his own interest or for his own account, while § 406(b)(3) prohibits fiduciaries from receiving any consideration for their own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan. 29 U.S.C. §§ 1106(b)(1), (b)(3). Section 406(b)(1) and (b)(3) establish per se ERISA violation.

319.    ERISA § 406(b)(2) exempts from the legal prohibition against payment for services from a covered plan to any party-in-interest including a fiduciary provided: (1) such service is necessary for the establishment or operation of the plan; (2) such service is furnished under a contract or arrangement that is reasonable; and (3) no more than reasonable compensation is paid for such service.  29 U.S.C. §§ 1106(b)(2).  If a covered service provider does not satisfy the conditions of the § 408(b)(2) regulations, the fees received are deemed unreasonable, and thus the service provider engages in a per se prohibited transaction.

320.    Defendants failed to satisfy the conditions of the § 408(b)(2) regulations, as set forth in ¶¶ 175-181 herein.

321.    Defendants were ERISA fiduciaries of the Plan and provided services to the Plan, and are thus deemed ERISA "parties in interest."

322.    Defendants were ERISA fiduciaries of the Plan and provided services to the Plan, and are thus deemed ERISA "parties in interest."

HB: 4831-7503-0460.1

323.    All Defendants were involved in causing the Plan to invest the Plan's assets in the various investments, use the service providers recommended by NFP/Kestra that were all affiliated with each other, and received fees for such conflicted advice and the use of Plan assets.

324.    By causing the Plan to invest the Plan's assets in the various conflicted investments and use the service providers that were all affiliated, Defendants caused the Plan to engage in transactions that they knew or should have known constituted the furnishing of services between the Plan and a party in interest, in violation of ERISA § 406.

325.    Defendants caused the Plan to engage in a prohibited transaction by advising, recommending, and causing investments of almost $1 million of Plan assets in high-fee PIMCO Class A Shares that may have been prudent for retail, not institutional investors, when lower-cost share classes of the same funds for which the Plan was eligible were available, solely to benefit themselves to the detriment of Plan Participants;  by receiving undisclosed 12b-1 fees and other fees and commissions, and NFP/Kestra selected the PIMCO Class A Shares that generated such fees, and failed to disclose the conflict, and all of the fees.  By placing such investments, the Defendants dealt with the assets of the Plan for their own interest and received consideration for their own personal account in connection with transactions involving the assets of the Plan.

326.    Defendants caused the Plan to engage in prohibited transactions by advising, recommending, and causing investment of approximately $900,000 of Plan assets in the CION Investment, Cole Credit Investment, and FS Investment, which were prohibited under the Plan's IPS, imprudent, and sustained negative returns, and by failing to disclose any and all fees received in connection with these investments.  By placing such investments, the Defendants dealt with the assets of the Plan for their own interest and received consideration for their own personal account in connection with transactions involving the assets of the Plan.

HB: 4831-7503-0460.1

327.    Defendants caused the Plan to engage in prohibited transactions by exercising their discretion to continue to make bond trades and generate fees and failing to disclose such fees.  By charging the mark-up and commissions, not disclosing all fees, and continuing to make bond trades that were made to generate fees, the Defendants dealt with the assets of the Plan for their own interest and received consideration for their own personal account in connection with transactions involving the assets of the Plan.

328.    Defendants caused the Plan to engage in a prohibited transaction by advising, recommending, and placing $4 million of Plan assets in a MetLife GIC.  Fees associated with this investment were unreasonable and excessive, and fees charged by the alleged investment administrator were duplicative of Defendants' fees and were not disclosed to the Plan or its Participants.  By making the investment and not disclosing the fees, Defendants dealt with the assets of the Plan for their own interest and received consideration for their own personal account in connection with transactions involving the assets of the Plan.

329.    Defendants caused the Plan to engage in a prohibited transaction by advising, recommending, and causing investment of approximately $10 million of Plan assets in a Unit Investment Trust (UIT), which was prohibited under the Plan's IPS and an imprudent investment, causing the Plan to pay duplicate management fees to AAM and themselves, and receiving "kick-backs" from AAM which were not disclosed.  By placing such investments, the Defendants dealt with the assets of the Plan for their own interest and received consideration for their own personal account in connection with transactions involving the assets of the Plan.

