# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

KEVIN DALE, FRANK HOVAR, JAMIE
LAWSON, MICHAEL LEOPARDO, BRAD
LONG, FORTUNATO SALAMONE, JOEL
SJOSTROM, GLEN TURPOFF, CHRIS
WOOD, AND JOSE ZAMARRIPA, as members
of the Board of Trustees of the
NORTHERN ILLINOIS ANNUITY FUND
AND PLAN,
on behalf of the Participants of the Northern
Illinois Annuity Fund and Plan,

        Plaintiffs,

    v.

BENEFIT PLANNING SERVICES, INC.,
6833 Stalter Drive, Suite 208,
Rockford, Illinois 61108,

NFP CORPORATE SERVICES (IL), INC.,

500 West Madison Street, Suite 2760

Chicago, IL 60661,

KESTRA ADVISORY SERVICES, LLC,
5707 Southwest Parkway, Suite 2-400,
Austin, Texas 78735,

KESTRA INVESTMENT SERVICES, LLC,
5707 Southwest Parkway, Suite 2-400,
Austin, Texas 78735,

JERRY G. KORCHAK,
2412 Harris Road,
Rockford, Illinois 61107, and

STEPHEN CURRY,
1873 Crenshaw Circle
Vernon Hills, IL 60061.

)
)
)
)   Case No. 1:20-CV-2942
)
)
)
)
)
)
)
)
)

1

## PLAINTIFF'S AMENDED COMPLAINT

NOW COME Plaintiff, the Northern Illinois Annuity Fund and Plan and as and for their Complaint against Defendants, alleges and shows unto the Court as follows:

## SUMMARY OF THE ACTION

1.     This action is filed under the Employee Retirement Income Security Act ("ERISA"), as amended, 29 U.S.C. § 1001, et seq., against various fiduciaries and parties in interest of a multiemployer defined contribution employee pension benefit plan as defined under 29 U.S.C. § 1002(2) (34), and (37) known as the Northern Illinois Annuity Fund and Plan (hereinafter, the "Plan").

2.     The Board of Trustees of the Plan (the "Board" or the "Trustees") bring this action as Plan fiduciaries directly on behalf of the Plan and the participants of the Plan ("Participants") in order to enforce the provisions of ERISA and to restore losses to the Plan, disgorge any profits, to ensure that the Plan and its assets have been properly administered, and to obtain other remedies arising out of Defendants' breaches of fiduciary duties and other violations of ERISA.

3.     The Trustees and their predecessor trustees placed their trust and confidence in defendant Benefit Planning Services, Inc. and defendant, Stephen Curry, and defendant Jerry Korchak, as their primary investment professionals, relying on them and paying them (1) to act solely in the interests of the participants, (2) to render correct advice as to the value of the Plan's investments, (3) to exercise discretion in the management of the Plan's fixed income investments, (4) to recommend appropriate investment policies and investment managers, (5) to report accurately on the performance of the Plan's investments, and (6), in general, to guide the Trustees in the management of the Plan so they could meet their legal duties as informed fiduciaries.

2

4.      At all relevant times, acting as ERISA fiduciaries of the Plan, BPS, Curry, and Korchak determined how, when, and where to invest certain Plan assets; selected, recommended, purchased, and held certain investments for the Plan; drafted and changed the Plan's Investment Policy Statement; selected and designated additional investment managers for certain illiquid investment options and negotiated agreements with them; selected and designated Kestra Investment Services as the directing broker for certain investments which they also recommended or purchased; and allocated Plan assets among other investment managers some of whom shared their fees with all Defendants.

5.      Defendants' ERISA fiduciary duties are the highest duties known to the law. They included the duty of loyalty, which required them to act for the exclusive purpose of providing benefits to the Participants, and to charge the Plan expenses that are reasonable and relate only to Plan activities.  The duty of loyalty required Defendants' complete and undivided loyalty to Participants.

6.      Defendants' ERISA fiduciary duties included the duty of prudence, which required them to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

7.      Defendants' ERISA fiduciary duties required them to disclose certain information to the Trustees relating to, among other things, the investment of Plan assets and the indirect and direct compensation relating to such investments.

8.      Defendants' ERISA fiduciary duties required them to follow the terms of the Plan documents.

9.     Defendants also were required to refrain from causing the Plan to engage in ERISA Section 406 prohibited transactions, from using Plan assets for their own benefit and for the benefit of parties in interest, and from engaging in self-dealing and in conflict-of-interest transactions unless the conflict was disclosed and waived.

10.     Defendants failed to carry out their responsibilities to the Plaintiff with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the management and representation of a pension plan.

11.     In general, Defendants failed to commit their responsibilities to the terms of written contracts, structured numerous investments to generate excessive direct and unlawful indirect compensation to themselves, regularly provided false or inadequate reports on the Plan's investment performance, provided inadequate or misleading advice concerning appropriate investment policies, invested the Plan's assets in inappropriate and illiquid investments causing the Plan to lose money on those investments and to lose the opportunity to generate substantial investment returns for the benefit of the participants, and regularly failed to disclose all the direct and indirect compensation they were obtaining through the use of the Plan's assets.

12.     Defendants turned a blind eye to their fiduciary duties.  Their actions reveal they were driven by one goal – to make as much money as they could for themselves – regardless of the impact on the Plan and its Participants. Defendants had a pattern and practice of giving investment advice and making investment decisions for the Plan that would maximize the Defendants' compensation without regard to the best interests of the Plan and its Participants.  In order to financially benefit themselves, Defendants administered, advised, and managed the Plan and assets

of the Plan as if the Plan was a high net worth investor instead of what it is, an ERISA-governed retirement plan and institutional investor.

13.     Defendants were at all times with respect to all Plan investments in a conflict of interest position, which they failed to disclose to the Trustees. They were incentivized to ignore what was best for the Plan and focused only on generating revenue for themselves.

14.     Defendants financially benefits from commissions, mark-ups on bonds, finder's fees, and kickbacks from parties in interest and other fiduciaries, for the same investments that they selected for the Plan's account, using assets of the Plan to generate compensation in excess of the fees agreed to and paid by Plaintiffs.

15.     To the extent that Defendants disclosed some of the commissions they earned on fixed income and equity investments, Defendants failed to disclose that the fixed income commission arrangement implemented an unlawful conflict of interest providing Defendants with the incentive to make investment decisions that would increase the compensation of Defendants rather than be made primarily to benefit Participants.

16.     Defendants' violations of ERISA have caused damage to the Plan and its Participants, and the Plan is entitled to the full extent of the remedies available under ERISA including, but not limited to, reimbursement to the Plan for the losses resulting from the fiduciary breaches, an accounting and disgorgement of assets and profits obtained through prohibited transactions, a surcharge, and an award of attorneys' fees and costs.

17.     The relevant time period applicable to the Amended Complaint, unless otherwise specifically noted, is June 1, 2013 through December 31, 2019.

## PARTIES AND FIDUCIARY STATUS

### The Plan

18.     The Plan is a defined contribution, multiemployer employee pension benefit plan within the meaning of ERISA, 29 U.S.C. § 1002(2), (34), and (37).

19.     The members of the Board of Trustees of the Plan are appointed by sponsoring labor unions and an employer association to a jointly administered Board of Trustees established under the federal Labor Management Relations Act, § 301.

20.     The Plan is required to be administered under the terms of ERISA, the Internal Revenue Code, other federal laws, and pursuant to governing Plan documents.

21.     The Board of Trustees is the Plan Sponsor and fiduciary within the meaning of ERISA, 29 U.S.C. § 1002(16)(B) and 1002(21).

22.     The Participants are past and present union members who, at the relevant time, were or are eligible to receive retirement benefits pursuant to the governing Plan documents and ERISA.

23.     The registered agent for service of process is the Plan's law firm, Dowd, Bloch, Bennett, Cervone, Auerbach & Yokich, LLP 8 South Michigan Avenue, 19th Floor, Chicago, Illinois 60603.

### Defendants Benefit Planning Services, Inc. and NFP Corporate Services (IL), Inc.

24.     Defendant Benefit Planning Services, Inc. (a/k/a NFP Benefit Planning Services, Inc.)("BPS") was an Illinois corporation with its principal place of business located at 6833 Stalter Drive, Suite 200, Rockford, Illinois 61108.  Its registered agent for service of process is CT Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

25.     Defendant NFP Corporate Services (IL), Inc. was a wholly-owned subsidiary of NFP Corp. f/k/a National Financial Partners Corporation. NFP Corporate Services (IL), Inc. had its

principal place of business at 6833 Stalter Drive, #200, Rockford, Illinois 61108. Its registered agent for service of process is 500 West Madison Street, Suite 2760 Chicago, IL 60661

26.     BPS was a wholly-owned subsidiary of NFP Corporate Services (IL), Inc.

27.     Unless otherwise noted, BPS and NFP Corporate Services, IL are referred to collectively herein as "NFP."

28.     NFP was appointed by the Board of Trustees and served as the Plan Administrator within the meaning of Plan Administrator under ERISA and also provided third-party administrative services.

29.     As detailed herein, NFP had and exercised discretionary authority and responsibility in its role as Plan Administrator and TPA.

30.     In addition, although it was not registered as an investment adviser under the Investment Advisors Act of 1940 (the "Act"), NFP had the power to manage, acquire, and dispose of any assets of the Plan in that portion of the Plan portfolio which defendants Steve Curry and Jerry Korchak designated as "fixed income."

31.     As investment manager for the Plan's fixed income portfolio, NFP and its representatives were responsible for selecting, managing, monitoring, and benchmarking the fixed income investment offerings of the Plan, and had discretionary authority to direct the investment of such funds.

32.     Although it was not registered as an investment adviser under the Act, NFP performed as an investment advisor with respect to both the fixed income and equity assets in the Plan's portfolio.

33.     As detailed herein, NFP rendered investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of the Plan, and has any authority or responsibility to do so.

34.     NFP also was a registered insurance agency that sold annuities and other insurance products to the Plan.

35.     As detailed herein, NFP exercised discretionary authority and control respecting management of the Plan and its assets.

36.     Each of the preceding paragraphs provides an independent basis for NFP having the status as an ERISA fiduciary of the Plan.

37.     The Plan was the only ERISA-governed retirement plan for which NFP provided investment advisory services.

### The Kestra Defendants

38.     Defendant Kestra Investment Services, LLC, and its predecessors in interest including NFP Securities, Inc. and NFP Advisor Services, LLC ("Kestra IS"), is a limited liability company registered under the laws of Texas with its principal place of business is 5707 Southwest Parkway, Suite 2-400, Austin, Texas 78735-6221. Its registered agent for service of process is CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

39.     From at least June, 2013 through June, 2016, Kestra IS acted in dual capacities as both registered investment advisor under the Act and registered broker-dealers.

40.     In addition to receiving an asset-based advisory fee as an investment advisor for the Plan, from at least June, 2013 through June, 2016, Kestra IS offered and sold securities for the Plan's accounts through Kestra IS through its registered representatives, defendants Jerry Korchak and Stephen Curry, among others.

41.     On or around June 24, 2016, NFP Corp. (f/k/a National Financial Partners Corporation), parent company of Kestra Financial, Inc. And Kestra IS, separated its advisory and brokerage businesses, rebranding its brokerage business as a stand-alone broker-dealer, Kestra IS.

42.     NFP Corp. transferred its investment advisory business to a newly-created affiliate successor entity, defendant Kestra Advisory Services, LLC.

43.     Defendant Kestra Advisory Services, LLC ("Kestra AS") is a limited liability company registered under the laws of Texas with its principal place of business located at 5707 Southwest Parkway, Suite 2-400, Austin, Texas 78735-6221. Its registered agent for service of process is CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

44.     Kesttra AS is a wholly-owned subsidiary of Kestra Financial, Inc.

45.     Kestra AS is a registered investment advisor under the Act.

46.     Kestra IS is Kestra AS's affiliated broker-dealer.

47.     From June, 2016 through December, 2017, Kestra AS purported to provide investment advisory services to the Plan and charged the Plan an advisory fee and other fees for such alleged services, which it caused the Plan to pay.

48.     Kestra AS was an ERISA fiduciary respecting the Plan.

49.     Kesttra IS represents that it provides security brokerage services to 150 defined contribution retirement plans of over $25 million in assets under management. Of those 150, only three, including the NIAF Plan, were so-called "individually-designed" defined contribution plans.

50.     Kesttra AS provided investment advisory services to approximately 350 defined contribution plans of $25 million or more in assets under management. Of those 350, only three, including the NIAF Plan, were so-called "individually-designed" defined contribution plans.

51.     Kestra IS and Kestra AS are affiliated with NFP.

9

**Defendants Jerry Korchak and Stephen Curry**

52.     Defendant Jerry G. Korchak ("Korchak") is an adult resident of the State of Illinois and resides in Rockford, Illinois 61107.

53.     From at least June, 2013 through April 9, 2018, Korchak was an employee of BPS.

54.     From at least June, 2013, Korchak was the Plan's Administrator within the meaning of ERISA.

55.     From at least June, 2013, Korchak was the Plan's investment advisor representative through NFP, Kestra IS, and/or Kestra AS (as of June 24, 2016).

56.     From at least June, 2013, Korchak was a registered representation through Kestra IS and executed trades in various Plan accounts.

57.     From at least June, 2013, Korchak sold insurance services and products to the Plan through NFP.

58.     Upon information and belief, Korchak had no employment or other written agreement with NFP, Kestra IS or Kestra AS, which defined the terms of his compensation relating to, among other clients, the Plan. Korchak was paid a percentage of the total revenue generated by the Plan, among other of his clients. After NFP's took its cut, upon information and belief, his compensation was at least 25% of Plan revenue and another 25% commission on any investment products he separately sold to Plan Participants.

59.     Korchak was an ERISA fiduciary of the Plan.

60.     Defendant Stephen F. Curry ("Curry") is an adult resident of the state of Illinois and resides in Vernon Hills, Illinois 60061.

61.     From at least June, 2013, Curry was the Plan's Administrator within the meaning of ERISA.

62.     From at least June, 2013, Curry was the Plan's investment advisor representative through NFP, Kestra IS, and/or Kestra AS (as of June 24, 2016).

63.     From at least June, 2013, Curry was a registered representation through Kestra IS and, upon information and belief, executed trades in various Plan accounts.

64.     From at least June, 2013, Curry sold insurance services and products to the Plan through NFP.

65.     From at least July, 2013 until approximately October, 2014, NFP paid Curry, through his company, BPS Management Company, LLC, based on the total revenue generated by the Plan, among other of his clients.

66.     In October, 2014, NFP bought out Curry and he entered into an employment agreement with NFP ("Curry's Employment Agreement"), pursuant to which Curry had the following duties and responsibilities to NFP: Retaining NFP IL and BPS's existing block of business; generating new business production of products and services sold by NFP and its affiliates; transitioning day-to-day management of the existing business of BPS and client relationships to NFP; and assisting in the management of BPS.

67.     Curry's Employment Agreement provided that Curry "shall devote full attention and time during normal business hours to the business and affairs of [NFP IL] and . . . use the Employee's best efforts to carry out such responsibilities faithfully and efficiently and to maximize the earnings, and otherwise advance the interests, of [NFP IL] and its affiliates."

68.     Curry's Employment Agreement prohibited him from engaging in business activities that would present a conflict of interest with his obligations to NFP.

