## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| KEVIN DALE, *et al.*, | No. 20-cv-02942 |
| Plaintiffs, | |
| | Judge John F. Kness |
| v. | |
| NFP CORP., *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, the Board of Trustees of a pension plan, the Northern Illinois Annuity Fund and Plan, bring this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*, on behalf of the Plan and its participants. (Dkt. 78, ¶¶ 1–3.) Plaintiffs allege that Defendants, the Plan's administrators and investment advisors, breached their fiduciary duties by structuring investments to generate excessive direct and indirect compensation for themselves; failing to disclose to Plaintiffs all compensation received from investment of Plan assets; providing false or inadequate reports on investment performance; providing inadequate or misleading investment advice; and investing Plan assets in imprudent and illiquid investments.[1] (*Id.* ¶ 11.) Plaintiffs plead thirteen separate

---

[1] Plaintiffs also bring claims under ERISA Section 406, 29 U.S.C. §§ 1106(a) and (b), alleging that Defendants caused the Plan to engage in prohibited transactions with "parties in interest." (*Id.* ¶¶ 519–549.) Additionally, Plaintiffs assert, in the alternative, that they are entitled to "other equitable remedies" against Defendants under ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3). Defendants have not moved to dismiss these claims, so the Court does not address them in this opinion.

counts of breach of fiduciary duty. (Dkt. 78, ¶¶ 398–518.)

Defendants move to dismiss all thirteen counts on the grounds that Counts I, II, IV, VI, and VII are time-barred under ERISA's statute of limitations; Counts I, II, III, IV, V, VI, VII, VIII and XII fail to allege sufficient facts to establish a breach of fiduciary duty; and Counts IX, X, XI, and XIII "challenge certain administrative and recordkeeping actions" for which there is no fiduciary liability. (Dkt. 83 at 2–3.) Defendants' motion to dismiss is granted in part and denied in part as follows:[2]

- Statute of Limitations: Defendants' request to dismiss Counts I, II, IV, VI, and VII as time-barred is denied, except that any breach premised on Defendants' initial recommendations to invest in the MetLife GIC investment (Count IV) and to hire First Trust Advisors, Inc. (Count VI), which occurred respectively in 2004 and 2009, is untimely.

- Count I – PIMCO Class A Shares: Count I is dismissed.

- Count II – Alternative Investments: Count II states a claim for breach of fiduciary duty premised on Defendants' alleged misrepresentations regarding the liquidity of the alternative investments. Plaintiffs allege insufficient facts, however, to substantiate their other theories of breach related to Defendants' failure to disclose commissions and failure to evaluate the prudence of the

---

[2] Plaintiffs organize the complaint such that each count corresponds to a certain investment decision made by Defendants. Within each count, Plaintiffs allege multiple alleged breaches related to that investment decision. Consequently, the Court dismisses certain counts in part, depending on the sufficiency of the factual allegations supporting each discretely alleged breach. *See Wells Fargo Bank, N.A. v. LaSalle Bank Nat. Ass'n*, 2011 WL 2470635 (N.D. Ill. June 20, 2011) (dismissing in part certain counts where "[e]ach of the eight loans at issue is a separate count and within each count [plaintiff] alleges that [defendant] breached multiple warranties").

alternative investments.

- Count III – Management of Fixed-Income Investments: Count III states a claim for breach of fiduciary duty based on Defendants' churning of the fixed-income portfolio.

- Count IV – MetLife Managed GIC Investment: Count IV states a claim for breach of fiduciary duty premised on Defendant Korchak's alleged misrepresentation in 2017 regarding redemption of the investment, but otherwise fails to state a claim under Plaintiffs' additional theories relating to recordkeeping fees, financial reports, and undisclosed information.

- Count V – UIT Investment: Count V is dismissed.

- Count VI – FTA as Money Manager: Count VI is dismissed.

- Count VII – Selection of Other Money Managers: Count VII is dismissed.

- Count VIII – Failure to Provide Section 408(b)(2) Disclosures: Count VIII states a claim for breach of fiduciary duty based on Defendants' failure to provide disclosures under ERISA section 408(b)(2).

- Count XII – Charging the Plan Unreasonable and Excessive Fees: Plaintiffs state a claim for breach of fiduciary duty with respect to Defendants' fees for the period running from September 1, 2017 through December 1, 2017 due to Defendants' allegedly intentional delay in transferring assets to the Plan's new service providers. Plaintiffs, however, fail to state a claim for excessive fees from November 2016 through September 1, 2017 because Defendants were authorized and continued to provide investment services to the Plan.

3

- <u>Counts IX, X, XI, and XIII – Fiduciary Status:</u> Plaintiffs allege sufficient facts to establish that Defendants were fiduciaries when performing the conduct at issue in Counts IX, X, XI, and XIII.

## BACKGROUND

### I.    The Plan and its Expenses

The Northern Illinois Annuity Fund and Plan (the "Plan") was created in 1981 to provide union workers with a fund to save money for disability, retirement, and death. (Dkt. 78, ¶ 79.) The Plan is a defined contribution, multiemployer employee pension benefit plan within the meaning of ERISA, 29 U.S.C. § 1002(2), (34), and (37). (*Id.* ¶ 18.) Plan participants "maintain individual investment accounts, which are funded by pretax contributions from employees' salaries and, where applicable, matching contributions from" the participants' unions and employers. *See Hughes v. Northwestern University*, 142 S. Ct. 737, 740 (2022). Participants' retirement benefits are equivalent to the "value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Albert v. Oshkosh Corp.*, 47 F.4th 570, 574 (7th Cir. 2022) (quoting *Tibble v. Edison Int'l*, 525 U.S. 523, 525 (2015)).

The Plan's expenses consist of various fees paid for administrative and advisory services. For example, the Plan paid investment management fees, which "compensate a fund, such as a mutual fund or index fund, for designing and maintaining the fund's investment portfolio." *Id.* Typically, investment management fees are calculated as a "percentage of the money a plan participant invests in a

particular fund, which is known as an expense ratio." *Id.* Expense ratios tend to be higher for actively managed funds than passive funds such as those that track an index like the S&P 500. *Id.*

The Plan also paid administration (or recordkeeping) fees. These fees compensate the plan's administrator for "track[ing] balances of individual accounts, provid[ing] regular account statements, and offer[ing] informational and accessibility services to participants." *Id.* (quoting *Hughes*, 142 S. Ct. at 740). Administration fees are typically assessed as a "flat fee per participant or via an expense ratio." *Id.* A plan's administrator may occasionally also be paid via "revenue sharing," where a portion of the investment management fees collected through an expense ratio goes to the administrator. *Id.* This portion, called 12b-1 fees, is charged to investors "to pay for distribution expenses and shareholder service expenses." *Lange v. Infinity Healthcare Physicians, S.C.*, 2021 WL 3022117, at *4 (W.D. Wis. July 16, 2021). Expense ratios and revenue-sharing payments generally "move in tandem: the higher a given share class's expense ratio, the more the fund pays the [administrator] in revenue sharing." *Albert*, 47 F.4th at 574 (quoting *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 909 (7th Cir. 2013)). A "share class" refers to the "groups of investors who invest in the same investment option." *Id.* A "retail" share class pays the same fees as the general public, while an "institutional" share class pays a discounted rate. *Id.*

The Plan also paid investment advisory fees. These fees compensate the plan's investment advisor for researching and recommending investment of the plan's

assets and providing individualized advisory services to the plan's participants. *See id.* at 575–76, 582; *see also Scott v. Aon Hewitt Financial Advisors, LLC*, 2018 WL 1384300, at *1–2 (N.D. Ill. Mar. 19, 2018).

## II.  The Parties and Their Responsibilities

The Plan's Board of Trustees oversees the Plan as fiduciary and is listed as the Plan Administrator in the governing Plan documents. (Dkt. 78, ¶ 19, 21, 90) The Board, however, delegated its responsibilities to NFP Corp ("NFP"). NFP, through its subsidiaries and employees, Stephen Curry and Jerry Korchak (collectively, "Defendants"), acted as the Plan's administrator, third-party administrator ("TPA"), investment advisor,[3] and broker-dealer.[4] (*Id.* ¶¶ 24–25, 28, 38–42, 52–58, 90–91.)

Defendants were required to manage Plan assets consistent with the objectives and standards laid out in the Plan's Investment Policy Statement ("IPS"). (*Id.* ¶ 84.) The IPS specifies that the Plan was to maintain a "diversified balanced portfolio to be managed at a reasonable expense." (*Id.* ¶ 85.) The Plan's portfolio "consisted of fixed-income investments and equity asset classes." (*Id.* ¶ 86.) The IPS "set minimum and maximum fixed income and equities asset allocation requirements," and changes

---

[3] The Plan and NFP maintained a written agreement for plan administration from July 14, 1997, until December 31, 2001, but operated without a written contract thereafter. (*Id.* ¶ 103.) NFP and the Plan never entered into a written contract for investment advisory services. (*Id.* ¶ 104.)

[4] NFP's subsidiary and codefendant, Benefit Planning Services, Inc. ("BPS"), acted as Plan Administrator and TPA. (*Id.* ¶¶24–25, 28, 52–58, 90–91.) Codefendant Kestra Investment Services ("Kestra IS"), another NFP subsidiary, served as the Plan's investment advisor and broker-dealer. (*Id.* ¶¶ 38–40.) On or around June 24, 2016, NFP separated Kestra's advisory and brokerage businesses, such that the newly-created Kestra Advisory Services, LLC ("Kestra AS") served as the Plan's investment advisor while Kestra IS remained as the Plan's broker-dealer. (*Id.* ¶¶ 40–42.) For ease of reference, this opinion will refer to NFP Corp. and its subsidiaries as "NFP."

in the asset allocation between fixed income and equities were required to be approved by the Trustees. (*Id.* ¶ 87.) The IPS prohibited transacting or investing through "non-marketable securities, commodity trading, short selling, option trading with the exception of covered calls, and private placements." (*Id.* ¶ 89.)