330.    Defendants caused the Plan to engage in a prohibited transaction by charging an asset management fee for fixed income investments of 37.5 bps of assets under management for the last 12 months of their employment while providing no effective management of the

portfolio, which fee was unreasonable . By charging and receiving the fees in connection with the investment of Plan assets without providing needed services, the Defendants dealt with the assets of the Plan for their own interest and received consideration for their own personal account.

331.     Any service fees, investment fees, and other compensation charged or received by Defendants from other service providers were per se "unreasonable" due to the failure of the Defendants to provide compliant written 408(b)(2) Disclosures. By receiving unreasonable fees, the Defendants engaged in a transaction prohibited by ERISA section 406(a)(1)(c).

332.     The Plan and its Participants have suffered losses and have been otherwise injured as a result of Defendants causing the Plan to engage in ERISA prohibited transactions. Defendants are required to render an accounting of all such fees, the amounts of which are assets owed to the Plan.

<u>**THIRD CLAIM FOR RELIEF**</u>

<u>**OTHER EQUITABLE REMEDIES**</u>
<u>**ERISA §502(a)(3)**</u>

333.     The Trustees incorporate by reference as if set forth in full herein the above stated paragraphs of the Complaint.

334.     As an alternative to the First and Second Claims for Relief, the Trustees seek relief pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1 132(a)(3).

335.     Under § 502(a)(3), a fiduciary may enjoin any act which violates ERISA or may obtain other appropriate equitable relief to redress such violations or enforce the terms of ERISA.

336.     Defendants were the primary fiduciaries of the Plan and occupied a position of trust and confidence in connection with the Plan, the Plan's assets, and the Plan's Participants.

HB: 4831-7503-0460.1

337.    Defendants had discretion and control over the Plan's assets and were strictly obligated to exercise that control for the exclusive purposes of providing benefits to Participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan.

338.    The Trustees were not fully informed as to how the Plan's assets had been managed or the fees being charged to the Plan.

339.    Defendants have received fees in connection with conflicted investment advice and have caused and allowed the Plan to pay – directly or indirectly – excess fees and expenses to Plan service providers.

340.    Accordingly, the Court should order that Defendants render an accounting of all transactions, disbursements, and dispositions occurring in, in connection with, and in respect to, the Plan and the assets of the Plan, the amount of which is owed to the Plan.

341.    The Trustees respectfully request that the Court order that such an accounting include, without limitation, detailed and specific information regarding all fees and expenses incurred by the Plan or paid to third parties, whether paid directly by the Plan or indirectly transferred among Plan service providers or other third parties.

342.    To the extent Defendants do not or cannot account for all such transactions and their property under ERISA, Plan documents, and/or other applicable law, Defendants should be surcharged for all amounts for which they cannot account.

343.    The Trustees further seek injunctive and other appropriate equitable relief to redress the wrongs herein.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants, NFP Corp., Benefit Planning Services, Inc., Kestra Financial, Inc., Kestra Advisory Services, LLC, Kestra

Investment Services, LLC, Jerry G. Korchak, and Stephen F. Curry, jointly and severally, and in favor of Plaintiffs directly on behalf of the Plan and its Participants as follows:

A.      An order declaring that the practices described above violate ERISA and a permanent injunction preventing Defendants from engaging in such conduct in the future, pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

B.      An award of monetary damages caused by Defendants' breaches pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

C.      Equitable relief, including imposition of a constructive trust pursuant to ERISA § 502(a)(3), 29 U.S.C.  § 1132(a)(3).

D.      Disgorgement or restitution pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

E.      An accounting for profits, pursuant to ERISA § 502(a)(3), 29 U.S.C. §1132(a)(3).

F.      An award of Plaintiffs' reasonable fees and costs pursuant to ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1).

G.      Pre-judgment interest at the maximum rate, whether at law or in equity.

H.      Post-judgment interest at the maximum rate, whether at law or in equity.

I.      Any and all further relief that the Court may deem just and equitable.

HB: 4831-7503-0460.1

Dated this 18th day of May, 2020.

s/Joshua B. Levy
_____
Joshua B. Levy
Karen L. Tidwall
HUSCH BLACKWELL LLP
555 East Wells Street, Suite 1900
Milwaukee, WI 53202-3819
(414) 978-5527 Phone
(414) 223-5000 Fax
joshua.levy@huschblackwell.com
karen.tidwall@huschblackwell.com

Attorneys for Plaintiffs

HB: 4831-7503-0460.1