69.     After NFP's took its cut, at least 10% of the revenue generated by the Plan was applied to Curry's draw.

11

70.     Curry was an officer of NFP.

71.     Curry was responsible for managing BPS and its employees including Korchak.

72.     Curry was an ERISA fiduciary of the Plan.

73.     Curry and Korchak may be referred to collectively herein as the Representatives."

## JURISDICTION AND VENUE

74.     Plaintiff brings this action pursuant to ERISA and under Sections 502(a)(2), 502(a)(3), and all other relevant sections of ERISA (29 U.S.C. § 1001 et seq.), which provide that an ERISA fiduciary may pursue a civil action on behalf of the Plan to remedy breaches of fiduciary duty as set forth in ERISA § 409, 29 U.S.C. § 1109, and to obtain other appropriate equitable relief.

75.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1132(e).

76.     All Defendants are subject to service of process issued from this Court and this Court has personal jurisdiction pursuant to 29 U.S.C. § 1132(e)(2).

77.     Venue with respect to this action lies in the Northern District of Illinois, pursuant 29 U.S.C. § 1132(e)(2) because (a) some or all of the breaches of fiduciary duty giving rise to this action occurred in this district, and (b) Defendants may be found in this district and have agents doing business in this district.

## FURTHER FACTUAL ALLEGATIONS

### The Plan's Documents and Operation

78.     The Northern Illinois Annuity Fund and Plan (the "Plan") was created in June, 1981 pursuant to the Agreement and Declaration of Trust dated June 25, 1981 (as restated and amended from time to time thereafter)(the "Trust") and the Rules and Regulations of the Northern Illinois

Annuity Plan dated June 25, 1981 (as restated and amended from time to time)("Rules and Regulations") or collectively, "Plan Documents."

79.     The Plan's purpose is to provide union workers with a trust fund through which to accumulate money to protect themselves and their families in the event of death or disability during their working years, and to provide additional financial security in retirement. Various labor unions and employers entered into collective bargaining agreements that initially provided for the establishment of the Plan and currently mandate that employers contribute to the Plan.

80.     A meeting of the Plan's Board of Trustees is noticed and held on a quarterly basis.

81.     The members of the Board of Trustees receive no compensation for their service to the Plan.

82.     The Plan Participants do not participate in any way in the investment of Plan assets, which is carried out by investment managers that previously included BPS, Kestra IS, and Kestra AS.

83.     The amount of benefit for each Plan participant is the balance in his or her individual account at the time he or she qualifies for a distribution.  Such amount is equal to the sum of all contributions made over the years of employment, adjusted to reflect the Participants' share of any investment earnings or losses of the Plan as a whole, less administration expenses incurred by the Plan.

84.     The Plan's Investment Policy Statement ("IPS"), which was adopted by the Board and amended from time to time with Board authorization, set the investment objectives and performance standards upon which all investment decisions were to be made.

85.     Under the IPS, the Plan's investment policy was to maintain a diversified balanced portfolio to be managed at a reasonable expense by an investment manager approved by the Trustees.

86.     The fund portfolio consisted of fixed-income investments and equity asset classes. The purpose of the fixed income allocation was to preserve capital and stability of the yield. The purpose of the equity allocation was long-term capital growth.

87.     The IPS set minimum and maximum fixed income and equities asset allocation requirements. Any changes to the asset allocation were required to be for the purpose of increasing the fund's returns and/or to reduce risk. Asset allocation and changes between fixed income and equity funds were required to be approved by the Trustees.

88.     As discussed herein, the IPS restricted the types of fixed income and equity investment products that could be purchase for the Plan to those identified therein.

89.     Pursuant to the IPS, non-marketable securities, commodity trading, short selling, option trading with the exception of covered calls, and private placements constituted restricted and prohibited transactions and assets.

**NFP Was Appointed and Functioned as an ERISA Plan Administrator**

90.     While the Board of Trustees was listed as the Administrator in the Trust, the Board delegated the role of Plan Administrator to NFP, Korchak, and Curry.

91.      NFP functioned at all times as the ERISA Plan Administrator responsible for maintaining and administering the Plan.

92.     NFP's obligations also included those typical of a third-party administrator commonly known as a "TPA."

93.     Pursuant to the Rules and Regulations, the Plan Administrator had the responsibility to, among other things: (1) determine and fix the amount in each Employer's Individual Account by figuring the amount in the Individual Account on the last valuation date, plus the investment yield, minus the pro-rated costs of administrative expenses, plus employer contributions, plus the amount of forfeiture; (2) determine the gross investment yield obtained by the Plan during the fiscal year pursuant to formula; and (3) deduct "expenses for the administration of the Plan and other amounts for reserves or such other purposes the Trustees, in their sole discretion, shall decide." *See* June 2, 2009 Rules and Regulations of the Plan, § 3, p. 9.

94.     As Plan Administrator, NFP was responsible for compliance with the reporting and disclosure rules under ERISA as respects the Plan.

95.     As Plan Administrator, NFP was represented at the quarterly Board of Trustees meetings. NFP's Gannon made an audio recording of the Board meetings and took notes. Based on the recordings and notes, Gannon prepared detailed meeting minutes for each board meeting and distributed them to the Board. The Board reviewed and approved the minutes at the following quarterly board meeting.

96.     On an annual basis, NFP was charged with preparing all necessary paperwork for the auditor for the Plan's annual audit and preparation of Form 5500s.

97.     NFP through Korchak and Gannon provided information respecting the Plan to the auditor on a yearly basis for the audit and Form 5500s.

98.     Korchak regularly represented that he was the Plan Administrator. He signed confirmations as such to obtain information from other Plan services providers for the Plan's annual audit.

99.     Korchak or Curry signed the Form 5500 as Plan Administrator along with the Plan Sponsor.

100.    NFP was required to maintain and control all investment-related records for the Plan.

101.    NFP had complete control of all information relating to the Plan.

102.    NFP determined what information was provided to the Trustees and what information was withheld.

103.    After a July 14, 1997 Administrative Services Agreement between BPS and the Plan terminated on December 31, 2001, there was never a written administrative service contract between BPS and the Plan.

104.    NFP never presented an administrative or investment advisory services agreement to the Board for its consideration or approval.

105.    NFP, Korchak, and Curry represented to the Board that a written agreement was not necessary or required.

106.    From at least June, 2013 until its termination, NFP charged the Plan a flat fee for administrative services based on the number of Plan participants.

**Defendants' Excessive and Unreasonable Investment Advisor and Management Fees Charged to the Plan**

107.    NFP and/or Kestra IS, through Curry and Korchak, regularly advised and made recommendation to the Trustees regarding performance of its existing investments, investment strategy, investment options, the market, and the overall portfolio.

108.    Since at least 2012, Curry, Korchak, and Bruce Hagshenas (until his death) worked together on the makeup of the Plan's investment portfolio.

109.     At all times, the Board of Trustees, the members of which were not investment experts but managers and laborers in the constriction trade, reasonably relied on the investment advice and management of NFP and/or Kestra IS.

110.     In all instances involving the investment of Plan assets, the Trustees relied upon the NFP's and/or Kestra IS's selection, recommendations, and determinations.

111.     In addition to the administrative services fee, from at least June, 2013, NFP charged the Plan a quarterly asset-based investment advisory fee, which was calculated based on three-eighths of one percent (.375%) of the average "fixed income assets" under NFP's management (the "NFP Advisory Fee").

112.     NFP, Curry, and/or Korchak, acting as both fixed income investment manager and Plan Administrator, provided the information as to the values of the fixed income portfolio. Based on such information, Gannon calculated the NFP Advisory Fee.

113.     Upon information and belief, the information provided by NFP, Curry, and/or Korchak to NFP as Plan Administrator to calculate the NFP Advisory Fee was not complete and thus the NFP Advisory Fee was based on inaccurate information.

114.     During the relevant time, the Plan wrote manual checks to BPS to pay the investment advisory fee as instructed by NFP. Korchak and/or Curry processed the advisory fee in one of three ways: they ran the advisory fee through NFP; they ran the advisory fee through the Plan's through Kestra IS; and/or they took payment from the Plan for their own account with no portion of the revenue going to NFP or Kestra IS.

115.     A complete accounting is necessary to figure out how these funds were processed, due to all Defendants' failures of prudent processes including a failure to maintain complete records of Plan investments, lack of contracts between the Plan and Defendants, failures to disclose

agreements between and among Defendants, and the existence and failures to disclose to the Board the many conflicts of interest.

116.     From approximately June 2013 through 2017, NFP caused to be charged to the Plan an NFP Advisory Fee in the total amount of at least $1,151,095.21.

117.     As described further herein, First Trust Advisors, Inc. ("FTA") was the selected investment manager for the equity portion of the portfolio to which the Plan agreed to pay FTA .55 bps for its investment management of the equity portion of the portfolio as set forth in a 2009 contract with the Plan (the "FTA Contract").

118.     NFP, which negotiated the FTA contract, did not disclose the Trustee that NFP would receive any type of fee from FTA for any reason.

119.     On December 17, 2009, Curry (as Vice President of NFP, BPS) emailed FTA's Foley regarding the Plan's fees: "I know we discussed in prior conversations, but is there any way you can collect the whole 57 Bps and pay Benefit Planning Services the difference from what your charge is and the 57 Bps? We can get a letter signed by the board that we are doing this if your legal needs it. NIAF wants the fees being paid coming from First Trust and not directly out of the annuity fund." This alleged desire of the Trustees was not discussed by Curry with the Trustees.

120.     From 2009 through about 2013, NFP failed to disclose to the Trustees that it was charging the Plan the NFP Advisory Fee an additional solicitor fee from FTA.

121.     Around 2013, NFP represented to the Trustees that the Plan was required to pay FTA .57 bps as a percentage of assets under FTA's management and pay NFP an equity recordkeeping fee calculated as follows: The equity portfolio value at the relevant time, multiplied by ¼ of .57 basis points, less the alleged FTA equity fee, with the balance billed by NFP to the Plan. This fee is referred to as the ("NFP  Equity Fee").

122.     Neither the FTA Contract nor any other agreement refers to an equity recordkeeping fee to be paid to NFP, yet NFP received additional compensation of 25 basis points in the FTA account through an undisclosed fee-splitting arrangement with FTA.

123.     NFP did not fully disclose their portion of this fee, and to the extent the Trustee received some information about the fee, such information was incomplete, confusing, and insufficient to apprise the Trustees of nature and extent of the fee.

124.     To the extent NFP provided any services to the Plan for this additional fee, FTA was already obligated to provide those services pursuant to the FTA Contract, causing the Plan to pay more than the 55 basis points set forth in the agreement.

125.     By negotiating the foregoing arrangement for the Plan, NFP/Kestra IS arranged for the payment of excessive fees to a marginally qualified equity manager with minimal experience in investing pension fund assets, and secured a cut of the fees paid to FTA.

126.     The Plan could have obtained management of its equity portfolio by highly qualified managers with substantially lower fees and with better returns over time.

127.     NFP intentionally concealed and did not disclose that this additional fee was actually a solicitor fee and constituted indirect compensation to NFP that was required to be disclosed as such.

128.     From approximately June 2013 through 2017, NFP caused to be charged to the Plan an FTA Advisory Fee in the total amount of approximately $199,351.02.

129.     From approximately June 2013 through 2017, the Plan also directly paid FTA an asset-based equity asset management fee in the total amount of at least $324,651.21 ("FTA Fee").

**Imprudent and Conflicted Conduct Relating to**
**Management of the Bond Portfolio**

130.     At the relevant times, a significant portion of the Plan's portfolio was invested in bonds.

131.     By at least December, 2008, unknown to the Trustees, Kestra IS contracted with AAM for certain fixed income securities trading services for Kestra IS's registered representatives, including Korchak and Curry.

132.     For each bond transaction placed by Korchak or Curry with AAM, Kestra IS received compensation in the form of fees and commissions.

133.     For each bond transaction placed with AAM, Kestra IS's registered representatives received compensation in the form of commissions. Gross Sales Concession ("GSC") referred to the RR's gross compensation earned on each bond investment, which was then applied in accordance with Kestra IS's guidelines.

134.     Under the Kestra IS/AAM agreement, for transactions in Kestra IS's fee-based advisory accounts, *the value of the GSC is equal to zero*.

135.     Although Kestra IS was required to provide AAM with a continually updated list of its fee-based advisory accounts, the Plan's account with Kestra IS was an asset based advisory account, but never was disclosed as such.

136.     Kestra IS and Korchak recommended this arrangement in which he exercised discretion in the execution of bond trades and, as a result, received commissions and other fees on such trades.

137.     Although it appears that Kestra IS was prohibited from realizing compensation (i.e., GSC) on the Plan's account under the contract with AAM, Kestra IS took at least a 1.0-2.5% markup on all bond trades executed by Korchak.

138.    Korchak did not disclose these commissions in the form of mark-ups to the Trustees.

139.    The NFP Advisory Fee was billed to the Plan regularly, without disclosure of any markups.

140.    There was no contract with the Plan allowing such markups.

141.    The Board did not learn about the markups on bond trades until June, 2017, when, after the Trustees required prior approval for all bond trades, Korchak asked the Trustees for authority to purchase $4 million in bonds. Korchak told the Trustees that he would agree to eliminate his practice of adding "mark-ups" on the bond purchases in the amount of 1 to 2.5% in exchange for an increase in the asset based advisory fee for the fixed income investments. The Trustees were unaware, before Korchak's "proposal" to forego markups, of any such markups and rejected the offer. Korchak stated that the compensation described as markups was a practice that was part of their longstanding arrangement with the Plan.

142.    Any such price markup should have been disclosed and approved by the Trustees and would have been inconsistent with industry standard for investment management of ERISA funds. A typical ERISA bond manager will only charge the Plan an asset based investment management fee and provide written representations that no additional compensation is received, neither broker's commission nor commission markups.

143.    Upon information and belief, Kestra IS, through Korchak, frequently bought and sold bonds to generate commission and fees in a course of conduct referred to as "churning." Upon information and belief, this activity caused the Plan to incur losses from the commissions and the "markups."

144. Kestra IS, through Korchak. invested the Plan's assets in taxable municipal bonds where bid-ask spreads are less risky securities such as Treasuries and many high-quality corporate debt bonds. By 2017, Korchak had invested a large majority of the bond portfolio in taxable municipal bonds, including bonds that were difficult to value and cash, creating unnecessary risk and losses when, on the advice of a qualified registered investment advisor who succeeded Korchak and Curry, the portfolio had to be restructured to obtain an appropriate allocation of invested assets.

145. In or around August 2015, the SEC issued guidance about its concerns with financial advisors selling structured products before maturity and the negative financial outcome for investors as a result. Curry and Korchak were identified as financial advisors of Kestra IS who were selling structured products prior to maturity. Upon information and belief, on the Plan's brokerage account with Kestra IS, Korchak executed at least 1,140 of these potentially problematic trades. Upon information and belief, Korchak's trading activities were in violation of his fiduciary duties to the Plan and resulted in losses to the Plan.

146. In December, 2016, the Trustees instructed Korchak to cease all discretionary bond purchases for the Plan's account and instead to make recommendations to the Trustees and obtain the Trustee's approval in advance of any proposed sales or purchases.