Defendants charged the Plan a flat fee for administrative services, based on the number of Plan participants, and a quarterly investment advisory fee equal to "three-eighths of one percent (.375%) of the average 'fixed income assets' under NFP's management." (*Id.* ¶¶ 106, 111.) Defendants also negotiated the Plan's contract with First Trust Advisors, Inc. ("FTA") for investment management services for the equity portion of the Plan's portfolio, under which the Plan agreed to pay FTA investment management fees equal to 57 basis points (0.57%) of equity assets under FTA's management. (*Id.* ¶¶ 117–19, 121.) FTA then paid Defendants a portion of this fee under a revenue-sharing agreement. (*See id.* ¶¶ 116–124.)

In late 2017, the Trustees selected new investment service providers and terminated their relationship with Defendants. (Dkt. 78, ¶¶ 329, 335.) The Trustees (now, "Plaintiffs") then filed suit against Defendants on behalf of the Plan and its participants. Plaintiffs allege in their first amended complaint that Defendants breached their fiduciary duties while servicing the Plan. Defendants move to dismiss all thirteen counts for breach of fiduciary duty brought by Plaintiffs. (Dkt. 83.)

## LEGAL STANDARD

A motion under Rule 12(b)(6) "challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Ord. of Police*

*of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). Each complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although legal conclusions are not entitled to the assumption of truth, *Iqbal*, 556 U.S. at 678–79, the Court, in evaluating a motion to dismiss, must accept as true the complaint's factual allegations and draw reasonable inferences in the plaintiffs' favor. *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

## DISCUSSION

### I.    Statute of Limitations

Defendants argue the Court should dismiss Counts I, II, IV, VI and VII as time-barred. Generally, "complaints are not required to anticipate affirmative defenses," so "dismissal under Rule 12(b)(6) on statute of limitations grounds is considered 'irregular.'" *Hakim v. Accenture United States Pension Plan*, 656 F. Supp. 2d 801, 816 (N.D. Ill. 2009) (quoting *United States v. Northern Tr. Co.*, 372 F.3d 886, 888 (7th Cir. 2004)). Dismissal is only appropriate where a plaintiff pleads himself out of court because the complaint "plainly reveals that an action is untimely under the governing statute of limitation." *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005).

Three possible limitations periods apply to claims for breach of fiduciary duty under ERISA: (1) a six-year statute of repose period beginning on "the date of the last

8

action which constituted a part of the breach or violation, or, in cases of breach by omission, the latest date on which the fiduciary could have cured the breach or violation"; (2) an accelerated three-year period that begins when "the plaintiff gains 'actual knowledge' of the breach"; and (3) in the case of fraud or concealment, a six-year period that "begins when the plaintiff discovers the alleged breach." *Intel Corp. Inv. Policy Comm. v. Sulyma*, 140 S. Ct. 768, 774 (2020) (quoting 29 U.S.C. § 1113). The parties entered a tolling agreement on June 6, 2019, so any claims in which the last action constituting the breach (or cure date or fraud discovery) occurred on or after June 6, 2013 are timely under ERISA's first and third limitations periods.[5] (Dkt. 84, at 12 n.7; Dkt. 92, at 15.)

The last action constituting the breach is determined by the defendant's injurious conduct, not the effects of that conduct. *See Berger v. AXA Network LLC*, 459 F.3d 804, 815–16 (7th Cir. 2006). For example, when the alleged breach is a particular investment decision or adoption of an overarching investment strategy, the limitations period begins to run when that investment is made or the strategy is adopted. *See Adepipe v. U.S. Bank, Nat. Ass'n*, 62 F. Supp. 3d 879, 897–98 (D. Minn. 2014), *aff'd on other grounds*, *Thole v. U.S. Bank, N.A.*, 140 S. Ct. 1615 (2020).

But the Seventh Circuit recognizes a "continuing-violation theory" when injuries are caused by repeated decisions that each cause independent harm. *Webb v. Gardner, Carton & Douglas LLP Long Term Disability Plan*, 899 F. Supp. 2d 788,

---

[5] Defendants do not move to dismiss based on ERISA's three-year statute of limitations period for "actual knowledge," so the Court does not discuss this limitations period in its analysis.

795 (N.D. Ill. 2012) (cautioning that the "continuing-violation theory" does not apply "merely where a single decision has lasting effects"). For example, a "fiduciary is held liable on a repeated basis" for its failure to remove imprudent investments "after the initial decision to offer an imprudent investment, on the theory that each day in which a fiduciary fails to remove an imprudent investment, a new breach is born." *Martin v. Consultants & Administrators, Inc.*, 966 F.2d 1078, 1087–88 (7th Cir. 1992); *Spano v. The Boeing Company*, 125 F. Supp. 3d 848, 859 (S.D. Ill. 2014) (applying the "continuing violation theory" to allegations that defendants "failed to review plan investment options or eliminate imprudent investment options").

## A. Count I: Investment in PIMCO Class A Shares

According to Defendants, "Plaintiff stated in its *original complaint* that PIMCO Total Return A shares were held in the amount of just under $1 million from at least 2011," so the "investment strategy adopted to invest in PIMCO Class A shares in 'at least 2011' is time barred" as it occurred before June 6, 2013. (Dkt. 84, at 12 (emphasis added).) The Court, however, reviews only the allegations in Plaintiffs' amended complaint when ruling on Defendants' motion to dismiss. *Ticketreserve, Inc. v. Viagogo, Inc.*, 656 F. Supp. 2d 775, 778–79 (N.D. Ill. 2009) ("Once an amended complaint is filed it supersedes the original complaint and controls the case from that point forward."). The amended complaint is devoid of any allegation regarding the timing of the PIMCO Class A shares investment. (*See generally* Dkt. 78, ¶¶ 171-185,

409-420.) Plaintiffs' amended complaint thus fails to show that Count I is untimely.

### B.    Count II: Alternative Investments

Defendants contend that Count II is untimely under ERISA's six-year statute of repose because the claim relates to "strategy . . . recommendations and purchases" of certain alternative investments that "were made on or before December 2013." (Dkt. 84, at 13; Dkt. 78 ¶¶ 237-239.) As noted above, the tolling agreement between the parties, entered on June 6, 2019, makes any claim timely in which the last breach occurred on or after June 6, 2013. Defendants allegedly convinced Plaintiffs to approve the alternative investments—the last act constituting the breach—at a Board meeting on December 12, 2013. (Dkt. 78, ¶ 223–224, 235.) The allegedly imprudent investment decision thus occurred within ERISA's six-year statute of repose. *Adepipe*, 62 F. Supp. 3d at 897–98. Accordingly, the allegations do not establish that Count II is untimely.

### C.    Count IV: MetLife Managed GIC Investments

Defendants move to dismiss Count IV because the amended complaint alleges that Defendants recommended investing in the MetLife Managed GIC Investments "in or around August 24, 2004," meaning the "investment strategy" was adopted well outside the applicable statute of limitations period. (Dkt. 84, at 13 (citing Dkt. 78, ¶ 159).) Plaintiffs respond that Count IV pertains to failures "[o]ver the life of the investment" and that Defendants made "continuing violations" within the limitations period by failing to provide "regular and timely financial reports" and "failing to include negligible returns on the investment when reporting to [Plaintiffs], including

in 2017." (Dkt. 92, at 13, n.8 (citing Dkt. 78, ¶¶ 161–169, 448–451).)

To the extent Plaintiffs rely on the initial adoption of the MetLife GIC investment strategy in 2004 to sustain Count IV, the claim is time-barred. But Plaintiffs also argue that Defendants committed continuing breaches of their fiduciary duty by failing to provide regular reporting throughout the life of the investment, particularly in 2017, which is within the applicable limitations period. Accordingly, the allegations do not establish that Count IV, pertaining to the latter reporting breaches, is untimely.

### D.   Count VI: FTA as Money Manager

Plaintiffs, at Defendants' recommendation, hired FTA as the Plan's money manager and equity investment advisor in 2009, so Defendants argue that "claims against Defendants related to its recommendations to hire or retain FTA are time-barred." (Dkt. 84, at 13 (citing Dkt. 78, ¶¶ 465–473, 116–129).) Plaintiffs respond that Count VI alleges an ongoing breach because Defendants "continuously paid excessive 'equity management fees' to FTA while not completely and accurately disclosing such fee." (Dkt. 92, at 14 n.9 (citing Dkt. 78 – Count VI).)

Count VI is untimely if premised on Defendants' allegedly imprudent recommendation to hire FTA, as that investment decision occurred in 2009. But Plaintiffs also allege that Defendants concealed their receipt of compensation from FTA until "[a]round 2013." (Dkt. 78, ¶ 121.) Without more specificity, the Court cannot determine, at this stage, whether this discovery of hidden compensation occurred before or after June 6, 2013, the governing date for timelines under the

tolling agreement. Moreover, to the extent that FTA's equity management fee was excessive, and Defendants failed to monitor whether continued retention of FTA was imprudent, that violation continued to occur within the applicable statute of limitations periods. *Martin*, 966 F.2d at 1087–88. Accordingly, the allegations do not establish that Count VI is untimely to the extent it is premised on the latter two breaches.