147. In instances when the Trustees instructed Korchak to execute bond trades after December, 2016, Korchak did not execute those trades.

148. From approximately December, 2016 through November, 2017, NFP, Kestra AS, and Korchak did not manage the bond portfolio, and the actions and inactions taken during that period were contrary to the expressed direction or actions of the Trustees.

149.     Despite the fact that NFP, Kestra AS and Korchak provided little to no investment advice or management from December, 2016 through 2017, including implementing transactions approved by the Trustees, Defendants collected the NFP Advisory Fee for that period.

**Kestra IS's Compensation for Trade Execution and Failure to Disclose Same**

150.     Kestra IS acted in dual capacities as investment advisor and broker-dealer for the Plan.

151.     From this conflict of interest position, on top of the NFP Advisory Fee and the FTA Fee, NFP and/or Kestra IS, through its Representatives, realized hundreds of thousands of dollars in commissions and transaction fees from securities transactions executed by Korchak and/or Curry as registered representatives.

152.     NFP and/or Kestra IS did not disclose all such commission and other fees.

153.     NFP and/or Kestra IS did not offset the NFP Advisory Fee to take into account such commission and other fees.

154.     Due to the lack transparency from Defendants, a complete accounting is required to determine what indirect compensation the Fund was paying to Kestra IS.

155.      Direct and indirect compensation information in the Plan's Form 5500s, audited financial statements, Defendants' sworn interrogatory answers, and other varied documentation provided the Fund Counsel after the fact contain inconsistent information as to the nature and amounts of the direct and indirect compensation received by Plan service providers on the back of the Plan and its Participants

156.     As Plan fiduciaries, Defendants were required to discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive

purpose of providing benefits to participants and their beneficiaries, and defraying reasonable expenses of administering the plan

157. Defendants had a conflict of interest when providing fiduciary services to the Plan including recommending and selecting investment products and services from which they financially benefited through commissions and fees at the expense of the Plan participants.

158. The Defendants failed to disclose to the Board the conflicted nature of the roles of Defendants and, as a result, the Trustees were unaware of the conflicts of interest plaguing the services they received.

<u>**Imprudent and Conflicted Conduct Concerning<br>the MetLife Managed GIC Investment**</u>

159. On or around August 24, 2004, BPS's Bruce Hagshenas informed the Trustees that the Plan invested an estimated $4 million in a MetLife Managed GIC contract 25157 that paid Alliance Benefit Group, the named investment administrator, 0.68% or 68 bps of the investment.

160. Korchak was not registered with Kestra until September 1, 2004, but signed the documentation for MetLife GIC.

161. Prior to making the investment, NFP and/or Kestra IS did not inform the Trustees that they would directly receive a quarterly "advisory fee" from Alliance Benefit Group ("ABG") through the life of the investment.

162. Prior to making the investment, no commission or fee schedule was disclosed.

163. Fees associated with this investment included quarterly custody and asset-based fees, which were unreasonable and excessive, and the Plan was charged fees payable to ABG for custodial services that duplicated other custodial services provided to the Plan.

164. NFP and/or Kestra IS did not reduce the NFP Advisory Fee to reflect the additional compensation from ABG.

165. Over the life of the investment, upon information and belief, NFP, Kestra IS, and later Kestra AS failed to disclose material information about the MetLife GIC in a continuing breach of fiduciary duty.

166. Over the life of the investment, upon and information and belief, NFP, Kestra IS, and later Kestra AS failed to disclose all direct and indirect compensation related to the MetLife GIC, in a continuing breach of fiduciary duty.

167. NFP, Kestra IS, and later Kestra did not provide the Trustees with all financial reports relating to the MetLife GIC investment.

168. These Defendants failed to evaluate the performance and fees of Alliance Benefit Group as investment manager for this investment.

169. In 2017, Korchak misrepresented to the Trustees that he was the "only" person that could request redemption of the MetLife GIC, when in fact the Plan Sponsor was authorized to immediately request a redemption. Korchak's misrepresentations delayed transfer of the control of this asset from to the Trustees. On information and belief, Kestra IS received fees during the period of delay in transferring control of the asset to the Trustees.

170. Upon information and belief, the Plan suffered losses because the $4 million should have been allocated to diversified investments of the other Plan assets which produced higher returns.

### Imprudent, Conflicted, and Prohibited Conduct Relating to Purchase of PIMCO Class A Shares

171. Kestra IS, through Korchak, caused to be purchased shares of the PIMCO Total Return Fund in mutual fund share class, PIMCO Class A Shares ("PIMCO Class A Shares"), which would result in exorbitant commissions.

172.     The PIMCO Class A Shares are a high fee share class typically purchased by retail investors and are not appropriate for institutional investors such as the Plan with substantially larger amounts to invest.

173.     The PIMCO Class A share class charges both 12b-1 fees and sales loads.

174.     Institutional shares were available but did not provide favorable 12b-1 fees for Kestra IS.

175.     Kestra IS received 12b-1 fees and other fees from investment in the PIMCO Class A Shares.

176.     Kestra IS failed to purchase, recommend, or hold for the Plan institutional share classes that did not charge 12b-1 fees, even though the Plan was eligible to hold institutional share classes.

177.     Had the Plan held shares in the institutional share class of a mutual fund, the Plan would have earned higher returns because of the absence of a 12b-1 charge, and because Defendants would have taken no commissions or significantly lower commissions than they in fact did.

178.     Investment in the PIMCO Class A Shares violated the Plan's IPS as the PIMCO Fund prospectus includes a disclosure that the PIMCO Class A Shares includes holdings in "below investment grade" fixed income investments.

179.     PIMCO Class A Shares constituted an imprudent investment using assets of the Plan.

180.     Upon information and belief, Kestra IS failed to disclose receipt of all fees and other compensation from the PIMCO Class A Shares.

181.     NFP and Kestra IS failed to disclose to the Trustees the conflict of interest that existed as a result of their receipt of 12b-1 fees, and their selection of the PIMCO Class A Shares that generated such fees.

182.     NFP and Kestra IS did not provide the Trustees with appropriate written financial reports relating to these investments and failed to disclose reasonable alternative investments.

183.     NFP and Kestra IS selected and retained these high fee investments to financially benefit themselves to the financial detriment of the Plan and its Participants.  They had a conflict of interest in doing so, and the amount of such fees are assets owed to the Plan.

184.     Upon information and belief, the Plan suffered a loss in value because the assets used for these investments would have earned higher returns if placed on terms available to institutional investors.

185.     Kestra IS has been rebuked by the SEC related to the PIMCO Class A Shares, confirming the practice of investing in retail-class funds was not a "one-off" event or possible mistake but an embedded firm practice designed to take additional compensation from 12b-1 fees without disclosing the arrangements.

### Imprudent and Conflicted Recommendation of First Trust Advisors

186.     NFP and/or Kestra IS, acting in a fiduciary capacity, recommended the Plan engage FTA to manage the equity portion of the portfolio.

187.     NFP and/or Kestra IS did not provide the Trustees with sufficient information about potential investment managers, including FTA, and did not provide the Trustees with a detailed summary, research, or comparison reports that included quantitative and qualitative analyses of the resources and past performance of qualified equity managers.

188.     It would be typical for this kind of fund to invest in equity index fund that could cost between 9-12 basis points, but NFP did not recommend this type of strategy to the Trustees.

189.     NFP and/or Kestra IS did not evaluate whether other equity investment managers with institutional client experience, adequate research capacity, and demonstrated excellent past performance could be engaged.

190.     The failure of NFP and/or Kestra IS to conduct a search for qualified, top-performing equity managers and provide the results of the research to the Trustees so they could select a manager violated their responsibility to act on behalf of the Trustees with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent investment advisor familiar with such matters would use in advising a board of trustees.

191.     FTA had extremely limited institutional retirement plan client experience and limited internal capabilities to evaluate equity managers, which was not disclosed to the Trustees.

192.     FTA paid Ibbotson Associates (n/k/a Morningstar, Inc.) a licensing fee of .07% out of its fee with respect to the assets invested in the FTA/Ibbotson Multi Discipline Portfolio. Ibbotson Associates provided asset allocation research and services.

193.     FTA's stock selection decisions were not made based on its independent research and review of the management policies, capabilities and performance of the companies issuing stock and, on information and belief, FTA made no company visits before investing the Fund's money. On information and belief based on FTA's communications, FTA relied primarily on Morningstar Inc.'s research available to the public. FTA's limited experience and resources compared to most institutional investment advisors were not disclosed to the Trustees.

194.     The Plan's portfolio represented approximately 48% of FTA's total assets under management in FTA's equity strategy, yet FTA's very limited experience in advising pension funds was not disclosed to the Trustees.

195.     FTA had 105 client relationships with an average account size of only $300,000. This lack of experience managing institutional assets, which was not disclosed to the Trustees, was known or should have been known to NFP and/or Kestra IS. It was imprudent of Defendants to cause the Plan to hire FTA as its investment advisor for the equity portfolio valued at $6.5 million at inception.

196.     The Trustees relied upon the NFP and/or Kestra IS's advice and recommendations to engage FTA.

197.     NFP and/or Kestra IS knew when they recommended FTA that they would condition the engagement of FTA on a directed brokerage through Kestra IS and, as such, NFP and/or Kestra IS would benefit from commissions and other fees.

198.     They did not disclose this to the Trustees. This compensation arrangement was inconsistent with the contractual arrangements with top-performing equity managers who would consider using brokers providing the best execution of trades and normally would not agree to directed brokerage of all trades.

199.     NFP and/or Kestra IS did not disclose the conflicts of interest related to their selection of FTA and the arrangement with FTA under which they would be the directing brokers and would receive other indirect fees and commissions.

200.     NFP and/or Kestra IS failed to inform the Trustees that use of a directed brokerage may negatively impact FTA's ability to secure best execution for the Plan's equity investments.

29

201.    NFP and/or Kestra IS recommended that the Trustees engage FTA precisely so that they would realize these undisclosed financial benefits.

202.    In reliance on NFP and/or Kestra IS, on December 15, 2008, the Trustees approved the engagement of FTA.

203.    In January, 2009, after the Board had approved a contract with FTA, Curry and Korchak misrepresented to FTA's Ed Foley that to move forward with FTA as equity manager for the Plan, the Board required that Kestra IS be the designated broker.

204.    Later, according to Mr. Foley, he was informed that NFP needed to conduct due diligence of FTA in order for "any of their advisors to recommend separate account investment management;" that NFP had no connectivity to the National Financial or Fidelity Advisor Channel, a platform that would be most advantageous for NIAF and FTA, and with the lack of platform connectivity, NFP suggested the investment managers provide management to the Plan in the form of self-custody. FTA was not comfortable with that arrangement because it presented a conflict of interest and placed FTA in a scenario where it would have to pay the Kestra Advisors a solicitation fee.

205.    NFP's Hagshenas then contacted Lisa Kotler, a Vice President, Retirement Services, at NFP asking that she waive the due diligence requirement. Ms. Kolter responded that no due diligence was required because of "the structure of the deal," described as follows: (1) First Trust is charging its investment advisory fee directly to the Plan sponsor; and (2) the Plan Sponsor is paying BPS its consulting fee.  "Only if First Trust were paying a solicitor's fee to BPS would there be a need for the DD [due diligence] process.

206.    On March 3, 2009, the Plan and FTA entered into a "Discretionary Investment Advisory Contract and Letter of Instruction" (the "FTA Contract"), pursuant to which FTA would provide investment management services in exchange for an annual investment management fee.

207.    The Kestra Advisors negotiated the FTA Contract.

208.    The initial FTA account value was $6,574,852 of Plan assets.

209.    Under the FTA Contract, the annual asset management fee paid by the Plan to FTA was based on the total value of Plan assets calculated at 0.55% of assets up to $5 million; 0.35% of assets between $5 and $10 million, and 0.30% of assets over $10 million.

210.    Kestra IS was designated as the directed broker by Korchak.

211.    Korchak had online-access to the Plan's account held at FTA's custodian, Southwest Securities, Inc.

212.    NFP and Kestra did not provide the Trustees with all financial reports relating to the investments held by FTA.

213.    NFP and Kestra did not provide information to the Trustees on the actual performance of FTA as an equity manager compared to other equity managers.

214.    After the initial selection of FTA, NFP and Kestra did not compare FTA's performance with those of other equity investment managers so that the Trustees could decide whether to retain or replace FTA.

215.    FTA for 3 years underperformed its index by 280 basis points.

216.    Kestra's failure to do so caused the Plan to continue to pay excessive fees and obtain substandard investment returns on its equity portfolio.

217.    NFP, Kestra and the Representatives financially benefitted from the FTA contract to the detriment of the Plan and its Participants.

### The Kestra Advisors' Further Manipulation
### of the FTA Relationship to Generate Revenue

218.    With Kestra IS in place as the designated broker for FTA, Curry, acting in his fiduciary capacity, told FTA that the Trustees wanted to add REITs to the possible classes of equity investments and increase the cash portion of the equity portfolio.

219.    On June 11, 2009, Curry, acting in his fiduciary capacity, recommended to the Trustees that the IPS be revised to allow FTA to invest in vehicles other than stocks – such as REITs, commodities, or gold.

220.    In reliance on the Kestra Advisors' recommendation, on September 10, 2009, the Board voted to amend the IPS to add REITs as an equity investment vehicle at the discretion of the equity manager, with total REIT investments not to exceed 5% of equity investments. In contrast to other categories of equity investments, REITs had no specific target allocation listed.

221.    Kestra IS through Korchak executed securities transactions relative to the REITs in the equity asset portfolio and realized commissions of at least $42,000 as a consequence.

### Imprudent, Conflicted, and Prohibited Conduct
### Relating to the Alternative, Non-Marketable Investments

222.    In late 2013, Korchak and Curry learned about the availability of certain alternative investment products with high commissions but which were risky, illiquid, and non-marketable.

223.    According to December 12, 2013 Board meeting minutes, Korchak, Curry, and Bruce Hagshenas, acting in a fiduciary capacity, recommended that the Trustees approve an amendment to the IPS to expand the asset classes that the fixed income manager could invest in to include "alternative investment" asset classes: non-traded REIT's, Business Development Companies (BDC's), Fixed Income – Mutual Funds; Unit Trusts (UIT's), Exchange Traded Funds (ETFs), and fixed and adjusted rate preferred securities. The proposed amendment provided that no

one of the new asset classes would exceed 5% of total plan assets and that all six asset types combined would not exceed 5% of the total plan assets.

224.    Korchak, Curry, and Bruce Hagshenas described the proposed alternative investments as high-quality and liquid.

225.    The Trustees were not provided with details about such investments including their risk profile, the costs and fees associated with them, whether they would generate fees or commissions and, if so, the formula to calculate the same.

226.    Korchak, Curry, and Bruce Hagshenas did not disclose that the alternative investments were not listed on any securities exchange, that there was no secondary market for these investments, or that the Plan might not be able to resell their shares regardless of how the investments performed.

227.    The alternative investments were non-marketable and thus prohibited under the IPS.

228.    Korchak, Curry, and Bruce Hagshenas did not provide the Trustees with a current prospectus or brochure or other written description of each of these types of investments and the fees and commissions associated with them.