### E. Count VII: Selection of Other Money Managers

Count VII relates to Defendants' recommendation to hire certain other money managers, including BlackRock, Morgan Stanley, and Merrill Lynch. (Dkt. 84, at 13.) Defendants contend that Count VII is untimely, even though the amended complaint "does not allege . . . when any of these managers were recommended, hired, or terminated," because the *original complaint* suggests that Merrill Lynch was hired in 2009. (*Id.* at 13–14.) Again, Defendants cannot move to dismiss Plaintiffs' *amended* complaint based on allegations contained in the *original* complaint. *See Ticketreserve*, 656 F. Supp. 2d at 778–79. Because the allegations, as set forth in Plaintiffs' amended complaint, do not "plainly reveal" that Count VII is untimely, *Lewis*, 411 F.3d at 842, the Court rejects Defendants' motion to dismiss Count VII as time-barred.

## II. Breach of Fiduciary Duty

Addressed next is whether Plaintiffs have pleaded sufficient factual allegations to state claims for breach of fiduciary duty. To state a claim for breach of fiduciary duty, Plaintiffs must establish "(1) that the defendant is a plan fiduciary; (2) that the defendant breached its fiduciary duty; and (3) that the breach resulted in

13

harm to the plaintiff." *Albert*, 47 F.4th at 579 (quoting *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016)). Defendants move to dismiss Counts I through VIII and Count XII for failing to allege sufficient facts to establish that Defendants breached their fiduciary duty. Defendants separately move to dismiss Counts IX, X, XI, and XIII on the grounds that Defendants were not fiduciaries when performing the conduct at issue.

### A.    Breach

Plaintiffs allege that Defendants breached multiple ERISA fiduciary duties, such as the duty of prudence, duty of loyalty (which encompasses a duty to disclose), and duty to monitor.

The duty of prudence requires plan fiduciaries to discharges their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use . . . ." *Albert*, 47 F.4th at 574 (quoting 29 U.S.C. § 1104(a)(1)(B)). Courts must, however, give "due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise," *Hughes*, 142 S. Ct. at 742, and the outcome of an investment is not proof of imprudence, *Albert*, 47 F.4th at 574. A plaintiff "may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Tibble*, 575 U.S. at 530.

The duty of loyalty requires a plan fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and in accordance with the documents and instruments governing the plan" and to "defray[]

14

reasonable expenses of administering the plan." *Albert*, 47 F.4th at 582–83 (quoting 29 U.S.C. § 1104(a)(1)(A)). The duty of loyalty encompasses a duty to disclose, which requires a plan fiduciary "not to mislead a plan participant or to misrepresent the terms or administration of an employee benefit plan." *Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452, 466 (7th Cir. 2010). Additionally, the duty imposes "an affirmative obligation to communicate material facts affecting the interests of beneficiaries," regardless of whether the beneficiary asks the fiduciary for the information. *Id.* In other words, a violation occurs when the plan fiduciary makes either an intentionally misleading statement, *see Varsity Corp. v. Howe*, 516 U.S. 489, 505 (1996), or a material omission, *see Anweiler v. American Elec. Power Serv. Corp.*, 3 F.3d 986, 992 (7th Cir. 1993). The fiduciary must know that the misrepresentations or omissions are "false or lack a reasonable basis in fact." *See Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 84 (2d Cir. 2001).

The duty to monitor requires individuals who "appoint ERISA fiduciaries" to "monitor those fiduciaries' actions and to provide them with the information necessary to carry out their responsibilities." *Bartnett v. Abbott Laboratories*, 492 F. Supp. 3d 787, 797 (N.D. Ill. 2020) (cleaned up); *see Howell v. Motorola, Inc.*, 633 F.3d 552, 573 (7th Cir. 2011) ("[T]hose who appoint plan administrators have an ongoing fiduciary duty under ERISA to monitor the activities of their appointees."). A "failure to monitor claim is derivative in nature and must be premised [on] an underlying breach of fiduciary duty." *Rogers v. Baxter Intern. Inc.*, 710 F. Supp. 2d 722, 740 (N.D.

Ill. 2010).

### i.    Count I: Investment in PIMCO Class A Shares

Defendants invested Plan assets into PIMCO Class A Shares, which are mutual fund retail-class shares. (Dkt. 78, ¶¶ 171–172.) These retail shares generated 12b-1 fees for Defendants via revenue sharing, when available institutional shares of the mutual fund would not. (*Id.* ¶ 175–177.) Plaintiffs allege that Defendants breached their fiduciary duty by incurring excessive fees through the selection of PIMCO Class A retail shares, as opposed to similar institutional-class shares; failing to disclose their receipt of 12b-1 fees; and violating the Plan's IPS because the PIMCO Class A shares contain holdings in "below investment grade" fixed income investments. (*Id.* ¶¶ 178, 412–415.) Defendants respond that Plaintiffs fail to "provide a meaningful benchmark as to investment fees for similar investments" to determine whether the fees were excessive, and it is not necessarily imprudent to "select[] retail shares or be[] paid with revenue sharing." (Dkt. 84, at 7.)

To state a claim for excessive fees, Plaintiffs are required to provide a "meaningful benchmark" for comparison. *See Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018); *see also Albert*, 47 F.4th at 579 (dismissing claim for excessive recordkeeping fees because the complaint was "devoid of allegations as to the quality or type of recordkeeping services the comparator plans provided"). In other words, a plaintiff is required to allege that two investments are similar in material respects before the Court may find that the higher-expense investment was imprudent. *See Meiners*, 898 F.3d at 822 (A claim is not stated by a "bare allegation

that cheaper alternative investments exist in the marketplace.").

In *Loomis v. Exelon Corp.*, the Seventh Circuit considered the claim that plan administrators breached their fiduciary duty by selecting retail instead of institutional investments. *See* 658 F.3d 667, 670 (7th Cir. 2011). In rejecting the plaintiffs' claim, *Loomis* explained that institutional shares, although often having lower expense ratios, may "come with a drawback: lower liquidity." *Id.* at 672; *see Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009) (The fact that "some other funds might have had even lower ratios is beside the point" because fiduciaries are not required to "scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)."). Because retail and institutional shares are not apples-to-apples, simply alleging that a plan's fiduciary invested in retail shares when cheaper institutional shares were available is insufficient to state a claim for imprudence.

Plaintiffs allege that PIMCO Class A Shares charged 12b-1 fees while available institutional shares did not. (Dkt. 78, ¶¶ 173–174) But Plaintiffs have not alleged facts showing that the institutional shares are a proper comparator investment—the institutional shares could be less liquid or have other drawbacks. *Loomis*, 658 F.3d at 672. Plaintiffs thus have not stated a claim that Defendants acted imprudently by investing in PIMCO Class A Shares.

Plaintiffs maintain that Defendants breached the duty of loyalty by not disclosing their receipt of 12b-1 fees via revenue sharing. But the failure to disclose revenue sharing is not a material omission. In *Albert* and *Hecker*, the Seventh Circuit

considered whether the failure to disclose fees generated via revenue sharing was a breach of the duty of loyalty. *See Albert*, 47 F.4th at 586; *Hecker*, 556 F.3d at 584–85. In both cases, the Seventh Circuit held that no breach occurred because the "total fee, not the internal, post-collection distribution of the fee, is the critical figure for someone" assessing the merits of the investment, and the "plan administrator . . . disclos[ed] the total fees" for the funds. *Albert*, 47 F.4th at 586 (quoting *Hecker*, 556 F.3d at 585–86). The fact that Defendants acted as both recordkeeper and investment advisor for the investment, "thereby enabling . . . additional revenue," was not a breach because there was no allegation "that the fees . . . charged are unreasonable in light of available alternatives." *Id.* at 583.

Plaintiffs do not allege that Defendants failed to disclose the expense ratio of the PIMCO Class A Shares. Defendants were in any event not required to provide a breakdown of the expense ratio's component parts because this information is immaterial when assessing the merits of the investment. Plaintiffs thus have not plausibly alleged that Defendants breached the duty of loyalty.

Plaintiffs allege finally that the PIMCO Class A Shares, which contain "below investment grade" assets, violate the Plan's IPS. *See* 29 U.S.C. § 1104(a)(1)(D) (A plan fiduciary must "discharge his duties . . . in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provision of this subchapter."). Under the IPS, the Plan's "investment policy was to maintain a diversified balanced portfolio [of fixed-income and equity asset classes] to be managed at a reasonable expense," and

"non-marketable securities, commodity trading, short selling, option trading with the exception of covered calls, and private placements" were "restricted and prohibited transactions and assets." (Dkt. 78, ¶¶ 84–89.) Nowhere do Plaintiffs allege that the IPS prohibits investment in mutual funds with "below investment grade" holdings. Plaintiffs' allegations thus do not plausibly show that Defendants violated the IPS by investing in PIMCO Class A Shares.

Plaintiffs have failed to allege a viable breach of fiduciary duty claim with respect to the PIMCO Class A Shares. Accordingly, Count I is dismissed.

### ii.     Count II: Alternative Investments

Defendants invested approximately $900,000 of Plan assets into three "alternative investments." (Dkt. 78, ¶ 423.) According to Plaintiffs, Defendants breached their fiduciary duties because these alternative investments violated the Plan's IPS. (*Id.*) Defendants respond, and Plaintiffs admit, that the Board approved an amendment to the IPS specifically allowing such alternative investments at a December 12, 2013, Board meeting. (Dkt. 78, ¶ 223–224, 235.) But, according to Plaintiffs, because Defendants did not disclose that the alternative investments were illiquid, non-marketable investments, the Board's approval "was tainted by Defendants' misrepresentations and concealment of information" (Dkt. 92, at 6). (*Id.* ¶ 226, 425.)