229.    NFP, Kestra IS, and Curry, and Korchak failed to act with regard to alternative investments with the care, skill, prudence, and diligence under the circumstances then prevailing that an investment advisor familiar with such matters would use in advising trustees of a pension plan.

230.    Kestra IS received compensation from certain select providers of alternative investment products including: a percentage of new investments in such products; fixed fees to support and participate in Kestra Financial conferences and seminars; and other initial fees.

33

231.     Upon information and belief, either the proposed investments were being sold by such select providers or Kestra IS received compensation through third-party managers or service providers, in this instance, the Kestra Advisors.

232.     These alternative investments could be purchased on a commission basis *or* at net asset value (NAV) through an advisory account for an ongoing advisory fee based on a percentage of the investment's value, according to Kestra IS.

233.     These alternative investments were not fixed income investments as they had significantly different risk and return characteristics than fixed income investments.

234.     The alternative investments would have higher commissions and fees than traditional investments.

235.     Based on incomplete and misleading information, the Board approved the IPS amendment.

236.     The same day, acting as a fiduciary of the Plan, Korchak, in his dual capacity as registered representative and investment advisor representative, caused the Plan to purchase three alternative investments at $300,000 each for a total of $900,000.00, through Kestra IS.

237.     On or around December 12, 2013, the BPS Defendants caused the Plan to invest $300,000 in CION Investment Corporation ("CION Investment").

238.     On or around December 12, 2013, the BPS Defendants caused the Plan to invest $300,000 in Cole Credit Corp. ("Cole Credit Investment").

239.     On or around December 24, 2013, Defendants invested $300,000 of Plan assets in FS Investment Corp. ("FS Investment").

240.     The CION, Cole Credit, and FS investments were non-marketable and highly illiquid. Each transaction constituted a prohibited transaction in violation of the IPS.

241. NFP, Kestra IS, and Korchak and Curry were required but failed to conduct an intensive and scrupulous investigation before making the decision to invest Plan assets in the CION, Cole Credit, and FS investments.

242. NFP, Kestra IS, and Korchak and Curry knew that these were imprudent and risky investments that were not suitable for the Plan.

243. NFP, Kestra IS, and Korchak and Curry were not acting solely in the interest of the Participants for the exclusive purpose of providing benefits to them.

244. The Alternative Investments were illiquid and should have been valued at net asset value for purposes of calculating the advisory fee account. Defendants have failed to provide the Trustees with the disclosures required by law of the fees they obtained as a result of the advisory fee account.

245. The Defendant Advisors' and Kestra IS's motivation in buying these investments was to generate commissions and other fees for themselves. On January 16, 2014, Curry received a marketing email from Icon Investments, one of the entities that pays Kestra IS compensation in connection with its investment products, informing him that Kestra IS approved a non-traded BDC, CION Investment Corp., Curry forwarded the email to Korchak and wrote: "Do we have this one for NIAF?" Korchak quickly responded, "yes, just booked. 300k."

246. Because the investments were characterized as fixed income assets at the recommendation of the Kestra Advisors they were paid the 37.5 basis points advisory fee on these investments. In addition, upon information and belief, Kestra IS receives commissions and other fees.

247. Upon information and belief, Defendants failed to disclose all of the compensation received in connection with these investments.

248.     Two out of the three alternative investments sustained negative returns.

249.     Had the Plan's assets been invested like its other fund assets, which invested during the same period in real estate, bonds, and income mutual funds, upon information and belief, the Plan would have obtained higher returns on its assets for the benefit of the Participants.

250.     In addition, had the Plan assets been invested in other suitable asset classes, liquidity would have been available to the Plan when, on the advice of a qualified investment advisor who replaced Defendants, an appropriate asset allocation was approved and had to be funded.   Where an investment produces declining investment value and limited liquidity, the amount and magnitude of the lost investment opportunity compounds.

251.     By characterizing the alternative investments as fixed income investments and including their purported values and returns as part of the fixed income portfolio's performance, Defendants inflated the returns they claimed to have earned for the fixed income portfolio.

### Curry's Covert Direction Regarding RFP for Fiduciary Liability Insurance

252.     In 2014, BPS, Curry and Korchak represented to the Trustees that they secured multiple quotes for fiduciary liability insurance for the Plan. Korchak and Curry, both of whom were insurance agents through the Kestra/NFP-affiliated entity known as NFP Property & Casualty, Inc., did not obtain multiple quotes.

253.     In connection with insurance business purchased for NFP Property & Casualty, Curry received 10% commission on all insurance written for the Plan.

254.     According to an employee of NFP Property & Casualty, Inc., Curry told her to not obtain other quotes and recommended that the Plan renew the Chubb policy. Without alternative bids, Curry did not risk another insurance carrier offering a fiduciary liability policy that would be more beneficial to the Plan but would not pay him a commission on the insurance sale.

## <u>Imprudent and Conflicted Conduct Relating to<br>the AAM Unit Investment Trust</u>

255.     In May, 2015, Curry and Korchak met with representatives of AAM regarding creating a Unit Investment Trust (UIT) for the Plan.

256.     On June 11, 2015, NFP and Kestra IS, in their fiduciary capacity as advisors and fixed income investment managers, recommended to the Trustees that the Plan invest $8 million in a UIT created by AAM and agree to invest 20% to 30% of the total Plan assets in the UIT. Korchak represented that he had done a study of Merrill Lynch's performance compared to the bond portfolio, and concluded that the approximately $8 million in the Merrill Lynch account should be invested in the UIT, which would ultimately make up 20% of the fixed income portfolio.

257.     As they had in December, 2013, so that they could buy the non-marketable CION, FS, and Cole products, NFP and Kestra IS asked the Trustees to further increase the allocation to the alternative investment asset class from 5% to 20% of the Plan's total assets to accommodate the UIT.

258.     When they recommended the UIT, it in fact did not exist and they had not even determined how the money would be invested through AAM. Since none existed, the Trustees were not given a prospectus or brochure that included the material information concerning the proposed investment including the risk profile or fees associated with the UIT.

259.     Relying on NFP and Kestra IS, based on what they did not know was incomplete information, the Board voted to amend the IPS to allow 20% of total plan assets to be investment in alternative investments.

260.     Before a UIT prospectus was even approved by the SEC, on June 22, 2015, Korchak attempted to transfer the funds in the Plan's Merrill Lynch account into the Plan's trust account at

Kestra IS. His attempted transfer was rejected by Kestra IS, which told Korchak that a non-prototype plan with a third-party administrator would need to be created for the transfer. The Plan was a "non-prototype pension plan" but Korchak caused Merrill Lynch to liquidate the account in the amount of $5,979,841.84, which was deposited in a cash account.

261.     In August, 2015, the proposed prospectus for the Plan's "bespoke" UIT raised concerns with the SEC due in part to what would be a significant concentration in the Plan's account and the potential impact on liquidity.

262.     While AAM's stated preference with respect to fees associated with the UIT was a SMA (the fee-based option), Korchak and Curry insisted, as they had in the past, on a commission-based fee structure.

263.     NFP and Kestra IS knew that, in addition to the commissions on the UIT, they would earn an advisory fee as the UIT was included in the fixed income portion of the Plan's portfolio.

264.     On September, 10, 2015, NFP IL's Jordan Pockross was investigating why BPS's revenue generation was down and was informed by Michelle Masters, "[The Plan] is expecting a sale this month that should be $100k in revenue (per Jerry [Korchak]), which would bring up to $733k for the year. If revert back to January to July average of %58k [sic] per month for remaining months, then at $754k. Steve [Curry] is also expecting to move $500k at 6% comm next month for $30k additional."

265.     The same day, on September 10, 2015 at the Trustees' quarterly board meeting, Curry and Korchak, in their fiduciary capacity as an investment advisors and managers, recommended to the Trustees that the IPS be amended to allow up to 30% of total plan assets be invested in alternative investments. Curry represented that a UIT was created specifically for the

Fund although private investors could invest; that it would run for two years; that the SEC had approved the prospectus; and that it would pay interest of 5%-5.5%.

266.     Korchak told the Trustees that he had already set aside necessary funds that were "waiting" to be invested in the UIT, which could not be accomplished until the Trustees amended their IPS to allow the move.

267.     Based on Curry and Korchak's recommendation and representations, the Trustees approved the UIT and increased the IPS alternative investment allocation to 20% of the Plan's assets.

268.     In September and October, the Kestra Advisors caused to be invested approximately $8 million in the UIT with AAM.

269.     The commissions paid to Kestra IS were as follows:

**9/25/15 - $2,000,010.39 – Commission - $25,005.96**

**9/28/2015 – $2,000,007.95 – Commission - $24,993.23.**

**10/9/15 –$ 2,000,001.33 – Commission – $24,995.09**

**10/16/15 – $2,000,010.52 - Commission - $24,996.34.**

270.     On October 19, 2015, Masters provided an update to Pockross: "Jerry made the NIAF $100k sale and it will show in October" and we should "meet $783k revised budget target."

271.     In February, 2017, after Korchak was restricted by the Trustees from trading bonds and under threat of NFP and Kestra AS termination as Plan service providers, Korchak was planning to roll over the UIT investment one last time in order to generate commissions but was prevented from doing so. Upon information and belief, Korchak was planning to do so before maturity.

272. The UIT included six investment classes including REITs and S&P 500 index funds.

273. NFP and Kestra IS included the UIT as part of the fixed income portion of the Plan's portfolio, but this was a misrepresentation since its overall risk profile differs significantly from fixed income investment classes.

274. Material information concerning the risk profile of this investment was not disclosed to the Trustees.

275. The Plan paid AAM an annual asset management fee of 2.5% of the total value of assets in the account. The UIT included a 1.95% sales fee.

276. AAM paid Kestra IS annual fees equal to 1.5% of the total asset value. This fee-splitting arrangement shows that, in the absence of the conflicted and self-dealing conduct of the Kestra Advisors and Kestra IS, AAM would have accepted an annual management fee of 1.5%.

277. The Kestra Advisors did not disclose to the Trustees the fee-splitting arrangement with AAM.

278. The Trustees never approved a written agreement reflecting any arrangement between the Plan and AAM.

279. Upon information and belief, Kestra IS received other compensation from the UIT investment, which was not disclosed.

280. NFP and Kestra IS did not provide the Trustees with regular reports from AAM as to the performance of the UIT investment.

281. Fees for the UIT are higher than similar investments.

282. Performance of the UIT was never reported net of fees.

283.    NFP failed to evaluate for the Trustees the performance of AAM as investment manager.

284.    While three of five tranches of these investments were liquidated after the termination of the Defendants, the remaining two have long-dated redemption dates, and the market value of these tranches declined significantly below the initial amount invested.

285.    All Defendants benefited from the UIT investment to the detriment of the Plan and its Participants.

286.    All Defendants failed to act with regard to the UIT investment with the care, skill, prudence, and diligence under the circumstances then prevailing that an investment advisor familiar with such matters would use in advising trustees of a pension plan.

**Defendants' 2016 and 2017 Efforts to Maximize Revenue and Cover-up ERISA Violations**

287.    On March 10, 2016, Curry and Korchak informed the Trustees that, over the next 2 months, they would move $2 to $3 million of Plan assets out of the equity portion of the portfolio and invest in short term bonds.  According to the Board minutes from that day, Curry stated that the Board's approval was not necessary for the transfer because Curry and Korchak had complete discretion over fund investments and Curry and Korchak were just giving the Trustees a "heads up" on how they planned to exercise it.

288.    On March 14, 2016, Korchak and Curry directed FTA to move $2 million to the Plan's Kestra IS account. FTA informed Korchak that it would raise cash for the transfer: $500k on March 15; $500k on April 15; $500k on May 16; and $500k on June 15.  On March 18, Korchak demanded that FTA transfer "$1,000,000 a.s.a.p."

289.     On April 19, 2016, Korchak caused to be withdrawn $902,650 from FTA and deposited with Kestra IS. Upon information and belief, Kestra IS received compensation for placing the funds with Kestra IS, which was not disclosed.

290.     As of April 30, 2016, Korchak and Curry had discretionary management and control over 70% of the approximately $78,000,000 in assets, or $54,600,000.

291.     Of note, on August 4, 2016, Kestra IS received a commission on the UIT investment of $17,352.58, a mark-up of 2.249%.

292.     On August 25, 2016, Kestra IS received a commission on corporate bond trades, representing a markup of 1.523% for a total of $17,250.00 and a fee of $2,472.50

### Trustees' Efforts to Address Defendants' Newly-Discovered ERISA Violations

293.     The Trustees were informed in 2016 that no written contracts between the Plan and Defendants existed, that Defendants had failed to provide complete, adequate, and accurate reports on the performance of Plan investments, and that the Plan assets were invested in multiple accounts with multiple custodians and managers.

294.     The Trustees took affirmative steps to address and remedy the problems created by the acts and omissions of Defendants as set forth herein.  Among other things, the Trustees, through counsel:

a.   Between September 4, 2016 and the beginning of December 2016 met with Defendants' representatives to try to determine what actions were being taken by them, requested creation of written contracts to disclose and clarify the Defendants' obligations, and requested written performance reports and disclosure of the identity and reports of the investment custodian being used by Defendants.

b. Approved requests for proposals to replace Defendants' administrator and select a new TPA and custodian.

c. Demanded that Defendants provide the Plan with a detailed investment report on current and past performance in a format commonly used by competent investment advisors.

d. Determined to modify the investment contract with FTA to remove Defendants as the designated broker and require FTA to use best execution principles in selecting brokers.

e. Commenced a process to determine which historical transactions and investments the Representatives had arranged that were not in the interests of Participants and may have violated ERISA.

295.    The Trustees demanded in January 2017 that Defendants produce performance reports including "total fund yield" information for the Plan over the current Plan year and for the previous, three, five and ten year periods. None existed. "Total Fund Yield" information was then created by Defendants to respond to the request. Michelle Masters of BPS provided a report as of November 30, 2016 that was incomplete and inaccurate.

**Korchak's Deceptive Conduct to Secure An Advisory Agreement**

296.    On or about September 8, 2016, Korchak surreptitiously and without their knowledge of what had been signed, obtained the signatures of two Trustees on a document purporting to be the contract for investment services to the Plan by the Defendants (the "September 8 Kestra Document").

297.    The September 8 Kestra Document had not been presented to or approved by the Board, which Korchak knew would be required for a contract with the Board to be valid.

298.     The September 8 Kestra Document was not reviewed with the two Trustees whose signatures were obtained without their knowledge or consent.

299.     The September 8 Kestra Document was not disclosed to the Plan's attorney from September through December when Curry, Korchak, and the Plan's attorney were negotiating over the terms to be included in a contract between the Board and Defendants.

300.     In the Fall of 2016, NFP and Kestra AS required a written investment advisory agreement with the Plan before they could cash the Plan's quarterly advisory payment check payable to BPS in the amount of approximately $68,000.

301.     At this time and into 2017, Curry was getting pressure from NFP to meet revenue targets and NFP was asking about the status of revenue from the Plan.

302.     On September 8, 2016 ,at a Board meeting, the Trustees were advised that, in fact, there were no written agreements with Curry and Korchak. The Plan's attorney then was authorized to meet with Curry and Korchak before the next regular Board meeting in December in order to commit to writing the arrangements with and authority of Korchak and Curry.