The Plan's IPS explicitly prohibited investment in non-marketable assets and limited investments to fixed income and equity asset classes. Defendants convinced Plaintiffs to amend the IPS to allow additional asset classes encompassing the

alternative investments: "non-traded REIT's, Business Development Companies (BDC's), Fixed Income – Mutual Funds; Unit Trusts (UIT's), Exchange Traded Funds (ETFs), and fixed and adjusted rate preferred securities." (Dkt. 78, ¶ 223.) Notably, the marketability requirement was not removed even though Plaintiffs approved additional asset classes. (*Id.*)

Defendants also described the alternative investments to Plaintiffs as "high-quality and liquid." (Dkt. 78, ¶ 224.) Defendants did not disclose that the alternative investments were "not listed on any securities exchange," and there "was no secondary market for these investments," meaning the "Plan might not be able to resell their shares regardless of how the investments performed." (*Id.* ¶ 226.) These facts, if disclosed, could have had a material effect on Plaintiffs' decision to approve the alternative investments, because liquidity was of explicit importance under the Plan's IPS. *See S.E.C. v. Randy*, 38 F. Supp. 2d 657, 668–69 (N.D. Ill. 1999) ("A fact is material if [] there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision and would view it as having significantly altered the total mix of information. *Basic, Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)."). Accordingly, at this stage, Plaintiffs have alleged sufficient facts that Defendants breached the duty of loyalty by failing to disclose that the alternative investments were non-marketable and illiquid.

Plaintiffs' additional theories of liability relating to the alternative investments, however, fail to state a claim. Defendants purportedly failed to disclose the investments' fees and commissions. (Dkt. 92, at 6.) Plaintiffs were aware of the

total fees owed by the Plan: Defendants were paid the quarterly "37.5 basis points advisory fee" due for all fixed-income investments. (Dkt. 78, ¶ 246.) Plaintiffs have not provided a benchmark to determine whether such a fee is excessive. *See Meiners*, 898 F.3d at 822–23.

Moreover, Defendants' receipt of undisclosed compensation from the dealers of the alternative investments does not violate the duty of loyalty. Defendants received a percentage commission of the total value of the alternative investments from the dealers. Plaintiffs say Defendants were required to disclose the commissions. (*Id.* ¶ 230, 243, 427.) But this was not a material omission—Defendants' receipt of the undisclosed compensation, which adds no additional cost to Plaintiff, is irrelevant to Plaintiffs' decision to approve the alternative investments. *Hecker*, 556 F.3d at 586 ("The total fee . . . is the critical figure for someone interested in the cost of including a certain investment in her portfolio.").

Finally, the receipt of undisclosed commissions does not present a per se conflict of interest. As the Seventh Circuit has explained, the "risk of conflicts of interest" is a factor in determining whether ERISA fiduciaries fail to act solely in the interest of the Plan. *Rush v. Greatbanc Tr. Co.*, 2022 WL 17740418, at *18 (N.D. Ill. Dec. 16, 2022) (citing *Leigh v. Engle*, 727 F.2d 113, 127 (7th Cir. 1984)). There is the potential for conflicts of interest where the interests of fiduciaries and beneficiaries "diverge." *See Leigh*, 727 F.2d at 127.

That Defendants received compensation does not necessarily mean that the interests of Plaintiffs and Defendants diverged. Defendants' receipt of compensation,

to be sure, creates an incentive to act out of self-interest.[6] *See Chavez v. Plan Benefit Servs., Inc.*, 2022 WL 1493605, at \*13 (W.D. Tex. Mar. 29, 2022) ("[U]ndisclosed financial incentives . . . call into question whether Defendants were indeed acting 'solely' in the interests of the plan."). But the alternative investments may still be prudent, so compensation alone is generally insufficient to prove disloyal behavior. *See Brotherston v. Putnam Investments, LLC*, 907 F.3d 17, 40 (1st Cir. 2018) (Despite receiving compensation, defendant's selection of affiliated funds did not prove that defendant's "operative motive was to further its own interests.").

Plaintiffs fail to make any specific allegations that the alternative investments were imprudent, which undermines their claim that Defendants behaved disloyally. Plaintiffs summarily allege that the alternative investments were imprudent and that Defendants "failed to conduct an intensive and scrupulous investigation" before investing. (Dkt. 78, ¶¶ 241–242.) But Plaintiffs provide no factual support beyond these "bald assertions" to support their contentions. *In re Citigroup*, 662 F.3d at 141 (plaintiff failed to state a claim for breaching the duty of prudence by alleging, without specific supporting facts, that defendants failed to conduct an "appropriate investigation" into whether the investment was prudent).

Plaintiffs allege that the "expected returns from these alternative investments

---

[6] The IPS amendment also provided that alternative investments could not exceed 5% of total plan assets, which caps potential commissions for Defendants and their corresponding incentives to act against the interests of the Plan. (Dkt. 78, ¶ 223.)

were above expected bond returns,"[7] which undermines Plaintiffs' contention of imprudence. Although "[t]wo out of the three alternative investments sustained negative returns" (Dkt. 78, ¶ 248), the "ultimate outcome of an investment is not proof of imprudence." *DeBruyne v. Equitable Life Assurance Soc'y of the United States*, 920 F.2d 457, 465 (7th Cir. 1990). Taken together, the facts alleged in the amended complaint fail to allege plausibly that the alternative investments were imprudent. As a result, the Court cannot infer that Defendants selected the alternative investments to generate compensation for themselves to the detriment of the Plan.

Plaintiffs state a claim that Defendants breached the duty of loyalty by failing to disclose that the alternative investments were non-marketable and illiquid because this fact, in view of the IPS's liquidity requirement, could have been material to Plaintiffs' decision to approve the investment. But Plaintiffs do not state a plausible claim based on undisclosed fees and potential conflicts of interest.

### iii.    Count III: Management of Fixed-Income Investments

Starting in 2008, Defendants contracted with AAM on behalf of the Plan for certain fixed income securities trading services. (Dkt. 78, ¶ 131.) Although

---

[7] Plaintiffs dispute Defendants' characterization of the alternative investments as fixed income investments, which Plaintiffs claim were "deceptively included . . . in the fixed income portfolio to inflate the overall performance of the portfolio." (*See* Dkt. 78, ¶ 251; Dkt. 92, at 6-7.) But Plaintiffs fail to allege sufficient facts to show that the alternative investments were improperly characterized as fixed income. First, the amendments to the Plan's IPS that were made to allow these alternative investments appear to include certain fixed income assets, such as "Fixed Income – Mutual Funds" and "fixed and adjusted rate preferred securities." (*Id.* ¶ 223.) These alternative investments thus could have been one of these fixed income classes. Plaintiffs also do not specify what asset class the alternative investments fall into— Plaintiffs identify the alternative investments as the "Cole Credit Investment," "FS Investment," and "CION Investment," but otherwise do not describe the investment structure. (*Id.* ¶¶ 237–239.)

23

Defendants were prohibited from receiving transaction-related commissions under the Plan's contract with AAM, Plaintiffs allege that Defendants took an undisclosed 1.0-2.5% markup on all bond trades. (*Id.* ¶ 137.) This was in addition to Defendants' 37.5 basis points investment advisory fee. (*Id.* ¶ 149.) Plaintiffs were unaware of these mark-ups until June 2017.[8] (*Id.* ¶ 141.)

Plaintiffs allege that Defendants violated the duty of loyalty by engaging in "churning": excessively trading bonds to generate fees from the undisclosed mark-ups, including by "selling bonds before maturity resulting in a loss to the Plan." (*Id.* ¶ 143, 435–436); *see Khalid Bin Talal Abdul Azaiz Al Seoud v. E. F. Hutton & Co., Inc.*, 720 F. Supp. 671, 676–77 (N.D. Ill. 1989) (Churning is defined as "excessive trading in an account over which the broker has control for the primary purpose of generating commissions."). Such trading "breaches a broker's fiduciary duty." *Khalid*, 720 F. Supp. at 677. Defendants, however, argue the amended complaint fails to plead facts showing excessive trading. (Dkt. 84, at 7.)

Generally, churning claims should be allowed to proceed to discovery and should not be dismissed because defendants are in the best position to provide the necessary data for proving the claim. *Id.* (citing *Saxe v. E. F. Hutton & Co., Inc.*, 789 F.2d 105, 112 (2d Cir. 1986)). For example, where a complaint "describes a series of trades," "delineates the composition thereof," and "contends that the trading was dominated by short-term positions," a churning claim is stated with enough

---

[8] In December 2016, Plaintiffs instructed Defendants to "cease all discretionary bond purchases" and to seek "approval in advance of any proposed sales or purchases." (*Id.* ¶ 146) This directive, however, does not appear to be related to the mark-ups because the directive was issued before Plaintiffs discovered the mark-ups in June 2017. (*Id.* ¶¶ 141, 146.)

particularity to satisfy even the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure. *Id.* at 677–78.

Plaintiffs' amended complaint contains sufficient allegations of churning. Since 2008, Defendants took undisclosed markups on bond trades, which provided Defendants with an incentive to inflate the number of trades conducted. (Dkt. 78, ¶¶ 131, 137–138.) Defendants primarily traded municipal bonds, Treasuries, and high-quality corporate debt bonds. (*Id.* ¶ 144.) In August 2015, the Securities and Exchange Commission (SEC) issued guidance detailing the agency's concerns regarding "financial advisors selling structured products before maturity and the negative financial outcome for investors as a result." (*Id.* ¶ 145.) Defendants were identified by the SEC as financial advisors who were selling structured products before maturity. (*Id.*) The amended complaint further alleges that Defendants "executed at least 1,140 of these potentially problematic trades." (*Id.*) The amended complaint outlines a series of trades, their composition, and the trading method— selling before maturity—used to generate excessive commissions. *Khalid*, 720 F. Supp. at 677–78. At this stage, Plaintiffs have sufficiently stated a claim for breach of fiduciary duty based on Defendants' churning.