303.     According to the minutes of that meeting, Curry represented to the Trustees that two agreements were needed, one for asset management and one for administration. He also stated that the asset management fee would probably need to be changed to a flat fee arrangement.  He did not present to the Trustees any draft agreement for consideration.

304.      On or about September 8, Korchak, caused to be signed by only two Trustees the September 8 Kestra Document entitled "Financial Planning/Consulting Agreement" between Kestra AS and the Plan and dated September 8, 2016.

305.     The September 8 Kestra Document was drafted by the NFP Administrator Office of Supervisory Jurisdiction, c/o Thomas Lamb and emailed to Korchak on September 8. Upon information and belief, NFP Corp.'s and/or Kestra Financials' in-house attorneys assisted.

306.     At the September 8th Board meeting, Korchak said nothing about such an agreement or even that one was being prepared.

307.     The September 8 Kestra Document was drafted in a way and for the sole purpose of attempting to protect Defendants – after the fact -- from liability for their past securities and ERISA violations.

308.     The September 8 Kestra Document was internally inconsistent and misrepresented the nature of the parties' past arrangement.

309.     In direct conflict with the fact that Kestra Advisors had exercised discretion and control over the management and investment of Plan assets for decades, the Kestra Agreement provided that the Plan would pay a quarterly asset-based charge for assets under management of $60M at .375 %, for services on an alleged *discretionary* basis for "directly managing client investment portfolios, referring clients to other third party investment managers, and selection of investment managers."

310.     The September 8 Kestra Document also provided that Kestra AS and Korchak "shall not have any discretion, trading or otherwise, with respect to any decisions made by or on behalf of the Client as Client will retain absolute discretion over all investment and implementation decisions."

311.     The September 8 Kestra Document provided that the .375 % fee expressly excluded commissions generated by the Plan's investment securities, investment product or insurance

recommendations by Client, but disclosed that Korchak could act in a dual capacity as a registered representative of Kestra AS affiliates or licensed insurance agent with NFP Insurance Services, Inc.

312. The September 8 Kestra Document further provided that the investment advisory representative and Kestra AS "may receive, *or may have already received*," compensation and/or commissions that [the Plan] may pay, and that the investment advisory representative or Kestra AS may receive.

313. Finally, the September 8 Kestra Document stated that the Plan "shall be responsible for additional fees, compensation, and/or commissions for any securities, insurance or other investment products that may be recommended as part of the services."

314. Korchak did not disclose to the two Trustees that the document was a contract, the nature of the contract, or its terms and conditions. Korchak did not disclose to the two Trustees that it provided for payment to Kestra of an advisory fee of 37.5 bps for allegedly non-discretionary services even though, at all relevant times, the Kestra Advisors provided advisory services on a discretionary basis as ERISA fiduciaries.

315. After supposedly agreeing under the September 8 Kestra Document that he "shall not have any discretion, trading or otherwise," Korchak executed at least two trades on the Plan's account in December or January which generated commissions and other fees for Korchak and the Kestra Advisors.

316. Korchak and Cyndi Trollop of NFP IL sent the unauthorized September 8 Kestra Document to Kestra AS to be represented as Defendants' contract with the Board.

317. In November, 2016, the Plan's counsel – who was not aware of the September 8 Kestra Document scheme - sent a draft "Investment Consulting Fiduciary Asset Management Agreement" to NFP Corp.'s in house legal counsel, David Horn, with whom he believed he was

engaged in good faith negotiations. The terms of Plan counsel's draft memorialized the fiduciary nature of the relationship between the Plan and Kestra AS. In the November contract negotiations between the Plan's and Defendants, neither Horn, nor Korchak, nor Curry claimed that an agreement had been reached as of September 8 or presented the September 8 Kestra Document.

318.    According to the Board meeting minutes from December 8, 2016, the Plan's counsel reported to the Trustees that he sent a proposed fiduciary advisor agreement to NFP's attorney. In response, Curry noted that it would take time to get them back because NFP is a big company. Korchak did not tell the Board about the September 8 Kestra Document.

319.    At a special meeting of the Board on December 14, 2016, the Board approved that all future bond transactions must be disclosed in advance to the Board and approved by the Board; and Request For Proposals (RFPs) be made for Plan auditor, third party administrator, and investment advisor.

320.    Bredt Norwood of Kestra Financial proposed an 3(38) investment management agreement to counsel for the Fund that identified Kestra AS as a fiduciary with discretion over fund assets.

321.    In February, 2017, meeting in Chicago, the Plan's attorneys were informed for the first time by Defendants' outside counsel about the September 8 Kestra Document. He claimed that the Board could not terminate the services of the Defendants because of a contract in place; he produced the September 8 Kestra Document stating that it was a contract in effect that prevented the Trustees from terminating Defendants.

322.    When the Board authorized RFPs to go out for administration and advisory services, Defendants thought they could submit a proposal to be retained and scrambled to prepare a RFP response because there were no agreements. Information about the allocation of duties and

responsibilities among Kestra AS, Kestra IS, NFP Corp, BPS, and Korchak and Curry had to be created from scratch and was modified, reviewed by counsel and compliance, and edited again.

323.     The same lack of information and the existence of contradictory information dogged Defendants' attempts with respect to the Trustees demand for a report on investment performance, including past performance. Defendants struggled to find out where all of the Plan's money was held. Defendants modified information regarding total performance of the Plan's assets. Ultimately, the information presented to the Trustees in January 2017 was incomplete and inaccurate.

324.     In February 2017, Defendants provided another report purporting to list the Plan's Total Fund Yield net of fees and through May 31, 2016 for the previous one, three, five and 10 years. Contrary to previous oral representations to the Trustees by Defendants in Plan meetings that the investments were performing well and exceeding appropriate benchmarks, the report disclosed below benchmark returns of -0.92% for one year, 3.02% for three years, 3.51% for five years and 3.27% for 10 years.

325.     The report showed the Plan failed to perform at or above an appropriate benchmark for the prior 10 years, which was contrary to what was conveyed to the Trustees throughout the ten years.

326.     In addition, the report indicated the performance of FTA was 115, 159 and 551 basis points below the All Equity Benchmark in the past five-, three-, and one-year periods, respectively.

327.     Defendants failed to provide the separate returns for the alternative investments and an appropriate benchmark that included the alternative investments.

328. In May, 2017, Defendants provided another document purporting to list the Plan's fiscal year returns through November 30, 2016, from one, three, five, and ten years. The seven-year performance information was blacked out, accompanied with a disclaimer about the underperformance of Lehman bonds. The report also showed significant underperformance of the Plan's managers not previously disclosed to the Trustees.

### Transition to New Services Providers

329. The Trustees agreed to hire a new investment advisor, new third-party administrator, and new custodian. Korchak, Curry, and Gannon were notified that the effective date for transfer of all responsibilities to the new service providers would be September 1, 2017.

330. The Plan, through the Trustees, made multiple written demands that Defendants cooperate and timely turn over the Plan's records, invested assets and other property to the new TPA and custodian.

331. Defendants had a fiduciary responsibility to provide for an orderly transition to the new service providers, including avoiding unnecessary costs, confusion, and delays that would raise administrative costs and be harmful to Participants.

332. Rather than cooperating with the transition request, Defendants significantly delayed and otherwise interfered in the transition of material documents, computer participant and contribution data, information concerning invested assets and other information, causing the Plan to incur significant costs and three months of delays beyond September 1, 2017 to accomplish most of the transition to the new service providers.

333. From December, 2017 through July 2019, all Plan assets still had not been placed in control of the Trustees and their new Fund investment advisor.

334.     Defendants objected to providing participant data in usable electronic form, contending that the information and computer software was owned by Defendants.

335.     In July, 2017, four months after the notification to Defendants of their termination and of the September 1, 2017 transition date, Defendants had taken no steps to accomplish the transition. Instead, Defendants demanded a non-disclosure agreement and a HIPAA Business Associate Agreement as a condition of their implementing the transition.  There was no basis for Defendants to condition the turnover of Plan information on entry into a NDA. Such an agreement would not be in the interests of Participants and would benefit solely the Defendants.  In addition, HIPAA applies only to welfare plans, and Defendants' demands were inappropriate and designed to delay the transition, and cost the Plan legal fees and caused a delay of several weeks.

336.     Because of Defendants' improper recordkeeping, organization, and management of electronic and other Plan records and materials, and Defendants' unreasonable delay tactics, the Plan was forced to delay the September transition date to December 1, 2017, pay additional administrative fees to Defendants, and incurred additional expenses to recover participant records and information concerning invested assets. The transition to the new service providers could not take place until December 1, 2017.

337.     Because of the disarray of the participant and contribution data turned over by Defendants, the new administrator, WPAS, had to create a duplicate benefits administration database system, which required the Plan to incur additional expenses.

**NFP and Kestra AS's Unearned and Excessive Advisory Fees in 2016 and 2017**

338.     NFP and/or Kestra AS benefitted from their own delays in transferring custody, management, and control of Plan assets to the Plan's new services providers.

339.     From November, 2016 through the first ten months of 2017, NFP and Kestra AS continued to charge the Plan an investment advisory fee of 37.5 bps on the fixed income investments and continued to receive other commission and fees.

340.     From November 1, 2016 through December 14, 2017, NFP charged the Plan a total of $400,311.52 in direct compensation.

341.     NFP and Kestra AS provided no advisory or investment management services to the Plan during that period except to request permission to purchase $4,000,000 of new bonds in June, 2017 when the Trustees had already notified them of their termination and that they had been informed that a new investment advisor had been hired.

342.     From December, 2016 through November, 2017, Defendants failed to follow the Trustees' directions concerning the purchase and sales of bonds and failed to provide an accurate report on the performance of all of the assets when providing requested performance reports in February and March 2017.

343.     Defendants maintained control and, upon information and belief, the discretionary management authority over the Cole, CION, and FS Investments after the effective termination date of all Defendants on December 1, 2017.

344.     In October, 2017, Defendants demanded an additional $6,000 for its last month of administration of the Plan as a condition of the Plan receiving all of its participant and contribution data and access to administrator's computer.  The Trustees had not yet received all of the equipment. and Plan data and had not formally approved payment of the additional $6,000 when BPS provided evidence that BPS directed such amount paid to itself without honoring its commitments concerning Plan data and equipment.

345. The Trustees and, by extension, the Plan Participants did not, and do not, have complete and actual knowledge of the commissions, fees, and expenses that Defendants charged to the Plan because such information was not disclosed.

346. As a result of the Defendants' failure and refusal to provide such information, the Trustees lacked the information necessary to understand and protect the Plan and/or to have complete knowledge of the Defendants' ERISA violations.

347. An accounting for profits is necessary.

**The Kestra Advisors' Lack of Prudent Process and Disclosure in Selection of Other Investment managers for the Plan Portfolio**

348. From time to time, NFP and Kestra IS, acting in their fiduciary capacity as investment advisors, engaged additional investment managers on a discretionary basis to manage the fixed income investments of the Plan.

349. The other money managers included, but were not necessarily limited to, BlackRock Investment Management, LLC ("BIM"), Morgan Stanley SmithBarney LLC ("MSSB"), and Merrill Lynch ("ML").

350. Upon information and belief, a prudent process was not employed by the Kestra Advisors in selecting other investment managers.

351. The Kestra Advisors provided little to no information to the Trustees about these money managers, the investment performance, or the fees or commissions paid to them.

352. The Kestra Advisors did not disclose to the Trustees the nature and extent of their arrangements with these other managers, or the compensation received for placing the Plan's assets with these managers.

353. Upon information and belief, there were no contracts between the Plan and these money managers.

354.    Upon information and belief, the Defendants received direct and/or indirect compensation from placing Plan assets with these money managers or providing brokerage services on these accounts, the extent of which is unknown at this time.

### Failure to Provide ERISA Rule 408(b)(2) Disclosures

355.    Each Defendant was a covered service provider as defined under ERISA for the Plan.

356.    Each Defendant was required to provide disclosures pursuant to 29 U.S.C. § 1108(b)(2) ("408(b)(2) Disclosures") beginning in 2012 and thereafter as fees changed materially on an annual basis, consistent with the rules and regulations governing such disclosures.

357.    Such written disclosure was required to disclose (a) a description of the services provided to the Plan, (b) whether the service provider is acting as a fiduciary, (c) a description of all direct compensation, (d) a description of all indirect compensation, (e) a description of compensation received by affiliates or subcontractors,(f) a description of payors and recipients of compensation, (g) a description of the arrangement between recipients of compensation, (h) description of commissions, sales loads, and other fees, and (i) a description of the mechanics of payment.

358.    Such written disclosure was required to be provided (a) in advance of the arrangement/providing services, (b) within 60 days of any change to compensation, (c) at least annually if there are any changes to compensation, and (d) upon written request by other fiduciaries.

359.     Each Defendant failed to provide written 408(b)(2) Disclosures to the Plan.

360.    Kestra IS provided a 2012 disclosure, but it was

non-compliant, vague, and did not contain the requisite information required under ERISA

section 408(b)(2).

361.     Any disclosures made did not provide a complete and accurate accounting of all direct and indirect compensation paid Defendants.

362.     As required under the Plan Documents, BPS as Plan Administrator was responsible for providing the Plan's accounting firm at least an annual disclosure of all direct and indirect compensation related to the Plan for the annual audit and Form 5500 filing.  Korchak provided all information to the auditor, but his responses to the auditors were incomplete, failed to disclose all indirect compensation, and did not comply with Section 408(b)(2).

<u>**Defendants' Lack of Procedural Prudence**</u>
<u>**With Respect to the Plan**</u>

363.     As ERISA fiduciaries, NFP as Plan Administrator and NFP, Kestra IS and Kestra AS as advisors had an affirmative obligation to provide full and accurate information to the Trustees and the Plan's Participants regarding the Plan assets.

364.     The advisors did not provide the Trustees with a written statement on a monthly, quarterly, or even annual basis that collectively accounted for all assets of the Plan for the purposes of determining a total return and performance and fees of all managers.

365.     Kestra IS and Kestra AS did not provide the Trustees with information measuring risk for the overall portfolio or the risk profile for the alternatives to the bonds and equity investments of FTA.

366.     NFP BPS as Plan Administrator and the Kestra Advisors did not provide the Trustees with information concerning faltering investments such as REITs and the certain alternative investments detailed below.

367.     In the absence of a total return analysis, it was impossible for the Trustees to understand the impact of underperforming investments relative to a benchmark.

368. BPS as Plan Administrator and the Kestra Advisors failed to obtain written contracts with all investment managers, failed to disclose the terms of investments to the Trustees including their compensation, failed to monitor investments adequately, and did not employ a watch list process for poorly performing managers.

369. BPS as Plan Administrator and the Kestra Advisors failed to educate the Trustees concerning their investment options, and the risks and returns of existing investments or possibilities of altering the heavy allocation from 79% fixed income investments.

370. As noted above, Korchak, in his fiduciary capacity as Plan Administrator, provided the Plan's auditor with incomplete information. By way of example only, when asked for the NFP Fiscal year statement that showed all trade activity for the year and a list of holdings, Korchak failed to provide it and gave the auditor only limited information. On multiple occasions, the auditor requested information from the BPS Defendants and Korchak did not understand the request. In 2014-2018, the auditor requested from Korchak detailed information about indirect and direct compensation for every service provider to the Plan. On more than one occasion, Korchak was unable to understand what was being requested and identify the information, and brought in Kestra IS, Kestra AS, and NFP IL to assist. These defendants were often unable to assist because the written documents requested did not exist including investments and service provider compensation information.