Defendants contend that Plaintiffs' claim should be dismissed because there is "no meaningful data establishing a purported reasonable commission on bond trades . . . ." (Dkt. 84, at 7) If Plaintiff's claim was premised solely on the value of the mark-ups—in other words, whether a 1.0-2.5% mark-up on bond trades was

excessive—Defendants would have a viable argument.[9] *See Meiners*, 898 F.3d at 822. But Plaintiffs' "churning" claim is based on an excessive *volume of trades*, not the *value of the commission* on each trade. To the extent Defendants traded bonds excessively to generate commissions for themselves, not to maximize the Plan's financial performance, Defendants failed to "discharge [their] duties with respect to a plan solely in the interest of the participants." *Albert*, 47 F.4th at 582–83 (quoting 29 U.S.C. § 1104(a)(1)(A)).

Defendants also argue that Plaintiffs fail to provide "a metric for bond laddering." (Dkt. 84, at 7.) Bond laddering is an investment strategy that involves buying bonds with different maturity dates to protect against "interest rate risk, the risk that interest rates will change over the life of a [bond]." *See Western Shoshone Identifiable Grp. v. United States*, 158 Fed. Cl. 633, 638 (Fed. Cl. 2022). In other words, laddering helps diversify a bond portfolio. *Id.* Defendants say bond laddering explains the selling of bonds before maturity. (Dkt. 84, at 7.) That may be so. But at the motion to dismiss stage, Plaintiff is not required to supply every trading metric necessary for proving the churning claim. *Khalid*, 720 F. Supp. at 677–78 (Metrics relevant to churning, such as the "applicable turnover ratio or percentage of the account value paid in commissions," will be calculated after discovery.). Accordingly,

---

[9] Plaintiffs assert that Defendants' mark-ups were contrary to industry practice, as the 37.5 basis points investment advisory fee "typically encompasses any commissions or other trading costs incidentally owed by the Plan." (*Id.* ¶ 437) But Plaintiffs "did not explain why the fees were excessive and unreasonable *in comparison to other service providers*." *Albert*, 47 F.4th at 582 (emphasis added). Simply put, the Court has no way of determining whether 37.5 basis points plus a 1.0-2.5% mark-up on bond trades is excessive.

Plaintiffs have pleaded sufficient facts to establish a churning claim. Defendants motion to dismiss Count III is denied.[10]

### iv.    Count IV: Metlife Managed GIC Investments

In August 2004, Defendants invested about $4 million of Plan assets into a MetLife Managed GIC, a type of annuity product. (Dkt. 78, ¶ 159.) Plaintiffs contend that Defendants breached their fiduciary duty by "advising, recommending, and placing" Plan assets into the investment. (*Id.* ¶ 447.) For reasons previously discussed, Plaintiffs' duty of prudence claim premised on the initial investment decision in 2004 is time-barred under ERISA's statute of limitations.

But Plaintiffs allege additional breaches by Defendants over the lifetime of the investment. Alliance Benefit Group (ABG), the administrator of the investment, received 68 basis points (0.68%) of the investment. (*Id.*) Before making the investment, Defendants allegedly failed to disclose to Plaintiffs that Defendants would receive a quarterly "advisory fee" from ABG throughout the life of the investment. (*Id.* ¶ 161.) Plaintiffs contend that Defendants' receipt of the undisclosed advisory fee presented a conflict of interest and was duplicative of "other custodial fees paid by the Plan." (*Id.* ¶ 448, 451.) Defendants, in turn, argue that Count IV

---

[10] In addition to churning, Plaintiffs allege that Defendants breached their duty of loyalty by failing to disclose the conflict of interest created by Defendants' receipt of mark-ups on bond trades. (Dkt. 78, ¶¶ 434, 440.) Undisclosed compensation, without additional evidence of disloyal motive, is, to reiterate, generally insufficient to establish a conflict of interest. *Reetz v. Lowe's Companies, Inc.*, 2021 WL 4771535, at *52 (W.D.N.C. Oct. 12, 2021) ("Even where a fiduciary has a direct financial incentive . . . courts have rejected claims of disloyalty based on that fact alone."). What distinguishes Plaintiffs' churning claim from the failure to disclose mark-ups claim is the former's additional allegations of disloyal behavior, such as the SEC guidance and excessive bond trading volume.

should be dismissed because it "is not improper for a plan to include an annuity product which includes an additional administrative fee and an additional recordkeeper." (Dkt. 84, at 8 (citing *Divane v. Northwestern University*, 953 F.3d 980, 985, 989–90 (7th Cir. 2020), *vacated and remanded by Hughes v. Northwestern University*, 142 S. Ct. 737 (2022)).)

In *Divane*, the Seventh Circuit held that ERISA fiduciaries did not breach their fiduciary duty by "establishing a multi-entity recordkeeping arrangement that allowed recordkeeping fees to be paid through revenue sharing." 953 F.3d at 989. *Divane* rejected the plaintiffs' contention that defendants should have selected a single recordkeeper for the annuity product because "ERISA does not require a sole recordkeeper or mandate any specific recordkeeping arrangement at all." *Id.* at 990. Moreover, the "total recordkeeping fees," not the allocation of the fee, is what must be disclosed to plan participants. *Id.* at 989–90 (citing *Hecker*, 556 F.3d at 586).

In *Hughes*, the Supreme Court vacated and remanded *Divane* due to the Seventh Circuit's focus on investor choice when rejecting claims that recordkeeping fees, in aggregate, were excessive. *See Hughes*, 142 S. Ct. at 739–40. But the Supreme Court did not criticize the Seventh Circuit's general permissiveness toward multiple recordkeepers. *Id. Divane* is still persuasive. Moreover, *Hecker* held that plaintiffs fail to state a breach of fiduciary duty claim on the basis of either a revenue sharing agreement or the failure to disclose information about that agreement. *Hecker*, 556 F.3d at 585.

Ultimately, the total fee charged by ABG, not the post-collection distribution

of that fee, is the relevant figure in assessing the continued prudence of the MetLife GIC investment. *Id.* Defendants thus did not breach their fiduciary duty by failing to disclose the revenue sharing arrangement with ABG. *Id.* Plaintiffs also have not provided comparator benchmarks to determine whether the 68-basis-points fee is excessive. *Meiners*, 898 F.3d at 822–23. Accordingly, Plaintiffs have failed to state a plausible claim based on the fees associated with the MetLife GIC investment.

Plaintiffs contend, however, that Count IV is not only about fees but about other purported breaches related to the MetLife GIC. These additional breaches include Defendants' failure to disclose material information about the investment and failure to provide Plaintiffs with accurate financial reports over the lifetime of the investment. (Dkt. 78, ¶¶ 163–170; Dkt. 92, at 8.) Plaintiffs do not specify which "material information" or "financial reports" about the investment were withheld. (*See* Dkt. 78, ¶¶ 165, 167, 449.) Such "bald assertions" do not state a breach of fiduciary duty claim. *In re Citigroup*, 662 F.3d at 141.

Finally, Plaintiffs allege that Defendants made misrepresentations in 2017 about redemption of the MetLife GIC. (Dkt. 78, ¶ 169.) Defendant Korchak purportedly told Plaintiffs that "he was the 'only' person that could request redemption of the MetLife GIC, when in fact the Plan Sponsor was authorized to immediately request a redemption." (*Id.*) Korchak's misrepresentation "delayed the transfer of control of this asset [] to the Trustees" and during this period of delay, Defendants continued to receive fees to the detriment of the Plan. (*Id.*)

Defendants neither address this allegation nor move to dismiss this theory of

breach. Korchak's alleged misrepresentation is also material: Plaintiffs could not redeem the investment because they mistakenly believed such powers were in Korchak's hands and thus had to continue paying fees to Defendants. *See Randy*, 38 F. Supp. 2d at 668–69 (A fact is material if it would be important to an investment decision.). At this stage, Plaintiffs have pleaded sufficient facts to state a claim regarding Korchak's 2017 misrepresentation. Plaintiffs fail though to state a claim relating to the MetLife GIC under any other theory.

### v. Count V: UIT Investment

In May 2015, Defendants met with representatives from AAM about creating a Unit Investment Trust (UIT) for the Plan.[11] (Dkt. 78, ¶ 255.) UITs were one of the "alternative" asset classes permitted under the December 2013 IPS amendment made to allow purchases of the CION, FS, and Cole alternative investments discussed in Count II. (*Id.* ¶ 223.) On June 11, 2015, Defendants advised Plaintiffs to invest $8 million from the Plan's Merrill Lynch account into the UIT created by AAM, representing about 20% of the fixed income portfolio. (*Id.* ¶ 256.) The December 2013 IPS amendment, however, capped allocation to alternative investment asset classes at 5% of total Plan assets. (*Id.* ¶ 257.)

At Plaintiffs' quarterly board meeting on September 10, 2015, Defendants recommended that Plaintiffs amend the IPS to allow 20% of Plan assets to be invested in alternative investments. (*Id.* ¶¶ 257, 259, 265.) Defendants represented to Plaintiffs that the UIT was "created specifically for the Fund although private

---

[11] The UIT included six investment classes such as "REITS and S&P 500 index funds." (Dkt. 78, ¶ 272.)

investors could invest; that it would run for two years; that the SEC had approved the prospectus; and that it would pay interest of 5%-5.5%." (*Id.* ¶ 265.) Defendants also said that they had already set aside the necessary funds to be invested in the UIT, which could not be accomplished unless the IPS amendment was approved. (*Id.* ¶ 266.) Based on Defendants' recommendation and representations, Plaintiffs approved the UIT investment and IPS amendment allowing allocation of 20% of the Plan's assets. (*Id.* ¶ 267.)