371. From at least 2014 through 2017, Korchak did not provide the auditor with complete information about all indirect and direct compensation generated from Plan assets.

372. The Plan Administrator failed to ensure that FTA's compensation was reported on the Plan's 2013 Form 5500.

373.    In its capacity as the Plan's recordkeeper, BPS failed to properly maintain material information concerning the Plan and its Participants.

374.    BPS failed to follow industry standards in the organization and maintenance of Plan records.

375.    The database for the Plan records was improperly maintained.

376.    The content of the Plan records was incomplete, incorrect, and otherwise deficient.

377.    BPS knew that numerous Participants could not be communicated with because of incomplete or erroneous records but charged the Plan with periodic communications to such Participants.

378.    BPS failed to monitor Participants' records through "death audits" to ensure that deceased Participants were removed, and survivors received benefits to which they were entitled.

379.    BPS failed to follow up with Employers to obtain current information about employees on whose behalf they were contributing.

380.    As a result of these failures, the number of Plan Participants was inaccurate, and the costs and fees paid to BPS were not predicated on accurate information.

381.    As a result of these failures, certain Plan Participants did not receive statements or disclosures required by law, while deceased individuals were sent statements.

382.    BPS charged for certain recordkeeping and related fees calculated based on the number of total Participants in the Plan.  The more Participants in the Plan, the more compensation BPS would charge the Plan.  The administrative fees, including statement printing and mailing fees charged by BPS to the Plan, were not adjusted so that BPS was compensated based on inflated numbers of active Plan Participants.

383.    Another result of the negligent recordkeeping was that certain required minimum distribution to Participants over age 70½ were missed, resulting in Participants not receiving the benefits to which they were entitled and subjecting the Plan and Participants to liability for potential IRS penalties of 50% of the benefits.

384.    In 2017, the Plan engaged an auditor to review the status of Plan records. The auditor determined that at least 3,200 Plan participant records were corrupted, had inaccurate names, addresses, or were otherwise incomplete, or went missing while in the custody of BPS.

385.    The Plan incurred fees to identify and correct the missing, incomplete, or inaccurate participant information and address other administrative deficiencies caused by BPS.

## Failures to
## Train, Supervise and Monitor

386.    Kestra IS was required to monitor and supervise Korchak and Curry as registered representatives with respect their trading activity using Plan assets, to ensure compliance with their fiduciary duties and applicable state and federal securities rules and regulations, and to take affirmative action against them in the event of non-compliance.

387.    NFP, Kestra IS, and Kestra AS were required to monitor and supervise Korchak and Curry as registered investment advisors with respect their trading activity using Plan assets, to ensure compliance with their fiduciary duties and applicable state and federal securities rules and regulations, and to take affirmative action against them in the event of non-compliance.

388.    NFP, Kestra AS, Kestra IS, and Curry failed to monitor and supervise, however. It was in all of the Defendants financial interests to turn a blind eye to the tortious conduct of Korchak and to refrain from monitoring themselves, because such conduct drove revenue to Kestra AS, Kestra IS, and/or NFP, at the expense of Plan Participants.

389.     Kestra AS, Kestra IS, and NFP lacked written compliance policies and procedures to prevent the ERISA violations.

390.     Kestra AS, Kestra IS, and NFP lacked adequate training for their representatives and employees.

391.     Kestra AS, Kestra IS, and NFP lacked experience and knowledge with respect to ERISA-governed retirement plans like the Plan here.

392.     Kestra AS, Kestra IS, and NFP profited from providing inadequate support for administration and profited from keeping NFP and Korchak, and Curry in place, rather than seeking bids for competent administrative services providers.

393.     Kestra AS, Kestra IS, and NFP failed to evaluate the performance and cost of BPS because BPS and NFP, among other reasons, such evaluation and monitoring would involve evaluating and monitoring itself.

394.     Kestra IS and Kestra AS failed to ensure that its representatives were competent to provide services to an ERISA retirement plan such as the Plan.

395.     Kestra IS and Kestra AS failed to provide competent representatives.

396.     As a result of the failure to supervise and monitor, Korchak and Curry were unchecked and lacked any accountability. They were able to breach their fiduciary duties and caused the Plan to engage in prohibited transactions in violation of ERISA.

397.     Pursuant to 29 U.S.C. § 1332(a), the Trustees have served by certified mail a copy of the Complaint upon the Secretary of Labor located at 200 Constitution Avenue, NW Washington, D.C. 20210, and the Secretary of Treasury, located at 1500 Pennsylvania Avenue, NW Washington, D.C. 20220.

**FIRST CLAIM FOR RELIEF FOR BREACH OF FIDUCIARY DUTY**
**ERISA SECTION 502(a)(2)**

58

398.    Plaintiff incorporates and realleges the allegations contained in the above stated paragraphs as if fully set forth herein.

399.    29 U.S.C. § 1132(a)(2), provides that a plan fiduciary may bring an action for appropriate relief under 29 U.S.C. § 1109.

400.    Defendants were ERISA fiduciaries of the Plan.

401.    As to each of the acts and omissions detailed herein, Defendants were acting in a fiduciary capacity.  Defendants provided regular, individualized investment advice pursuant to an arrangement with the Plan in exchange for a fee, and further exercised discretionary authority and control with respect to the disposition of assets including the advice, recommendation, and execution of investments of Plan assets.

402.    ERISA requires fiduciaries to act for the exclusive purpose of providing benefits to Participants and their beneficiaries, and defraying reasonable expenses of administering the plan, with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. 29 U.S.C. § 1104(a)(l)(A) and (B).

403.    Pursuant to their fiduciary duty of prudence, Defendants were required to administer the Plan and advise and manage its investments as would a prudent person acting in a like capacity and familiar with such matters.

404.    Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in the plan. *See* 29 U.S.C. § 1104(a)(1)(A). "[A] fiduciary of a defined contribution … plan created to provide retirement income for employees who is given discretion to select and maintain specific investment options for participants—must exercise prudence in

selecting and retaining available investment options." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 4180 (4th Cir. 2007).

405.     Pursuant to their fiduciary duty of loyalty, Defendants were required to discharge their duties with respect to the Plan solely in the interest of the Participants and for the exclusive purpose of providing benefits to Participants and their beneficiaries, and defraying reasonable expenses of administering the plan.

406.     ERISA fiduciaries selecting plan investments and service providers "must also scrupulously adhere to a duty of loyalty, and make any decisions in a fiduciary capacity with 'an eye single to the interests of the participants and beneficiaries." *Id.* at 418-19. As the Supreme Court has held, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble v. Edison Int'l*, 135 S.Ct. 1823, 1829 (2015).

407.     An investment policy statement or IPS is a governing plan document within the meaning of 29 U.S.C. § 1104(a)(1)(D). *See* 29 C.F.R. §2509.94-2 (1994), replaced by 29 C.F.R. §2509.08-2(2)(2008)("Statements of investment policy issued by a named fiduciary authorized to appoint investment managers would be part of the 'documents and instruments governing the plan' within the meaning of ERISA Sec. 404(a)(1)(D)."). "Fiduciaries who are responsible for plan investments governed by ERISA must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Cal. Ironworkers Field Pension Trust v. Loomis Sayles & Co*., 259 F.3d 1036, 1042 (9th Cir. 2001). "[F]ailure to follow written statements of investment policy constitutes a breach of fiduciary duty." *Id.* (citing *Dardaganis v. Grace Capital, Inc*., 889 F.2d 1237, 1241–42 (2d Cir. 1989)). A violation of investment guidelines is an independent breach of fiduciary duty, regardless of whether the action was otherwise prudent. *See* 29 U.S.C. §1104(a)(1)(D).

408.    Pursuant to their fiduciary duties, Defendants acting as dual-registered IARs and RRs with respect to assets of the Plan, were required to fully disclose the existence, nature, and extent of such conflict of interest, the details of whether they were brokering a security as an RR or providing investment management and advice as an IAR, and the nature and the extent of any and all direct and indirect compensation.

**COUNT I**
**BREACH OF FIDUCIARY DUTY RELATING TO INVESTMENT OF PLAN ASSETS**
**IN PIMCO CLASS A SHARES**

409.    Plaintiff incorporates and realleges the allegations contained in the above stated paragraphs as if fully set forth herein.

410.    NFP, Kestra IS, Curry, and Korchak, acting as investment advisors to the Plan with discretionary authority and control over fixed income Plan assets, and Kestra IS, acting as broker-dealer, and Korchak as registered representative, had fiduciary duties to act prudently and solely in the best interest of Plan Participants in dealing with Plan assets.

411.    Each of these Defendants, acting in their respective and dual capacities, breached their fiduciary duties to do so by advising, recommending, and causing investment of Plan assets in high-fee PIMCO Class A Shares that were imprudent for the Plan as an institutional investors, when lower-cost share classes of the same funds for which the Plan was eligible were available.

412.    Each of these Defendants, acting in their respective and dual capacities, breached their fiduciary duties to the Plan by selecting the PIMCO Class A Shares that generated 12b-1 fees and other fees and commissions through trade execution by Korchak through Kestra IS as broker-dealer, by holding such shares in an amount to maximize their receipt of fees, and by failing to purchase, recommend, or hold for the Plan institutional share classes that did not charge 12b-1 fees, even though the Plan was eligible to hold the institutional share classes.

413. NFP, Kestra IS, Curry, and Korchak, acting as investment advisors, breached their fiduciary duty to follow plan documents because investment in the PIMCO Class A Shares violated the Plan's IPS.

414. NFP, Kestra IS, Curry, and Korchak, acting as investment advisors, breached their fiduciary duties by failing to disclose the nature and extent of all fees and other compensation from the PIMCO Class A Shares, and failing to disclose the existence, nature and extent of the conflict of interest presented by their receipt of 12b-1 fees, their selection of the PIMCO Class A Shares that generated such fees, and failing to disclose that a slightly greater investment would generate no or less fees for the Defendants.

415. NFP, Kestra IS, Curry, and Korchak, acting as investment advisors, also breached their fiduciary duties by failing to disclose the existence, nature and extent of the conflict of interest presented by Kestra IS's receipt of 12b-1 fees, their selection of the PIMCO Class A Shares that generated such fees, and failing to disclose that a slightly greater investment would generate no or less fees for Kestra IS.

416. NFP, Kestra IS, Curry, and Korchak, acting as investment advisors, breached their fiduciary duties in connection with the PIMCO investment because they did not establish a process for determining whether the investment continued to be prudent and whether the fees were reasonable for the level of investment return, and they did not communicate their findings or the process to the Trustees.

417. NFP, Kestra IS, Curry, and Korchak breached their fiduciary duties by failing to act in the best interests of the Plan and its Participants, instead acting in their own best interest.

418. Each Defendant financially benefitted from this conduct because of the compensation structure described herein under which NFP, Kestra IS, and Curry and Korchak financially benefited, to the financial detriment of the Plan and its Participants.

419. The Plan and its Participants have suffered losses, including a possible loss in value, and been otherwise injured, as a result of the breaches of fiduciary duty by NFP, Kestra IS, Curry, and Korchak

420. Defendants are required to render an accounting of all such fees, the amount of which are assets owed to the Plan.

### COUNT II
### BREACH OF FIDUCIARY DUTY RELATING TO INVESTMENT IN "ALTERNATIVE INVESTMENTS" USING PLAN ASSETS

421. Plaintiff incorporates and realleges the allegations contained in the above stated paragraphs as if fully set forth herein.

422. NFP, Kestra IS, Curry, and Korchak, acting as investment advisors to the Plan with discretionary authority and control over fixed income Plan assets, and Kestra IS, acting as broker-dealer, and Korchak as registered representative, had fiduciary duties to act prudently and solely in the best interest of Plan Participants in dealing with Plan assets.

423. NFP, Kestra IS, Curry, and Korchak breached their fiduciary duties to do so by advising, recommending, and causing investment of approximately $900,000 of Plan assets in the CION Investment, Cole Credit Investment, and FS Investment as described herein. These three investments were non-marketable investments prohibited under the Plan's IPS. They were imprudent for the Plan and not for the exclusive purpose of providing benefits to the Participants.

424. NFP, Kestra IS, Curry, and Korchak's breaches in recommending these investments were further aggravated when they (a) failed to disclose any and all fees they received

63

in connection with these investments, and (b) failed to monitor or recommend changes when these investments sustained negative returns.

425.    NFP, Kestra IS, Curry, and Korchak breached their fiduciary duties by failing to disclose the risk profile of these investments including that the Plan may not be able to resell their shares regardless of how the investment performed because they were not listed on any securities exchange; and that there was no secondary market for them. Including these investments in the fixed income portfolio was deceptive because the expected returns from these investments, above bond returns, would, upon information and belief, make the performance of the fixed income portfolio appear better than it was.

426.    NFP, Kestra IS, Curry, and Korchak breached their fiduciary duties by failing to disclose the risk profile of these investments, specifically that the Plan may not be able to resell their shares regardless of how the investment performed because they were not listed on any securities exchange and there was no secondary market for them.

427.    NFP, Kestra IS, Curry, and Korchak breached their fiduciary duties by failing to disclose the existence, nature and extent of their conflict of interest by their receipt of compensation relating to these investments based on their selection of the very investments that generated such compensation.

428.    NFP, Kestra IS, Kestra AS, Curry, and Korchak received a financial benefit through undisclosed fees in connection with the CION Investment, Cole Credit Investment, and FS Investment, directly benefitting from these investments to the detriment of the Plan and its Participants.

429.    The amount of any fees received by NFP, Kestra IS, Kestra AS, Curry, and Korchak are assets owed to the Plan.

430.    The Plan and its Participants have suffered losses, including in the amount of lost principal and the amounts these investments could have earned if placed in diversified investments permitted under the IPS, and have been otherwise injured as a result of Defendants' breaches of fiduciary duty.

431.    NFP, Kestra IS, Kestra AS, Curry, and Korchak are required to render an accounting of all such indirect compensation, the amounts of which are assets owed to the Plan.

**COUNT III**
**BREACH OF FIDUCIARY DUTY RELATING TO**
**MANAGEMENT OF FIXED INCOME INVESMENTS**

432.    Plaintiff incorporates and realleges the allegations contained in the above stated paragraphs as if fully set forth herein.

433.    NFP, Kestra IS, Kestra AS, and the Representatives, acting as investment advisors to the Plan with discretionary authority and control over fixed income Plan assets, and Kestra IS and Korchak as broker-dealer, had fiduciary duties to act prudently and solely in the best interest of Plan Participants in dealing with Plan assets including managing the bond portfolio and executing trades in the bond portfolio.

434.    NFP, Kestra IS, Kestra AS, and the Representatives, breached their fiduciary duties to do so by failing to disclose to the Plan all of the commissions and other fees received through brokering the bonds, including an undisclosed "mark-up" of 1.0-2.5% on bond trades.

435.    Kestra IS and Korchak breached their fiduciary duties by (a) excessively trading bonds to generate more fees; (b) selling bonds before maturity resulting in a loss to the Plan; and (c) failing to follow bond trading instructions in 2016 and 2017.