In September and October 2015, Defendants invested the $8 million in the UIT with AAM on behalf of the Plan. (*Id.* ¶ 268.) The Plan paid AAM a "1.95% sales fee" and an "annual asset management fee of 2.5% of the total value of the assets in the account." (*Id.* ¶ 275.) Plaintiffs did not know that Defendants and AAM maintained a fee-splitting arrangement. (*Id.* ¶ 277–278.) Under this arrangement, Defendants received about $100,000 in commissions from AAM—about 1.25% of the total UIT investment. (*Id.* ¶¶ 264, 269.) Defendants also received from AAM annual fees equivalent to "1.5% of the total asset value." (*Id.* ¶ 276.)

Plaintiffs contend that Defendants breached their fiduciary duties in recommending and placing the UIT. (*Id.* ¶ 458.) Plaintiffs contend that the fees were excessive and that, but for the fee-splitting arrangement, AAM would have accepted a lower annual management fee. (*Id.* ¶ 276.) Defendants caused the Plan to pay "unreasonable management fees to AAM" to obtain a share of those fees and other commissions via the hidden fee-splitting arrangement. (*Id.* ¶ 459.) Defendants, however, say that Plaintiffs fail to state a claim because Plaintiffs have not provided

a benchmark against which to measure the excessiveness of the UIT fees. (Dkt. 84, at 8.)

Plaintiffs fail to state a claim for breach of fiduciary duty based on the UIT's excessive fees. To state a claim for excessive fees, Plaintiffs were required to provide a "meaningful benchmark," meaning comparable investments with lower fees. *See Meiners*, 898 F.3d at 822. Plaintiffs summarily allege that "[f]ees for the UIT are higher than similar investments." (Dkt. 78, ¶ 281.) But Plaintiffs have not provided any examples of a similar investment with lower fees. To state a claim, "it is not enough to allege that costs are too high." *Parmer v. Land O'Lakes, Inc.*, 518 F. Supp. 3d 1293, 1305 (D. Minn. 2021) (dismissing claim that fees for collective trusts were excessive because of failure to plead meaningful benchmark).

Plaintiffs also argue that Defendants breached their fiduciary duty by taking undisclosed commissions and fees on the UIT. (Dkt. 78, ¶¶ 460, 462.) A defendant's failure to disclose compensation from the dealer of an investment does not violate the duty of loyalty unless this omission is material to the investment decision, *Kenseth*, 610 F.3d at 466, or the compensation creates a conflict of interest, *Rush*, 2022 WL 17740418, at *18.

Defendants' failure to disclose the fee-splitting arrangement with AAM was not material because the "total fee"—here, the 1.95% sales fee and 2.5% annual management fee—were the relevant figures for Plaintiffs to evaluate the UIT investment. *Albert*, 47 F.4th at 586; *Hecker*, 556 F.3d at 545–85. Plaintiffs do not

allege that Defendants concealed the total fees charged by AAM.[12] Moreover, a conflict of interest exists only if the Plan and Defendants' interests with regards to the UIT "diverge." *See Leigh*, 727 F.2d at 127. In other words, the UIT must be an imprudent investment. Plaintiffs, however, have not alleged facts demonstrating imprudence, such as the availability of similar investments with lower expenses or higher returns. Although the market value of two tranches in the UIT have "declined significantly below the initial amount invested" (Dkt. 78, ¶ 284), the outcome of the UIT is not proof of imprudence. *DeBruyne*, 920 F.2d at 465. Accordingly, Count V is dismissed.[13]

### vi.     Count VI: FTA as Money Manager

First Trust Advisors, Inc. (FTA), at the recommendation of Defendants, was selected by Plaintiffs in 2009 to manage the equity portion of the Plan's portfolio. (Dkt. 78, ¶ 117.) From 2013 through 2017, the Plan paid FTA 57 basis points (0.57%)

---

[12] Plaintiffs argue in their response to Defendants' motion to dismiss that the "Trustees did not receive a prospectus or brochure showing the risk profile or fees associated with the UIT Investment." (Dkt. 92, at 8.) Whether Plaintiffs received a prospectus is unclear from the complaint: Defendants told Plaintiffs at the September 10 board meeting that the "SEC had approved the prospectus" (Dkt. 78, ¶ 265), but the complaint does not explicitly say whether the prospectus was provided to Plaintiffs. Regardless, the complaint does not plead facts showing that Defendants failed to disclose the total fees associated with the UIT or other material facts about the investment. In fact, the UIT was approved by Plaintiffs only after Defendants described the UIT's duration, expected returns, and bespoke nature at that same board meeting. (*Id.*) Plaintiffs argue that approval was obtained only after "Defendants engineered and staged an entire process" (Dkt. 92, at 8), but Plaintiffs have not alleged any specific facts, besides the fee-splitting arrangement, that were concealed by Defendants.

[13] Plaintiffs also assert in the complaint that Defendants breached their fiduciary duty by not disclosing "[m]aterial information concerning the risk profile of [the UIT]" and "not establish[ing] or follow[ing] a process for determining whether the investment continued to be prudent and whether the fees were reasonable." (Dkt. 78, ¶¶ 274, 461.) Plaintiffs allege no specific facts, however, to support these conclusory claims. *In re Citigroup*, 662 F.3d at 141.

of assets under FTA's management. (*Id.* ¶ 121.) FTA remitted a portion of the equity investment management fee to Defendants for equity recordkeeping services under a fee-splitting (or revenue sharing) arrangement.[14]

Plaintiffs contend that Defendants breached their fiduciary duty by imprudently recommending that the Plan hire FTA without conducting a thorough investigation of other "highly qualified managers with substantially lower fees with better returns over time."[15] (*Id.* ¶126.) Specifically, Plaintiffs say that Defendants should have disclosed that FTA had limited experience managing institutional retirement plans—FTA's average account size was $300,000, but the Plan's equity portfolio at inception was $6.5 million (*Id.* ¶¶ 191, 194–195)—and FTA primarily relied on Morningstar, Inc. research available to the public (as opposed to proprietary research) in making investment decisions. (*Id.* ¶¶ 192–193, 467.) The equity management fee was excessive considering FTA's deficiencies and Defendants should have disclosed the fee-splitting arrangement because it presented a conflict of interest.[16] (*Id.* ¶ 468.)

Plaintiffs fail to state a claim for breach of the duty of prudence because they

---

[14] It is not clear from the complaint how much of the 57-basis-points equity management fee was shared with Defendants. Plaintiffs first allege that Defendants' recordkeeping fee was calculated by taking the "equity portfolio value at the relevant time, multiplied by ¼ of .57 basis points, less the alleged FTA equity fee, with the balanced billed by [Defendants] to the Plan." (Dkt. 78, ¶ 121.) Plaintiffs then state in the next paragraph that the recordkeeping fee was equivalent to "25 basis points in the FTA account." (*Id.* ¶ 122.)

[15] As previously discussed, Defendants' initial recommendation to hire FTA in 2009 is also time-barred under ERISA's six-year statute of repose.

[16] Plaintiffs summarily allege that Defendants imposed a directed brokerage upon FTA as a condition of Defendants recommending FTA's services to the Plan, by which Defendants'

do not provide a "basis for comparison" between the fees paid to FTA and fees that could have been paid to other investment managers. *Albert*, 47 F.4th at 582; *see Ramos v. Banner Health*, 461 F. Supp. 3d 1067, 1132 (D. Colo. 2020), *aff'd*, 1 F.4th 769 (10th Cir. 2021) ("A high fee alone does not mandate a conclusion that recordkeeping fees are excessive; rather, fees must be evaluated 'relative to the services rendered.'" *Young v. General Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009)).

In *Albert*, the Seventh Circuit considered a claim that fees paid to an investment advisor were excessive and therefore imprudent. *Id.* The plaintiff summarily alleged that the plan's fiduciaries "did not solicit competitive bids from other [investment advisors] or evaluate whether other [investment advisors] could provide the same or superior benefits and services . . . at a lower cost to Plan Participants." *Id.* But the plaintiff failed to state claim because he did "not explain why the fees" charged by the selected advisor "were excessive and unreasonable in comparison to other" potential advisors. *Id.* Critically, the plaintiff omitted from his complaint the fees charged by other advisors. *Id.*

Just as in *Albert*, Plaintiffs assert that Defendants should have hired other "highly qualified manages with substantially lower fees with better returns" (Dkt. 78, ¶ 126), but Plaintiffs do not name these other investment managers, nor do they specify their capabilities, fees, and returns. As a result, the Court has no comparator

---

brokerage arm, Kestra IS, would place all equity trades for FTA and receive commissions. (Dkt. 78, ¶¶ 197–200, 468.) Plaintiffs, however, do not provide any facts, such as trading activity, commissions, or an agreement entered between FTA and Defendants.

to determine whether FTA's investment management fee—57 basis points—is excessive in the light of its experience and research capabilities. *Ramos*, 461 F. Supp. at 1132. Defendants might have had prudent reasons for hiring FTA despite its alleged deficiencies. For instance, other investment managers with greater institutional client experience and substantial in-house research capabilities might have charged more than 57 basis points. Or, as Plaintiffs say, the other managers might charge lesser fees despite providing better service. Plaintiff has not, however, pleaded facts allowing the Court to make that determination.