436.    These Defendants breached their fiduciary duties in connection with the bond trades because the generation of commissions on bond trades was not in the best interest of Plan Participants. NFP, Kestra IS, Kestra AS, and the Representatives'  interest in generating

commissions so that each could financially benefit from the increased fees compromised their ability to make investment decisions solely in the interests of Participants.

437.     Kestra IS's practice of charging the Plan for commissions on bond trades was contrary to industry practice, which NFP, Kestra IS, Kestra AS, and the Representatives, acting as investment advisors, did not disclose to the Plan. The 37.5 basis points fee paid to qualified bond managers to administer a bond portfolio typically encompasses any commissions or other trading costs incidentally owed by the Plan.

438.     Kestra IS breached its fiduciary duties in connection with the bond trades because it did not establish a process for determining whether regular and continuous bond trades were prudent for the Plan and in the best interest of Plan Participants.

439.     Besides not establishing a proper process, NFP, Kestra IS, Kestra AS, and the Representatives did not establish the suitability and prudence of the investments or reasonableness of the associated fees. The Trustees were essentially left in the dark concerning the bond trades.

440.     NFP, Kestra IS, Kestra AS, and the Representatives breached their fiduciary duties by failing to disclose the existence, nature and extent of the conflict of interest presented by Kestra IS's and Korchak's receipt of mark-ups and other compensation relating to the bond trading, and their decisions on where, when and how to buy and sell the bonds that generated such fees.

441.     NFP, Kestra IS, Kestra AS, and the Representatives received or benefited from undisclosed commissions in connection with the aforementioned bond trades, and directly benefitted from these trades to the detriment of the Plan and Plan Participants.

442.     These Defendants had a clear, undisclosed conflict of interest trading these bonds, and the commissions and/or fees received are assets owed to the Plan.

443. The Plan and its Participants have suffered losses and been otherwise injured as a result of NFP, Kestra IS, Kestra AS, and the Representatives' breaches of fiduciary duty.

444. NFP, Kestra IS, Kestra AS, and the Representatives are required to render an accounting of all such fees and markups, the amount of which are assets owed to the Plan.

## COUNT IV
## BREACH OF FIDUCARY DUTY RELATING TO
## METLIFE MANAGED GIC INVESTMENTS

445. Plaintiff incorporates and realleges the allegations contained in the above stated paragraphs as if fully set forth herein.

446. NFP, Kestra IS, and the Representatives, acting as investment advisors to the Plan with discretionary authority and control over fixed income Plan assets, and Kestra IS and Korchak as broker-dealer, had fiduciary duties to act prudently and solely in the best interest of Plan Participants in dealing with Plan assets including managing the fixed income portfolio including the Met Life GIC.

447. NFP, Kestra IS, and the Representatives breached their fiduciary duties to do so by advising, recommending, and placing $4 million of Plan assets in a MetLife GIC designed to yield a negligent return on the investment and pay excessive compensation to these Defendants.

448. NFP, Kestra IS, Kestra AS, and the Representatives also breached their fiduciary duties by failing to determine whether fees associated with this investment were unreasonable and whether fees charged by the alleged investment administrator were unnecessary because they were duplicative of other custodial fees paid by the Plan.

449. NFP, Kestra IS, Kestra AS, and the Representatives breached their fiduciary duties also by (a) failing to disclose all material information regarding this investment, including regular and timely financial and other performance reports, (b) failing to monitor or evaluate the

performance of Alliance Benefit Group as an investment manager, and (c) failing to replace the investment based on poor performance.

450. NFP, Kestra IS, Kestra AS, and the Representatives failed to include the negligible returns on this investment when periodically reporting their own performance to the Trustees. On information and belief, they did not include the returns on this investment when reporting on Plan investment returns in 2017.

451. NFP, Kestra IS, Kestra AS, and the Representatives breached their fiduciary duties by failing to disclose the existence, nature and extent of the conflict of interest presented by their receipt of compensation from the MetLife GIC and their selection of the MetLife GIC that generated such compensation.

452. NFP, Kestra IS, Kestra AS, and the Representatives received compensation in connection with the purchase of MetLife GIC investments, directly benefitting from this investment to the detriment of the Plan and Plan Participants. These Defendants had a clear, undisclosed conflict of interest in doing so, and the compensation received is an asset owed to the Plan.

453. The Plan and its Participants have suffered losses and been otherwise injured as a result of NFP, Kestra IS, Kestra AS, and the Representatives' breach of fiduciary duty.

454. NFP, Kestra IS, Kestra AS, and the Representatives are also liable for the lost earnings resulting from acquiring this investment rather than investing the $4,000,000 in a diversified fixed income and equity portfolio, as required by the Plan's IPS.

455. NFP, Kestra IS, Kestra AS, and the Representatives are required to render an accounting of all such fees, the amount of which are assets owed to the Plan.

## COUNT V
## BREACH OF FIDUCARY DUTY RELATING TO UIT INVESTMENT

456.     Plaintiff incorporates and realleges the allegations contained in the above stated paragraphs as if fully set forth herein.

457.     NFP, Kestra IS, Kestra AS, and the Representatives, acting as investment advisors to the Plan with discretionary authority and control over fixed income Plan assets, and Kestra IS and Korchak as broker-dealer, had fiduciary duties to act prudently and solely in the best interest of Plan Participants in dealing with Plan assets including managing the fixed income portfolio including the AAM/UIT investment.

458.     NFP, Kestra IS, Kestra AS, and the Representatives breached their fiduciary duties to do so by advising, recommending, and placing an investment in the UIT because the investment was imprudent. It generated fees that higher than similar investments.

459.     NFP, Kestra IS, Kestra AS, and the Representatives caused the Plan to pay unreasonable management fees to AAM to obtain a one-half share of those management fees, thus receiving commission and other fees from AAM which, upon information and belief, were not disclosed to the Plan and its Participants.

460.     Kestra IS and Korchak breached their fiduciary duty by, among other things, taking commissions on the UIT when no markups were allowed for the UIT.

461.     NFP, Kestra IS, Kestra AS, and the Representatives breached their fiduciary duties in connection with the UIT investment because they did not establish or follow a process for determining whether the investment continued to be prudent and whether the fees were reasonable for the level of investment return. Consequently, they did not communicate their findings or the (lack of) process to the Trustees.

462.     NFP, Kestra IS, Kestra AS, and the Representatives breached their fiduciary duties in connection with the UIT investment because they received compensation in connection with the purchase of UIT, directly benefitting from this investment to the detriment of the Plan and its Participants. These Defendants had a clear, undisclosed conflict of interest in doing so, and the amount of fees received are assets owed to the Plan.

463.     The Plan and its Participants have suffered losses and been otherwise injured as a result of Defendants' breaches of fiduciary duty.

464.     NFP, Kestra IS, Kestra AS, and the Representatives are required to render an accounting of all such fees, the amount of which are assets owed to the Plan.

**COUNT VI**
**BREACH OF FIDUCARY DUTY RELATING TO**
**FIRST TRUST ADVISOR AS ADDITIONAL MONEY MANAGER AND**
**FAILURE TO DISCLOSE FEES PAID BY FTA**

465.     Plaintiff incorporates and realleges the allegations contained in the above stated paragraphs as if fully set forth herein.

466.     NFP, Kestra IS, Kestra AS, and the Representatives, acting as investment advisors to the Plan with discretionary authority and control over management of the Plan, had a duty to but failed to act in accordance with their duties of prudence and loyalty in selecting other money managers to manage assets of the Plan.

467.     NFP, Kestra IS, and the Representatives breached their fiduciary duties by advising, recommending, and effecting the hiring of FTA as an equity investment manager, without (a) providing information consistent with industry standards concerning multiple investment managers; (b) disclosing the lack of experience of FTA with multiemployer pension benefit plans, and (c) disclosing the limited resources of FTA.

468.     NFP, Kestra IS, and the Representatives also breached their fiduciary duties by (i) designating Kestra IS through Korchak as the directing brokers for all securities transactions; (ii) failing to disclose that the directed brokerage imposed on FTA was a conflict of interest; (iii) paying an excessive "equity management fee" to FTA and splitting that fee with NFP, Kestra IS, and Kestra AS, while failing to completely and accurately disclose such fee-splitting.

469.     In addition, NFP in its fiduciary capacity as Plan Administrator failed to disclose such indirect compensation when it was requested annually on behalf of the Trustees by the accountant.

470.     NFP, Kestra IS, Kestra AS, and the Representatives breached their fiduciary duties in connection with FTA because they did not establish a prudent process for determining whether the investments offered through FTA continued to be prudent and whether the fees were reasonable for the level of investment return and level of service. Consequently, they did not communicate their findings or the (lack of) process to the Trustees.

471.     NFP, Kestra IS, Kestra AS, and the Representatives received compensation in connection with the hiring of FTA, directly benefitting from this selection to the detriment of the Plan and its Participants. These Defendants had a clear, undisclosed conflict of interest in doing so, and the amount of fees received are assets owed to the Plan.

472.     The Plan and its Participants have suffered losses and been otherwise injured as a result of NFP, Kestra IS, Kestra AS, and the Representatives' breaches of fiduciary duty.

473.     NFP, Kestra IS, Kestra AS, and the Representatives are required to render an accounting of all such fees and commissions, the amounts of which are assets owed to the Plan.

## COUNT VII
## BREACH OF FIDUCARY DUTY RELATING TO
## SELECTION OF OTHER MONEY MANAGERS FOR PLAN ASSETS

474.     Plaintiff incorporates and realleges the allegations contained in the above stated paragraphs as if fully set forth herein.

475.     NFP, Kestra IS, and the Representatives, acting as investment advisors to the Plan with discretionary authority and control over management of the Plan, had a fiduciary duty to follow a prudent process in accordance with industry standards to recommend and select other investment managers for the Plan's portfolio, including BIM, MSSB, and ML and possibly others.

476.     NFP, Kestra IS, and the Representatives breached their duties by failing to enter into agreements with other investment managers, causing the Plan to pay duplicate management fees, and failing to disclose these relationships to the Plan or the nature and extent of all compensation or fees realized by Defendants as a result of investing with these managers.

477.     NFP, Kestra IS, and the Representatives received compensation in connection with these selections, directly benefitting from them to the detriment of the Plan and its Participants. NFP, Kestra IS, and the Representatives had a clear, undisclosed conflict of interest in doing so, and the amount of fees received are assets owed to the Plan.

478.     The Plan and its Participants have suffered losses and been otherwise injured as a result of NFP, Kestra IS, and the Representatives' breaches of fiduciary duty.

479.     NFP, Kestra IS, and the Representatives are required to render an accounting of all such fees, the amounts of which are assets owed to the Plan.

## COUNT VIII
## DBREACH OF FIDUCARY DUTY FOR
## FAILURE TO DISCLOSE PURSUANT TO SECTION 408(b)(2) DISCLOSURES

480.     Plaintiff incorporates and realleges the allegations contained in the above stated paragraphs as if fully set forth herein.

481.     As ERISA covered service providers, Defendants had a statutory and fiduciary duty to provide 408(b)(2) Disclosures to the Plan.

482.     Defendants breached their duty by (a) failing to provide such disclosures, with the exception of a 2012 disclosure by NFP Securities which was non-compliant, and (b) failing to otherwise provide a complete and accurate accounting of all fees and commissions paid to Defendants.

483.     Defendants received compensation in connection with their performance as fiduciaries to the Plan, and directly benefitted from their non-disclosure to the detriment of the Plan. Defendants had a clear, undisclosed conflict of interest in doing so, and the amount of fees received are assets owed to the Plan.

484.     The Plan and its Participants have suffered losses and been otherwise injured as a result of Defendants' breach of fiduciary duty.

**COUNT IX**
**BREACH OF FIDUCARY DUTY FOR FAILURE TO IMPLEMENT AND FOLLOW PRUDENT PROCESSES WITH RESPECT TO THE PLAN**

485.     Plaintiff incorporates and realleges the allegations contained in the above stated paragraphs as if fully set forth herein.

486.     NFP, Kestra IS, Kestra AS, and the Representatives, acting Plan Administrator (NFP) and as investment advisors to the Plan with discretionary authority and control over management of the Plan, had a fiduciary duty to implement or follow prudent processes, consistent with industry standards and with ERISA.

487.     NFP, Kestra IS, Kestra AS, and the Representatives breached their fiduciary duty by, among other things, (a) failing to enter into written service agreements with the Plan; (b) failing to provide the Trustees with a total return analysis of all Plan assets on a monthly, quarterly, annual basis, and over market cycles such as three years, five years, and 10 years; (c) failing to provide

detailed information and risk/return education about each investment significantly different from traditional equities and bonds in advance of acquiring alternative investments; (d) failing to monitor investments and to provide written information about performance of ongoing investments; and (e) failing to provide written benchmarking and fee data to enable the Trustees to assess the reasonableness of fees.

488.     NFP, Kestra IS, Kestra AS, and the Representatives financially benefited from these breaches to the detriment of the Plan and its Participants. Defendants had a clear, undisclosed conflict of interest in doing so, and the amount of all commissions/fees received are assets owed to the Plan.

489.     The Plan and its Participants have suffered losses and been otherwise injured as a result of NFP, Kestra IS, Kestra AS, and the Representatives' breaches of fiduciary duty.

## COUNT X
## BREACH OF FIDUCIARY DUTY FOR FAILURE TO IMPLEMENT AND FOLLOW PRUDENT PROCESSES WITH RESPECT TO PLAN ADMINISTRATION AND RECORDKEEPING

490.     Plaintiff incorporates and realleges the allegations contained in the above stated paragraphs as if fully set forth herein.

491.     NFP, Curry, and Korchak, as Plan Administrator and/or a functional fiduciary with respect to administration and recordkeeping for the Plan, had a fiduciary duty to implement and follow prudent processes, consistent with industry standards and with ERISA, in serving as administrator and record-keeper of the Plan and providing services to the Plan.

492.     NFP, Curry, and Korchak breached their fiduciary duty by failing to properly organize, monitor, update, and maintain any and all records relating to the Plan and its Participants and by charging the Plan unreasonable, excessive, and unnecessary recordkeeping and related fees in light of these failures.

493.    The Plan and its Participants have suffered losses, including fees to address the failings, and been otherwise injured as a result of NFP, Curry, and Korchak's breaches of fiduciary duty.

494.    NFP, Curry, and Korchak's failures to update and enter into reasonable written service contracts since 1981 enabled Defendants to provide substandard support and services for administration and to retain greater profits from their relationship with the Plan. Their failure to provide adequate financial and technical support for day-to-day administration of the Plan resulted in the creation of incomplete and inaccurate participant records to the detriment of Participants over many years. More than half of the Participants did not have usable records of their addresses and did not receive notices, plan documents, 408 (b)(2) expense disclosures, and periodic benefit account reports to which they were entitled.

495.    NFP's inadequate financial and technical support for the collection of employer contributions resulted in long delays in crediting Participants' accounts with the amount contributed by their employers and resulted in months of lost earnings on the amounts paid by contributing employers.

496.    NFP, Curry, and Korchak are required to render an accounting of all such administrative fees for which appropriate written agreements did not exist and inadequate services were provided, the amounts of which are assets owed to the Plan.

**COUNT XI**
**BREACH OF FIDUCIARY DUTY TO SUPERVISE AND MONITOR**

497.    Plaintiff incorporates and realleges the allegations contained in the above stated paragraphs as if fully set forth herein.