In addition, Defendants' receipt of recordkeeping fees from FTA does not create a conflict of interest. As previously explained, failure to disclose revenue sharing is not a breach of fiduciary duty because the "total fee . . . is the critical figure for someone" evaluating an investment decision, so "information about how fees are distributed internally" is not material. *Albert*, 47 F.4th at 586; *Hecker*, 556 F.3d at 585. That Defendants received a portion of FTA's 57-basis-points fee is immaterial to Plaintiffs' decision to approve the hiring of FTA.

Plaintiffs have failed to allege sufficient facts to show that Defendants' recommendation to hire FTA was imprudent or conflicted. Accordingly, Count VI is dismissed.

### vii.     Count VII: Selection of Other Money Managers

Defendants occasionally engaged additional investment managers to manage the Plan's fixed-income investments. (Dkt. 78, ¶ 348.) These other money managers included BlackRock, Morgan Stanley, and Merrill Lynch. (*Id.* ¶ 349.) Plaintiffs allege

that Defendants breached their fiduciary duty by "causing the Plan to pay duplicate management fees" by engaging these additional investment managers and failing to disclose that Defendants received compensation from these other managers, which presented a conflict of interest. (*Id.* ¶¶ 476–477.).

Plaintiffs allege no specific facts supporting these claims, such as the services provided by the other managers, the fees paid to the other managers, how the fees paid were duplicative, and what compensation, if any, Defendants received by investing the Plan's assets with these managers. (*See id.* ¶¶ 348–354 474–479.) Such "bald assertions," without any specific factual support, cannot state a claim for breach of fiduciary duty. *In re Citigroup*, 662 F.3d at 141; *Dean v. Nat'l Prod. Workers Union Severance Tr. Plan*, 502 F. Supp. 3d 1320, 1330 (N.D. Ill. 2020) (conclusory allegations that amounts paid to the plan's advisors were excessive without benchmark for comparison fails to state a claim for breach of fiduciary duty). Count VII is thus dismissed.

### viii. Count VIII: Failure to Provide Section 408(b)(2) Disclosures

Plaintiffs contend that Defendants breached their fiduciary duty by failing to provide the requisite disclosures under ERISA section 408(b)(2). *See* 29 U.S.C. § 1108(b)(2). Under ERISA, fiduciaries are prohibited from causing plans to engage in certain prohibited transactions with parties in interest because they entail a high potential for abuse and injury to the plan. (Dkt. 78, ¶ 520 (citing 29 U.S.C. §§ 1106(a) and (b)).) Section 408(b)(2), however, allows transactions with parties in interest if the transactions are for "[c]ontracting or making reasonable arrangements" for

services necessary for operating the plan, such as recordkeeping, so long as reasonable compensation is paid. 29 U.S.C. § 1108(b)(2); *see Alas v. AT&T Servs.*, 2021 WL 4893372, at *8–9 (C.D. Cal. Sept. 28, 2021). Providers of such services are required to make various disclosures to plan fiduciaries regarding the services provided and compensation received. 29 U.S.C. § 1108(b)(2)(B)(iii); 29 C.F.R. § 2550.408b-2(c)(1)(iv). Initial disclosures must be made in advance of the date the contract or arrangement is entered, and supplemental disclosures must be made within 60 days of any change made to the terms of the contract or arrangement. 29 C.F.R. § 2550.408b-2(c)(1)(v)

Plaintiffs allege that Defendants failed to provide any such disclosures except in 2012, when Defendants provided non-compliant disclosures. (Dkt. 78, ¶¶ 481–482.) Defendants respond that, because Plaintiffs received a 408(b)(2) disclosure in 2012 and Plaintiffs were required to first raise any compliance concerns with Defendants or the U.S. Department of Labor, Count VIII should be dismissed. (Dkt. 84, at 10 (citing 29 C.F.R. § 2550.408b-2(c)(1)(ix).)

As Defendants concede, 408(b)(2) disclosures were provided only in 2012. Defendants thus failed to provide the requisite disclosures for any contracts or arrangements covered by section 408(b)(2) that were entered after 2012. In the amended complaint, Plaintiffs detail multiple transactions or arrangements completed after 2012. Specifically, the Alternative Investments and UIT Investment were approved in December 2013 and September 2015, respectively. (Dkt. 78, ¶¶ 223–224, 235, 257, 259, 265, 267.) The Court need not determine at the pleading stage

38

whether these transactions were in fact covered by section 408(b)(2); it is enough that Plaintiffs plausibly alleged that the transactions were. *See National Sec. Systems, Inc. v. Iola*, 700 F.3d 65, 93–94 (3d Cir. 2012) (affirming district court's findings on *summary judgment* regarding the reach of section 408(b)(2)). Accordingly, Defendants' motion to dismiss Count VIII is denied.

### ix. Count XII: Charging Plan Unreasonable and Excessive Fees

Defendants charged the Plan multiple fees, including the 37.5 basis points fixed-income advisory fee, the per participant administrative fee, and additional commissions and fees generated from Plan assets. (Dkt. 78, ¶ 510.) Plaintiffs contend that Defendants breached their fiduciary duty by continuing to charge the Plan these fees from November 2016 through November 2017, "during which time [Defendants] provided no advisory or investment management services to the Plan, rendering any such fee unreasonable and excessive." (*Id.* ¶ 511.) Defendants move to dismiss Count XII because the amended complaint acknowledges that Defendants provided investment services until at least September 2017 and Plaintiffs fail to provide a benchmark for determining whether the fees were excessive. (Dkt. 84, at 9.)

The amended complaint makes clear that Defendants provided investment services to the Plan at least until September 1, 2017. Plaintiffs decided in March 2017 to hire a new investment advisor, third-party adminsitrator, and plan administrator, and notified Defendants that the "effective date for transfer of all responsibilities to the new service providers would be September 1, 2017." (Dkt. 78, ¶¶ 329, 335.) Defendants were thus retained as the Plan's service providers until at least

September 1, 2017. Plaintiffs fault Defendants for providing "no advisory or investment management services . . . during that period except to request permission to purchase $4,000,000 of new bonds in June 2017." (*Id.* ¶¶ 339–341.) But this $4 million purchase shows that Defendants were in fact managing the Plan's fixed-income portfolio. Plaintiffs plead no facts in support of the contention that conducting a single bond purchase during that period was imprudent.[17] In any event, Plaintiffs complained in Count III that Defendants were making *too many* bond trades for the purpose of generating commissions. Defendants do not breach their fiduciary duty simply because they fail to conform to Plaintiffs' Goldilocks approach to bond trading. Defendants also provided investment performance reports during this same period—further evidence that Defendants continued to service the Plan. (*See id.* ¶¶ 323–328.)

Whether Defendants improperly exacted fees from the Plan after September 1, 2017, however, is less clear. Plaintiffs notified Defendants that Defendants' services would be formally terminated by September 1, 2017. (Dkt. 78, ¶¶ 329, 335.) But certain assets were held by Defendants until December 1, 2017, and Defendants continued to charge the Plan the 37.5 basis points advisory fee during this time. (*Id.* ¶¶ 332–333, 336.) In addition, the amended complaint contains no allegations that Defendants conducted trades, provided reports, or otherwise provided any services during this period. Plaintiffs blame Defendants for the three-month delay in the

---

[17] Defendants' reduced bond-trading activity could also be explained by Plaintiffs' December 2016 directive that Defendants "cease all discretionary bond purchases for the Plan's account and instead [] make recommendations to the Trustees and obtain the Trustee's approval in advance of any proposed sales or purchases." (Dkt. 78, ¶ 146.)

transfer of assets and responsibilities to the Plan's new service providers (*Id.* ¶¶ 332–333, 336.) For instance, Defendants objected to providing Plan participant data in electronic form and demanded a non-disclosure agreement and a HIPAA Business Associate Agreement as a condition of implementing the transition. (*Id.* ¶¶ 335–337.) Plaintiffs further allege that Defendants' demands were "designed to delay the transition" to generate additional fees. (*Id.* ¶ 335.)

Defendants may have been justified in demanding a non-disclosure agreement, a HIPAA Business Associate Agreement, and raising concerns regarding the transfer of electronic data. In that case, the three-month delay in transferring the assets and the corresponding fees exacted for managing those assets would be justified. But the amended complaint alleges that Defendants' demands were pretext for delay and provides facts supporting that allegation. For example, the amended complaint states that "HIPAA applies only to welfare plans," so Defendants' demands were inappropriate. (*Id.* ¶ 335.) To the extent Defendants delayed to generate additional fees, the Defendants were not acting "solely" in the interests of the Plan and its participants. 29 U.S.C. § 1104(a)(1)(A).

Accordingly, Plaintiffs state a viable claim for breach of fiduciary duty with respect to Defendants' fees for the period running from September 1, 2017 through December 1, 2017. Plaintiffs, however, fail to state a claim for excessive fees from November 2016 through September 1, 2017.