498. Under 29 U.S.C. § 1104(a), an individual with discretion to appoint an ERISA fiduciary has a fiduciary duty to select, retain and monitor those whom they appoint as would a reasonably prudent businessperson.

499. Corporate entities "may well have some duty to monitor" appointed plan administrators, even when the administrators are not close business associates. *Ed Miniat, Inc. v. Globe Life Ins. Grp., Inc.*, 805 F.2d 732, 736 (7th Cir. 1986).

500. As set forth in paragraphs 413-424, NFP, Kestra IS, and Kestra AS, in their respective roles as set forth herein, had a fiduciary duty to supervise and monitor NFP, Korchak, and Curry, including a duty to ensure that Korchak and Curry, while serving in professional and fiduciary positions, possessed the knowledge and experience needed to administer a Plan in a manner that professionals familiar with the operation of ERISA governed defined contribution employee benefit plans would act.

501. NFP, Kestra IS, and Kestra AS had a fiduciary duty to avoid creating an administrative and investment arrangement in which the Representatives had conflicts of interest that would affect the actions and advice provided to the Plan.

502. NFP, Kestra IS, and Kestra AS breached their fiduciary duties by failing to supervise, monitor, and guide its Representatives as to all matters for which they were serving as fiduciaries of the Plan including, but not limited to, (a) investigating, advising on, recommending, and selecting prudent investments for the Plan, (b) avoiding conflicts of interests, (c) educating and informing the Plan regarding investments, (d) disclosing all direct and indirect compensation, (e) ensuring written agreements were in place, and (f) otherwise complying with ERISA.

503.     NFP, Kestra IS, and Kestra AS breached their fiduciary duty by failing to ensure their Representatives were competent to provide services to an ERISA-governed defined contribution employee benefit plan.

504.     Kestra IS, as broker-dealer, breached its fiduciary duties by failing to ensure their Representatives were competent to provide brokerage services to an ERISA-governed defined contribution employee pension benefit plan.

505.     These failures to supervise and monitor allowed the Representatives to breach their fiduciary duties as set forth herein.

506.     The Plan and its Participants have suffered losses and been otherwise injured as a result of NFP, Kestra IS, and Kestra AS's breaches of fiduciary duty.

507.     NFP, Kestra IS, and Kestra AS are jointly and severally liable for the losses caused by the Representatives to the Plan.

**COUNT XII**
**BREACH OF FIDUCIARY DUTY FOR**
**CHARGING PLAN UNREASONABLE AND EXCESSIVE FEES**

508.     Plaintiff incorporates and realleges the allegations contained in the above stated paragraphs as if fully set forth herein.

509.     NFP, Kestra IS, Kestra AS, and the Representatives, in each of their fiduciary roles as described herein, had a fiduciary duty to charge only reasonable compensation for services provided to the Plan.

510.     NFP, Kestra IS, Kestra AS, and the Representatives, breached their fiduciary duty by charging the Plan not only the NFP Advisory Fee of 37.5 basis points for fixed income investments and the NFP administrative fee, but also additional compensation from Plan assets including commissions and other fees, which compensation was unreasonable and excessive.

511.     NFP, Kestra AS, and the Representatives breached their fiduciary duty by continuing to charge the Plan an advisory fee of 37.5 bps and other fees from November 2016 through November 2017, during which time NFP, Kestra AS, and the Representatives provided no advisory or investment management services to the Plan, rendering any such fee unreasonable and excessive.

512.     The Plan and its Participants have suffered losses and have been otherwise injured as a result of NFP, Kestra AS, and the Representatives breaches of fiduciary duty.

513.     Defendants are required to render an accounting of all such fees collected during the last 12 months of their responsibility for the bond portfolio, the amounts of which are assets owed to the Plan.

**COUNT XIII**
**BREACH OF FIDUCIARY DUTY RELATING TO**
**TRANSITION TO NEW SERVICE PROVIDERS**

514.     Plaintiff incorporates and realleges the allegations contained in the above stated paragraphs as if fully set forth herein.

515.     After their termination by the Plan, Defendants had a fiduciary duty to cooperate in a timely and reasonable fashion in the transition of Plan assets and Plan records to the Plan's new administrator, custodian, investment providers, and other service providers, and breached such duty by failing to so act.

516.     By failing to act in a timely manner and delaying the transfer of assets, equipment and information, Defendants continued to receive fees for the assets' administration and for the conflicted investments they made with Plan assets.  Rather than transfer the assets, which the Trustees determined was in the best interest of the Plan, Defendants retained the assets and delayed the transfer so they could continue to earn fees for their own account, to the detriment of Plan Participants.

517.    The Plan and its Participants have suffered losses and have been otherwise injured as a result of Defendants' breaches of fiduciary duty.

518.    Defendants are required to render an accounting of all such administrative, brokerage and other fees collected after September 1, 2017 because of the delayed transition, the amounts of which are assets owed to the Plan.

## SECOND CLAIM FOR RELIEF

### VIOLATION OF
### ERISA SECTION 406 - PROHIBITED TRANSACTIONS

519.    Plaintiff incorporates and realleges the allegations contained in the above stated paragraphs as if fully set forth herein.

520.    Under 29 U.S.C. §§ 1106(a) and (b), fiduciaries are prohibited from causing plans to engaged in transactions with parties in interest and fiduciaries that are expressly prohibited and are considered "per se" violations because they entail a high potential for abuse and injury to a plan.

521.    With respect to transactions between a plan and party in interest, "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect— (A)sale or exchange, or leasing, of any property between the plan and a party in interest; (B)lending of money or other extension of credit between the plan and a party in interest; (C) furnishing of goods, services, or facilities between the plan and a party in interest; (D)transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or (E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title." 29 U.S.C. § 1106(a).

522.    29 U.S.C. § 1002(14) defines a "party in interest" includes any fiduciary and any person providing services to such plan.

523.     29 U.S.C. § 1106 (b), which lists *per se* ERISA violations, provides that a fiduciary with respect to a plan shall not "(1) deal with the assets of the plan in his own interest or for his own account, (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or (3)receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b).

524.     29 U.S.C. § 1108(b)(2) provides that the prohibitions provided in 29 U.S.C. § 1106(b) do not apply to payment for services from a covered plan to any party-in-interest including a fiduciary, provided (a) such service is necessary for the establishment or operation of the plan; (b) such service is furnished under a contract or arrangement that is reasonable; and (c) no more than reasonable compensation is paid for such service. 29 U.S.C. §§ 1106(b)(2). If a covered service provider does not satisfy these conditions, the fees received are deemed unreasonable, and thus the service provider engages in a *per se* prohibited transaction.

525.     As set forth herein, each Defendant acted as a fiduciary of the Plan, and is thus deemed an ERISA party in interest.

526.     Each Defendant provided services to the Plan and is thus deemed an ERISA party in interest.

527.     NFP, Kestra IS, Kestra AS, and the Representatives, as Plan Administrator, investment advisor and fixed income investment manager for the Plan, were involved in causing the Plan to invest the Plan's assets in the investments descried herein and use Kestra IS as broker-dealer and Korchak as registered representative.

528.     The Defendants were hopelessly conflicted providing administrative, advisory, and brokerage services to the Plan. In fact, until June, 2016, they were operating as a single entity under the corporate umbrella of NFP Corp. Thereafter, Kestra AS continued to use Kestra IS as its affiliated broker.

529.     By causing the Plan to invest the Plan's assets in these investments and use the service providers that were all affiliated, NFP, Kestra IS, Kestra AS and the Representatives, as fiduciary investment advisor and manager for the Plan's fixed income portfolio, caused the Plan to engage in transactions that they knew or should have known constituted the "furnishing of [] services [] between the Plan and a party in interest," in violation of 29 U.S.C. §1106.

530.     As set forth herein, NFP, Kestra IS, Kestra AS and the Representatives caused the Plan to engage in a prohibited transaction by selecting and causing investments of almost $1 million of Plan assets in high-fee PIMCO Class A Shares that may have been prudent for retail, but not institutional investors. NFP, Kestra IS, Kestra AS and the Representatives did so even though lower-cost share classes of the same funds for which the Plan was eligible were available.

531.     As set forth herein, NFP, Kestra IS, Kestra AS and the Representatives caused the Plan to engage in a prohibited transaction by selecting and causing investment of approximately $900,000 of Plan assets in the CION Investment, Cole Credit Investment, and FS Investment, which were prohibited under the Plan's IPS, imprudent, and sustained negative returns.

532.     As set forth herein, NFP, Kestra IS, Kestra AS and the Representatives caused the Plan to engage in a prohibited transaction by advising, recommending, and placing $4 million of Plan assets in a MetLife GIC.  Fees associated with this investment were unreasonable and excessive, fees charged by the alleged investment administrator were duplicative; and were not disclosed to the Plan or its Participants.

533.    As set forth herein, NFP, Kestra IS, Kestra AS and the Representatives caused the Plan to engage in a prohibited transaction by advising, recommending, and causing investment of approximately $10 million of Plan assets in the AAM/UIT, which was an imprudent investment. This caused the Plan to pay duplicate management fees to AAM, which led to NFP, Kestra IS, Kestra AS and the Representatives compensation from AAM which were not disclosed to the Plan or its Participants.  By placing such investments, the Defendants dealt with the assets of the Plan for their own interest and received consideration for their own personal account in connection with transactions involving the assets of the Plan.

534.    With respect to the above referenced investments, NFP, Kestra IS, Kestra AS and the Representatives caused the Plan to execute trades through Kestra IS and Korchak.

535.    NFP, Kestra IS, Kestra AS, and the Representatives failed to disclose all compensation including commissions and fees received in connection with these investments.

536.    By placing these investments and executing trades to generate commission and other fees through Kestra IS and Korchak, NFP, Kestra IS, Kestra AS and the Representatives dealt with the assets of the Plan for their own interest and received consideration for their own personal account in connection with transactions involving the assets of the Plan.

537.    As set forth herein, NFP, Kestra AS, and the Representatives, as investment advisor and manager of the fixed income portfolio, caused the Plan to engage in a prohibited transaction by charging an asset management fee for fixed income investments of 37.5 bps of assets under management for the last 12 months of their employment while providing no effective management of the portfolio. NFP, Kestra AS and the Representatives provided no service to the plan, which is enough to deem any fees unreasonable.  By charging and receiving the fees in connection with the investment of Plan assets without providing needed services, NFP, Kestra AS and the

Representatives dealt with the assets of the Plan for their own interest and received consideration for their own personal account.

538. As set forth herein, NFP, Kestra AS, and the Representatives, as investment managers of the fixed income portfolio, caused the Plan to engage in prohibited transactions by exercising their discretion to continue to make bond trades and generate fees, through Kestra IS and Korchak, and by subsequently failing to disclose such fees. By charging the mark-up and commissions, not disclosing all fees, and continuing to make bond trades that were made to generate self-serving fees, the Defendants dealt with the assets of the Plan for their own interest and received consideration for their own personal account in connection with transactions involving the assets of the Plan.

539. To the extent that any Defendant is found to be a non-fiduciaries, in participating in the prohibited transactions, each Defendant acted with actual or constructive knowledge, and is liable to the Plan.

540. Any service fees, investment fees, and other compensation charged or received by Defendants from other service providers were per se "unreasonable" due to Defendants' failure to provide proper 408(b)(2) Disclosures. By receiving unreasonable fees, Defendants engaged in a transaction prohibited by 29 U.S.C. § 1106(a)(1)(c).

541. The Plan and its Participants have suffered losses and have been otherwise injured as a result of Defendants causing the Plan to engage in ERISA prohibited transactions.

542. Defendants are required to render an accounting of all such fees, the amounts of which are assets owed to the Plan.

**THIRD CLAIM FOR RELIEF**
**KNOWING PARTICIPATION IN BREACHES OF FIDUCIARY DUTIES AND**
**PROHIBITED TRANSACTIONS**
**(IN THE ALTERNATIVE)**

543. Plaintiff incorporates and realleges the allegations contained in the above stated paragraphs as if fully set forth herein.

544. U.S.C. § 1132(a)(3) provides a cause of action against a non-fiduciary "party in interest" who knowingly receives payments made in breach of a fiduciary's duty, and authorizes "appropriate equitable relief" such as restitution or disgorgement to recover ill-gotten proceeds from the non-fiduciary.

545. Anyone, including a non-fiduciary, who receives the benefit of conduct that violates ERISA may be subject to equitable remedies under 29 U.S.C. § 1132(a)(3) if they have "actual or constructive knowledge of the circumstances that rendered the transaction unlawful." *Harris Trust & Sav. Bank v. Soloman Smith Barney, Inc*., 530 U.S. 238, 251 (2000).

546. With respect to the acts and omissions set forth herein, NFP, Kestra IS, Kestra AS, and the Representatives are, at the very least, all parties in interest to the Plan.

547. As described herein, NFP, Kestra IS, Kestra AS, and the Representatives have profited financially, in an amount to be proven at trial, from the breaches of fiduciary duty and prohibited transactions identified in the First and Second Claims for Relief.

548. Upon information and belief, NFP, Kestra IS, Kestra AS, and the Representatives remain in possession of such profits.

549. By knowingly participating in these breaches and violations and as parties in interest to the Plan, NFP, Kestra IS, Kestra AS, and the Representatives are subject to appropriate equitable relief including disgorgement of any profits, having a constructive trust placed on any proceeds received (or which are traceable thereto), a surcharge, having the transactions rescinded, requiring all or part of the consideration to be restored to the Plan, or to be subject to other appropriate equitable relief.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants, Benefit Planning Services, Inc., NFP Corporate Services (IL), Inc., Kestra Advisory Services, LLC, Kestra Investment Services, LLC, Jerry G. Korchak, and Stephen F. Curry, jointly and severally, and in favor of Plaintiff directly on behalf of the Plan and its Participants as follows:

A.    An order requiring restoration of all losses caused to the Plan as a result of their fiduciary breaches;

B.    An order declaring that the practices described above violate ERISA and a permanent injunction preventing Defendants from engaging in such conduct in the future, pursuant to 29 U.S.C. § 1132(a)(3).

C.    An award of monetary damages caused by Defendants' breaches pursuant to 29 U.S.C. § 1132(a)(2).

D.    Equitable relief, including imposition of a constructive trust pursuant to 29 U.S.C. § 1132(a)(3).

E.    Disgorgement, restitution, or surcharge pursuant to 29 U.S.C. § 1132(a)(3).

F.    An accounting for profits, pursuant to 29 U.S.C. §1132(a)(3).

G.    An award of Plaintiffs' reasonable fees and costs pursuant to 29 U.S.C. § 1132(g)(1).

H.    Pre-judgment interest at the maximum rate, whether at law or in equity.

I.    Post-judgment interest at the maximum rate, whether at law or in equity.

J.    Any and all further relief that the Court may deem just and equitable.

Dated: December 10, 2021.

s/Joshua B. Levy
Joshua B. Levy
Karen L. Tidwall
HUSCH BLACKWELL LLP
511 North Broadway, Suite 1100
Milwaukee, WI 53202
(414) 978-5527  Phone
(414) 223-5000  Fax
joshua.levy@huschblackwell.com
karen.tidwall@huschblackwell.com

Attorneys for Plaintiffs