## B. Fiduciary Status

To be liable, Defendants must have been acting as fiduciaries when committing

the conduct at issue. *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000) ("In every case charging breach of ERISA fiduciary duty . . . the threshold question is . . . whether that person was acting as a fiduciary."). Defendants argue that Counts IX, X, XI, and XIII should be dismissed because "they relate to only administrative and ministerial acts, not fiduciary acts." (Dkt 84, at 9) Plaintiffs respond that "the determination of whether Defendants are fiduciaries with respect to certain activities is not appropriate at the pleading stage," but regardless, Plaintiff has in fact "established that Defendants were ERISA fiduciaries" with respect to these four claims. (Dkt. 92, at 10)

A "claim for breach of fiduciary duty lies only against an individual or entity that qualifies as an ERISA 'fiduciary.' " *Schmidt v. Sheet Metal Workers' Nat. Pension Fund*, 128 F.3d 541, 547 (7th Cir. 1997). A person is a fiduciary of an ERISA plan if "he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets." *Baker v. Kingsley*, 387 F.3d 649, 660 (7th Cir. 2004) (quoting 29 U.S.C. § 1002(21)(A)). For example, a fiduciary is anyone "acting in the capacity of manager, administrator, or financial adviser to a plan." *Brooks v. Pactiv Corp.*, 729 F.3d 758, 765 (7th Cir. 2013) (cleaned up). But persons "who perform purely ministerial functions with respect to a plan within a framework of policies, rules, and procedures established by others . . . are not fiduciaries." *Spano v. Boeing Co.*, 2007 U.S. Dist. LEXIS 28774, at *11 (S.D. Ill. Apr. 17, 2007). Ultimately, "ERISA makes the existence of discretion a sine qua non of fiduciary

duty." *Pohl v. Nat'l Benefits Consultants, Inc.*, 956 F.2d 126, 129 (7th Cir. 1992).

Whether someone is a fiduciary is not all-or-nothing: a "person may be a fiduciary for some purposes, but not for others." *Gallagher Corp. v. Massachusetts Mut. Life Ins. Co.*, 105 F. Supp. 2d 889, 893 (N.D. Ill. 2000). Courts must take a functional approach and decide whether the conduct complained of was fiduciary in nature. *Baker*, 387 F.3d at 660 (A "court must ask whether that person is a fiduciary with respect to the particular activity at issues.").

ERISA suits may be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failing to properly allege the fiduciary status of the defendant. *See, e.g.*, *Burke v. Boeing*, 42 F.4th 716, 728 (7th Cir. 2022) (affirming the district court's dismissal of ERISA suit under Rule 12(b)(6) because "none of the defendants were acting as fiduciaries"). Some judges in this District, however, have found dismissal inappropriate because whether a person was performing a fiduciary versus ministerial function can be a fact-intensive inquiry. *See George v. Kraft Foods Global, Inc.*, 674 F. Supp. 2d 1031, 1050 (N.D. Ill. 2009) (Whether a "party's fiduciary status with respect to a particular activity in this case is a fact-sensitive inquiry, such a determination is best left for a later stage of these proceedings."); *Porterfield v. Orecchio*, 2008 U.S. Dist LEXIS 2215, at *8 (N.D. Ill. Jan. 9, 2008) (A "determination as to what extent an alleged fiduciary exercised control of ERISA plan assets is typically premature at the motion to dismiss stage because the court lacks sufficient facts to make the necessary analysis.").

Because Plaintiffs delegated significant discretion to Defendants to administer

the Plan and because the Court cannot determine conclusively, at the pleading stage, that Defendants were not acting as fiduciaries, the Court denies Defendants' request to dismiss Counts IX, X, XI, and XIII on this basis.

> **x.      Count IX: Failure to Implement and Follow Prudent Processes with Respect to the Plan**

In Count IX, Plaintiffs allege that Defendants breached their fiduciary duty by "failing to enter into written service agreements with the Plan," and for failing to provide several reports such as a "total return analysis" of Plan assets, "detailed information and risk/return education" about alternative investments, "written information about performance of ongoing investments," and "written benchmarking and fee data." (Dkt. 78, ¶ 487.) Defendants move to dismiss Count IX because the failures relate to "ministerial and administrative functions." (Dkt. 84, at 10 (citing 29 C.F.R. § 2509.75-8, D-2).)

ERISA regulation 29 C.F.R. § 2509.75-8, D-2 lists certain administrative functions that are non-fiduciary. Included in this list is the "Preparation of reports concerning participants' benefits" and "Making recommendations to others for decisions with respect to plan administration." *Id.* But for these administrative functions to be non-fiduciary or, in other words, truly ministerial, the person must perform the functions "within a framework of policies, interpretations, rules, practices, and procedures made by other persons." *Id.* In other words, the person must "not have discretionary authority or discretionary control respecting management of the plan." *Id.*

At this stage, the Court cannot say that Defendants were not fiduciaries.

44

Plaintiffs delegated their duties as plan administrator to Defendants. Plaintiffs allege that Defendants breached their fiduciary duty by failing to memorialize the agreement in writing and by failing to provide adequate reporting regarding the risks and performance of certain investments. Plaintiffs do *not* allege that Defendants were required to conduct either of these tasks under some external policy, such as an agreement with Plaintiffs or a separate document governing administration of the Plan. In other words, the amended complaint does not establish that Defendants were performing a mere "ministerial" task. *Spano*, 2007 U.S. Dist. LEXIS 28774, at *11. Defendants' alleged breaches instead stemmed from imprudent decision-making regarding Plan administration or, in other words, a poor exercise in discretion. *See George v. Kraft Foods Global, Inc.*, 684 F. Supp. 2d 992, 1007 (N.D. Ill. 2010) (Defendants were fiduciaries because they had "authority and discretion" over "non-investment operations of the Plan, which included disclosures to participants."), *reversed in part on other grounds by* 641 F.3d 786 (7th Cir. 2011); *Pohl*, 956 F.2d at 129 (discretion is the sine qua non of fiduciary status). Defendants' motion to dismiss Count IX is therefore denied.

### xi. Count X: Failure to Implement and Follow Prudent Processes with Respect to Plan Administration and Recordkeeping

Plaintiffs allege in Count X that Defendants failed to "properly organize, monitor, update, and maintain any and all records relating to the Plan and its Participants" and have failed to "provide adequate financial and technical support for day-to-day administration of the Plan." (Dkt. 78, ¶¶ 492, 494.) These failures caused

more than half of the Plan's participants to "not have usable records of their addresses" and "not receive notices, plan documents, 408 (b)(2) expense disclosures, [and] periodic benefit account reports." (*Id.* ¶ 494.) Defendants move to dismiss Count X because all Defendants' alleged failures related to "ministerial and administrative functions." (Dkt. 84, at 10 (citing 29 C.F.R. § 2509.75-8, D-2).)

Plaintiffs again allege that Defendants imprudently administered the plan by providing inadequate financial and technical support. Put another way, Defendants, in their discretion, could have done more to ensure that the Plan was administered to enable proper recordkeeping and adequate disclosure to participants. *George*, 684 F. Supp. 2d at 1007. Without greater factual clarity, the Court cannot say, at the pleading stage, that that Defendants' shortcomings were ministerial instead of fiduciary in nature. Defendants' motion to dismiss Count X is thus denied.

### xii.        Count XI: Failure to Supervise and Monitor

Plaintiffs allege in Count XI that Defendants NFP, Kestra IS, and Kestra AS—the corporate-entity Defendants—breached their fiduciary duties by failing to properly supervise their employees, Korchak and Curry, when they acted as Plan fiduciaries. (Dkt. 78, ¶¶ 498–507.) Defendants argue that Count XI should be dismissed because supervisory services are also administrative, citing again to 29 C.F.R. § 2509.75-8, D-2. (Dkt. 84, at 10.)

Section 2509.75-8 does not list supervision of employees as one of the ministerial tasks exempted from fiduciary status. In addition, monitoring employees performing fiduciary acts is itself a fiduciary act. *Howell v. Motorola, Inc.*, 633 F.3d

552, 573 (7th Cir. 2011) ("[T]hose who appoint plan administrators have an ongoing fiduciary duty under ERISA to monitor the activities of their appointees."). Regardless, a failure to monitor claim is "derivative in nature and must be premised [on] an underlying breach of fiduciary duty." *Rogers v. Baxter Intern., Inc.*, 710 F. Supp. 2d 722, 740 (N.D. Ill. 2010). Whether the corporate-entity Defendants may be liable for their failure to supervise thus depends on whether Korchak and Curry inadequately performed fiduciary tasks, not on whether the supervision itself is fiduciary in nature. Accordingly, Defendants' motion to dismiss Count XI is denied.[18]

### xiii.  Count XIII: Transition to New Service Providers

In Count XIII, Plaintiffs assert that Defendants in 2017 delayed the transfer of assets and data to the Plan's newly-selected service providers so that Defendants could continue to earn fees. (Dkt. 78, ¶¶ 515–516.) Defendants argue transition services are administrative, so Count XIII must be dismissed. (Dkt. 84, at 10.)

Plaintiffs allege that Defendants intentionally delayed the transition by refusing to provide Plan participant data in electronic form and demanding a non-disclosure agreement and a HIPAA Business Associate Agreement. (*Id.* ¶¶ 335–337.) In other words, Plaintiffs allege that Defendants, in their discretion, created several contrived conditions on transitioning Plan assets. Defendants' conditions might have been justified, but Defendants do not argue that the conditions on

---

[18] Defendants separately argue that Count XI should be dismissed because a derivative duty to monitor claim requires an underlying breach of fiduciary duty and Plaintiffs have failed to state a claim for breach of fiduciary duty. (Dkt. 84, at 11.) As previously discussed, because Plaintiffs have adequately stated multiple claims for breach of fiduciary duty, the Court rejects this argument.

transitioning plan assets were required under the "policies, interpretations, rules, practices and procedures made by other persons." 29 C.F.R. § 2509.75-8, D-2. These conditions thus were creatures of Defendants' discretion. Accordingly, Defendants' motion to dismiss Count XIII is denied.

## CONCLUSION

For the reasons stated, the Court grants in part and denies in part Defendants' motion to dismiss.

SO ORDERED in No. 20-cv-02942.

Date: March 1, 2023

_____
JOHN F. KNESS
United States District Judge